**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **URLEEN NAUGHTON**<br>      **Plaintiff** )<br> )<br>**v.** )<br> )<br> )<br>**ADAM GUTCHEON, et al.,** )<br>      **Defendants.** )<br> ) | **CASE NO.: 3:21-cv-402 (KAD)**<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN**<br>**OPPOSITION TO DEFENDANTS' GUTCHEON,**<br>**JAMAAL, ENGLEMAN, SCHUMSKY AND THE WHA**<br>**MOTION TO DISMISS**<br><br>**October 30, 2021.** |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' GROSSMANN, MCALLISTER AND SMITH'S MOTION TO DISMISS

**COMES NOW THE PLAINTIFF**, Urleen Naughton by and through counsel moves pursuant to the Federal Rules of Civil Procedure, and Rule 7 of the Local Rules in opposition to Defendants' Grossmann, McAllister and Smith's (hereinafter, collectively referred to as the Defendants) Motion to Dismiss her First Amended Complaint, dated May 17, 2021.

As a preliminary matter, the Ms. Naughton requests that the Court incorporate by reference the five other memoranda in opposition, as well as all the exhibits used in reference to her opposition to their motions to dismiss, filed by the other thirteen defendants.

### A. **PRELIMINARY STATEMENT**

Ms. Naughton (hereinafter, the Plaintiff) asserts that there is ample evidence showing that the Plaintiff's amended complaint provides plausible claims for relief on the basis of conspiracy, claims sounding in violation of privacy, and race-based discrimination against the defendants.

Ms. Naughton is a private person and resident of the Town of Windsor for the past twenty (20) years.  Ms. Naughton is a highly competent-African American woman, who holds a master's degree, speaks Spanish, French, Creole, she has worked for twenty-five (25) years as a

1

Housing Hearing Officer, and she has thirty (30) years in housing.

The court will also find that natural person defendants Gutcheon, Jamaal, Engleman and Schumsky at all times relevant, were agents/representatives/officials of the Windsor Housing Authority (hereinafter, WHA), and engaged in concerted and unlawful acts leading to her termination on May 10, 2021, and that these acts were binding upon the WHA.

The WHA is a quasi-public corporate entity that provides housing for the aged, disabled and the indigent. The WHA came into existence in Windsor, based on a cooperative agreement signed by the parties in February 1968. As part of this agreement, the town consented to "furnish normal services and facilities," like it does to all other tax paying entities in the town. **Exhibit # 13, Agreement between Windsor and WHA, February 1968.** Essentially, the WHA is a landlord that manages three apartment complexes in Windsor, Fitch Court Apartments, Millbrook Village and Shad Run Apartments. **Affidavit of Urleen Naughton, item # 7.** By statute, the WHA is considered a quasi-public corporate entity, primarily because it accepts Section-8 from the Housing and Urban Development (hereinafter, HUD). The WHA's Section-8 program comprise a mere 12 percent (12 %) of its annual revenue, while the remaining 88 percent derives from the entity's private rental units in the three named apartment complexes. For example, the Fitch Court Apartments is a wholly private LLC, and the WHA Executive Director is the president of the LLC. **Affidavit of Urleen Naughton, item # 7.**

The WHA operates independently from the Town of Windsor. Although the WHA is located in the Town of Windsor, the town does not contribute any funds to the WHA, it does not own the WHA, it does not maintain any administrative responsibilities over the entity, it has no jurisdiction over the affairs of the WHA, and the executive director does not serve at the pleasure of the Town of Windsor's Town Council, or the mayor. In fact, in or around 2017, the Housing

Authority changed its name from the Housing Authority of Windsor (HWA) to the Windsor Housing Authority (WHA) in order to change the perception that the authority was a Windsor operated entity.

By state statute, the town merely interviews, recommend, and appoints "commissioners to the WHA Board of Commissioners," and the commission has oversight responsibilities over the WHA, but once appointed, the Board operates independently of the Town of Windsor. Based on the size of the WHA's apartment holdings, the board consists of five members, and it is led by a chairman, who is elected by the board members. The Board's primary responsibility is to ensure that the WHA executive director perform "her job" in accordance with the WHA's bylaws. **Affidavit of Randy McKenney, item # 6-9.** Any report the WHA makes to the Town of Windsor, is done as a mere courtesy, and is not mandated by state statute, local ordinance, or the entity's bylaws. As a landlord, the WHA pays and maintains its own liability insurance, maintains employee benefits, and pays the salaries of its staff exclusively from funds it collects from its rental units. The physical administrative office of the WHA is located in a refurbished school building, which was also converted into the Fitch Court Apartments.

The defendants' conspiracies were tainted with racially discriminatory animus, hostile work environment, retaliation, incessantly harassing conduct towards the Plaintiff, leading to threats of physical violence against the Plaintiff and her staff. The facts show that the defendants took acts in furtherance of their covert and overt plans to terminate the Plaintiff's employment, based on the misrepresentation and lies derived from the document referred to as "the petition." That after the defendants agreed on their joint action to terminate the Plaintiff, they took to the media to destroy her personally and professional, some stated so publicly, while others resorted to similar destructive sorties to local newspapers (Windsor Journal Weekly, Hartford Courant,

the Journal Inquirer (hereinafter, WJW, the Courant, and JI), the Windsor Town Council, social media, and by word of mouth. **Affidavit of Randy McKenney, item # 35.**

For all times relevant, the Plaintiff was a private citizen, and remained out of the public sphere as she had done for all her adult life inside and outside of the Town of Windsor, even during the times the defendants publicly trammeled and destroyed her reputation. Ms. Naughton did not respond to any of the defendants "stated goal and conduct to assail and destroy her reputation," at any point. At all relevant times, the three public entity defendants, Mayor Trinks, Councilwoman Bress and State of Connecticut Representative, Garibay engaged in various concerted actions with private party defendants, three members of the press and their employers to put their plans and schemes into effect to terminate Ms. Naughton. **Affidavit of Urleen Naughton, items #17-22 and Affidavit of Randy McKenney, item # 19, 23, 26, 29-33.**

Essentially, the defendants' goal was to ultimately terminate Ms. Naughton's employment, but at all times leading up to that event, they "mounted pressure" on her, and to destroy her thirty-year reputation in housing industry.

The Plaintiff believes that the motive underlying the defendants'' conduct is that "they wish to get their hands on the WHA funds for their personal enrichment." **Affidavit of Urleen Naughton, item # 55 and Affidavit of Randy McKenney, item # 30.** In her view, "why else would they contrive the allegations in their petition, destroy my reputation, attempt to block my access to WHA bank accounts, when the evidence shows I have never logged into the WHA accounts, not once!" **Affidavit of Urleen Naughton, item # 55.**

## B.   FACTS

The defendant's quest to terminate Naughton was various, continuous, and unrelenting. Beginning in October 2020, Defendants Gutcheon, Trinks, Bress, Garibay, Jamaal, McAllister, Englemann, and Grossman began a concerted effort to oust Naughton from her position as Executive Director of the WHA, because of her race.  Defendant Smith joined the group in January 2021, while Defendant Schumsky is believed to have joined the group surreptitiously in or around late October 2020.

The facts show that the defendants, Gutcheon, Garibay, Trinks, Bress, Jamaal, McAllister, Englemann, and Grossman began assembling as a group, around September 2020. Defendant Smith who joined in or around January 7, 2021, after holding discussions with Defendant Gutcheon on the plans to terminate the Plaintiff.  **Sylvia's Affidavit, item # 27.**  The defendants' concerted effort was intended to oust Ms. Naughton from her position as Executive Director of the WHA, based on her race, and by destroying her reputation.  **Sylvia's Affidavit, item # 14.**

The Defendants' plans to oust Ms. Naughton manifested from a document referred to as "a petition," in which they alleged was drafted and published by Defendants McAllister and Jamaal, in or around October 2020, two residents of WHA Millbrook Village Apartments.  This document sought, *inter alia,* to have Ms. Naughton removed as Executive Director of the WHA due to alleged problems and issues with the WHA's property at Millbrook Village ("Millbrook"), and Fitch Court as alleged by Defendant Smith.   **Exhibit # 33, Petition.**

The "petition" was an eleven-page document, and it contained two pages of alleged signatories to the grievances outlined in it.  The document was contrived with, and was riddled with intentional falsehoods, including but not limited to:

Naughton was harsh and abusive towards residents; that Naughton told residents they should be glad they have a roof over their heads and that if they did not like things they should go buy a house; that Naughton clandestinely removed two computers from the Community Room; that Naughton relentlessly bashed and smeared the previous Executive Directors; that Naughton fired experienced and competent employees and replaced them with ineffective and incompetent workers of her own choosing; that Naughton lies recklessly and shamelessly; that **Naughton threatened and defrauded tenan**ts; and that Naughton frequently threatened residents with eviction if they disagreed with her; that **she was dishonest**; that she towed visitor's vehicles; that she rejected the sound recommendations of WHA contractors; that she underestimated dangerous electrical problems; left tenants without heat for weeks, and even months; maintained a bodyguard on the Millbrook premises. **[Emphasis added] Exhibit # 33, The Petition.**

Other sections of "the petition" claimed that the Plaintiff viewed maintenance as tenant's financial responsibilities; **extorted ill-gained revenue** from tenants through **usurious profit oriented collection practices backed by illegal, harassing threats**; that she regularly terrorized indigent aged, mentally and physically disabled tenants with eviction; **wasted administration expenditures** by purchasing a new lawnmower, new truck, new snow blowers, a new covered, enclosed truck trailer, a new cavernous prefabricated shed, and most notably, a ridiculous and unnecessary deluxe golf-cart for management to use when touring the [small] grounds; that she provided below standards moving services done by **non-professional paid under-the-table laborers** that arrived with no equipment whatsoever and use [sic] a derelict shopping cart to haphazardly move tenants; that she regularly overlooked existing tenants and generously renovated units to **preferred outsiders;** that new handicapped units hazardous to disabled

tenants-flooring [had] raised strips of vinyl between floor sections . . . and tenant complaints were ignored; that she maintained a failed strategy of dividing and isolating tenants from one another-an isolated tenant is a weakened and vulnerable tenant and that is what this adversarial management wants; that the tenants [stood] together [in] protest  . . .the hurtful policies and practices of the abusive, corrupt, and dishonest Executive Director.  **[Emphasis added] Exhibit # 33, The Petition.**

Defendant Gutcheon was appointed to the WHA Board of Commissioner on November 3, 2020, by the Windsor Town Council, at the behest of Defendants Garibay, Bress and Trinks. At his first WHA Board meeting on November 17, 2020, Gutcheon stated on the record, in earshot of all present via ZOOM that "Windsor is a very racist town, and they try to sweep it under the rug as if it does not exist." **Exhibit # 18, transcript WHA November 17, 2020, Meeting.**  He also acknowledged that "there have been many racism [sic] statements from residents towards and about the staff members." **Exhibit # 18, transcript WHA November 17, 2020, Meeting.**

At the next meeting, held on December 17, 2020, Defendant Gutcheon moved to have the statements stricken from the official Board minutes, claiming "he was either misquoted or misunderstood."  Commissioners Della Rondinone (vice-chair), Randy McKenney (Chairman), and Robert Berman from the Bloomfield Housing Authority (a guest at the meeting) heard the attempted retraction because he was not present at the November meeting. **Affidavits of Randy McKenney, items # 15, Della Rondinone, items # 13, and Robert Berman, items # 29-30, Chairman of the Bloomfield Housing.**  All three, attendees at the November meeting, WHA Chairman Randy McKenney, WHA Vice-Chairman, Della Rondinone, and Mr. Berman swore in individual affidavits about the statements they heard in both the November meeting (McKenney,

Rondinone, and Mr. Berman), as well as the meeting held on December 15, 2020, meeting. (McKenney, Berman, and Rondinone).

From the beginning of Defendant Gutcheon's tenure on the WHA Board, he made it clear that his goal was to force Naughton out of her position as Executive Director. Prior to the December 15, 2020, WHA's Board meeting, Gutcheon sent an email to fellow commissioners in which he sought to add to the meeting's agenda "a motion to go into executive session to discuss the appointment, employment, performance, evaluation, health or dismissal of a public officer or employee." **The same notice he sent out around May 8, 2021, leading to Ms. Naughton's eventual termination on May 10, 2021. [Emphasis added]**

Former chairman of the WHA, Randy McKenney informed Ms. Naughton in or around September 2021 that during the summer of 2020, at the height of the Covid-19 Pandemic state mandated lockdown, Defendant Gutcheon showed up unannounced at his home, and made inquiries about her competence, and performance as the executive director of the WHA. **Affidavits of Urleen Naughton, item # 50 and Affidavit of Randy McKenney, items # 19, 26, 29-33, 35.**

This unannounced visit by Defendant Gutcheon occurred approximately four (4) months prior to publication of the petition (publication to the Windsor Town Council) in late October 2020. At all times relevant, Mr. McKenney informed Defendant Gutcheon that "Ms. Naughton did her job very well." **Affidavit of Randy McKenney, items # 6.**

On December 7, 2020, at the Town Council meeting, "Mr. McKenney was bushwhacked," by the Windsor Town Council, comprising Defendants Trinks and Bress! Mr. McKenney was not apprised about the existence of the petition before the meeting, and when it was clear he could not respond to the Council's questions, Defendants Bress and Trinks

promised he would receive a copy.  Before McKenney and the WHA received a copy of the

petition, the defendants sent copies to Housing and Urban Development (herein referred to as

HUD), the Connecticut Housing Finance Administration (herein referred to as CHFA), the

Windsor Journal Weekly (herein referred to as WJW), the Journal Inquirer (herein referred to as

JI), and the Hartford Courant Newspaper (herein referred to as the Courant).  The WHA did not

obtain a copy until January 12, 2021, when Defendant Gutcheon was already aware of the

necessity of the WHA responding to HUD and the CHFA.

### Publication by Defendants Gutcheon, Trinks, Bress, and Garibay

The WHA was required to respond to queries from the CHFA and HUD about the claims

made in the petition, by the end of December 2020, which necessitated the WHA Counsel, Claire

Howard to request two extensions.  In other words, the WHA was totally bypassed with a

publication of the petition, while the document was being sent around at the Windsor Town Hall,

and to the local newspapers-WJW, JI, the Hartford Courant., and town residents, by Defendants

Gutcheon, Trinks, Bress, and Garibay. In the end, it was the CHFA which sent a copy of the

petition to the WHA, for a response on January 11, 2021.   Neither Defendants Trinks nor Bress

sent a copy to the WHA as promised at the December 7, 2020, Town Council Meeting.

On or around January 7, 2021, Defendant Gutcheon met with Defendant Smith and

during that meeting, he outlined his group's game plan to terminate Ms. Naughton.  After

recruiting Smith into his group of conspirators, Defendant Gutcheon informed Defendant Smith

that he was committed "to terminate Ms. Naughton's employment as the executive director of

the WHA, as well as, her entire staff, once the Windsor Town Council had replaced enough

commissioners with new commissioners, who would side with him to vote out Naughton."

**Sylvia's Affidavit, item # 27.**  As the lead person on the plan to terminate Ms. Naughton,

Defendant Gutcheon outlined his strategy to Smith that, "he intended to use the media to mount pressure on Naughton," though this aspect of his plan had already begun at this point, by virtue of the fact that The Courant, WJW and JI had already produced articles about the petition, before December 31, 2020. **Sylvia's Affidavit, item # 27 and Exhibit # 11 (a), (b), and (e)**

Immediately upon joining the WHA Board, Gutcheon embarked upon a campaign to criticize Ms. Naughton harshly, always lacking context, was domineering and unrelenting, and was always out of order, despite the fact he had only been a member of the WHA Board mere weeks, and admittedly knew little about housing.   **Affidavit of Della Rondinone, items # 24-29.**

On multiple occasions, Gutcheon has made false statements about Naughton, including but not limited to the following: "that **Naughton was running a deficit at the WHA**, when in fact, she was running a surplus; that she **forced residents to pay to have their belongings moved from one unit to another to accommodate renovations**.  Most damaging of all, Gutcheon and his co-defendants alleged, and published statements that Naughton harassed and intimidated residents, and **she stole WHA funds**. [**Emphasis added**]

At all times relevant, Defendants Trinks and Bress took steps ensuring Ms. Naughton's termination, and at no point did any of the policymaking individual (Trinks Bress and Garibay) make any inquiries to Naughton as to the truthfulness of the petition, published by initially by Defendants McAllister's and Jamaal's, or at the least, stopped the other defendants from destroying Naughton's excellent thirty-year (30) reputation through the falsities represented in the petition.

At various points, both Defendants Trinks and Bress acted in furtherance of their plan to destroy, defame, and terminate the Plaintiff, employment.  That Defendants Gutcheon, Jamaal, and Englemann, as agents of the WHA acted *ultra vires* to terminate the Plaintiff on May 10,

2021, in violation of the contract she signed in August 2020 with the WHA. For her part, Defendant Schumsky concocted lies, and fed them to Gutcheon, who then published them to the other defendants. It was Defendants Trinks and Bress who in concert interviewed, recommended, accepted for appointment, voted, and ultimately appointed their co-conspirators, Englemann and Jamaal, after they had done the same in Gutcheon's case. Defendants Bress and Trinks appointed Englemann, Jamaal and Gutcheon to the WHA Board of Commissioners for the singular purpose of destroying and then terminating Ms. Naughton. **Affidavit of Randy McKenney, items # 19, 26, 29-33, 35.** When Defendant Bress was informed in November 2020 that, Jamaal was a democrat and therefore he could not serve on the WHA Board because there were already three democrats (McKenney, Mack, and Gutcheon) on the WHA Board, she stated "I will interview him for the board anyway!"

### Acts in Furtherance.

Other defendants also acted in furtherance of the plan to destroy Ms. Naughton's reputation and terminate her employment, prior to May 10, 2021, when their goal was finally accomplished. The facts show that Defendants Trinks and Bress colluded to remove Commissioner Della Rondinone, a longstanding "Republican" member from the WHA Board of Commissioners, (because she spoke in support of Ms. Naughton in the November 2020 WHA board Meeting when she was attacked by Gutcheon), and for them to stack the Board of Commissioners with "newly appointed members who were partial to their goal to terminate Naughton," as stated by Gutcheon. **Affidavit of Nelson Sylvia, item # 27.** More specifically, Trinks sent a letter to Ms. Rondinone removing her from the WHA Board of Commissioner on February 1, 2021, then appointing Jamaal to the WHA board on the very next day. **Affidavit of Della Rondinone, item # 34-35.**

Ms. Rondinone's removal by Defendants Trinks and Bress was executed simultaneously with their interviewing, recommending, and participated in appointing Defendant Jamaal (interviewed, November 2020) and Defendant Engleman's respective appointments to the Windsor Housing Board of Commissioners on February1, 2021 and March 1, 2021.  As earlier asserted, Defendant Jamaal was one of the two authors of the "petition," while Defendant Englemann was an active participant in the drive to oust Naughton months before October 2020. **Affidavit of Randy McKenney, items # 19, 26, 29-33, 35.**

When Defendant Bress was informed in November 2020 that, Jamaal was a democrat and therefore he could not serve on the WHA Board because there were already three democrats (McKenney, Mack, and Gutcheon) on the WHA Board, she stated "I will interview him for the WHA board anyway!"  Thereafter, Defendant Jamaal, tried to join the WHA board as a "tenant commissioner," but found he could not serve because he was not elected by the tenants at Millbrook Village, in violation of the WHA Bylaws and State law.  **Exhibits # 21 and 22, and Exhibit # 23,**  It is believed at this point, Defendants Trinks and Bress instructed Defendant Jamaal to change his party affiliation to "unaffiliated."  **Exhibit # 17 and 19.**  Defendants Trinks and Bress then prepared Jamaal for approval before the Windsor Town Council.  **Exhibit # 17 and 19.**

After Commissioner Woodward resigned as Chairman of the WHA on March 22, 2021, Defendant Gutcheon maneuvered his way to, and ascended to the chair of the WHA.  At this point, he was now the Democratic Town Chairman, and the President of the Windsor Chamber of Commerce in the town.  His membership on the WHA Board was a clear violation of Connecticut General Statute § 8-41, Appointment. Qualifications and Tenure of Commissioners, which provides in pertinent parts that "no commissioner of an authority may hold any public

office in the municipality for which the authority is created," and the WHA Bylaws. **Exhibit #**

**23, WHA Bylaw, Art. VI, Sec. 2, and Conn. Gen. Stat. § 8-41.** Added to this sordid

relationship, the Windsor Journal Weekly for all relevant times was also a member of the

Windsor Chamber of Commerce. Ostensibly, it was not surprising when Defendant Gutcheon

informed Defendant Smith in January 2021, that "he would mount media pressure on Ms.

Naughton until she was terminated," and that "Defendants Trinks and Bress provided

Commissioners committed to the plan to fire Naughton." **Affidavit of Nelson Sylvia, item #**

**27.**

### *(i)*      Newspaper Publications. Exhibit # 11

While Defendants Gutcheon, Grossman, and Smith mounted their campaign against Ms.

Naughton through the Windsor Journal Weekly (hereinafter, WJW), The Hartford Courant

(hereinafter, The Courant) and the Journal Inquirer Newspaper (hereinafter, JI). Articles were

written by Defendant Joe Chaisson of the Journal Inquirer, Steven Goode of the Hartford

Courant (not a defendant in this case), and Anthony Zepperi of the Windsor Journal Weekly,

affectively parroting the false claims from the "petition." Gutcheon, Smith and Grossman timed

their scandal-laden letters, and opinion-hit-pieces (Op-eds) to the newspapers (JI, the Hartford

Courant and WJW) to coincide with their stated plans to "pressure" Ms. Naughton until she was

terminated. All told there were over twenty-four articles/Op-eds that were written by the

defendants, and their media conspirators between December 16, 2020, and May 11, 2021, one

day after the defendants terminated Ms. Naughton.

All articles were written through a thematic interconnectedness and in concert with the

defendants plans to destroy Ms. Naughton, on the basis she was incompetent, failed to perform

her job, was an angry Black woman who threatened, retaliated against residents/tenants, and who stole WHA funds.

**Summation of all related Articles, Opinion Pieces, and Dates of Publication - Exhibit # 11 (a through s):**

(a) December 20, 2020, <u>WJW- Letter to the Editor, "There is a Problem in Housing Authority," Written by Adam Gutcheon.</u>  In this piece, he represented that "ninety (90) percent of the residents signed the petition; that tenant feared retaliation and if they approached the WHA Board; that members of the Town Council were mocked and reviled in their absence by the WHA Board; and if they were complicit in the abandonment of their duties, they should resign."

(b) January 2021<u>, WJW- Letter to the Editor, "Can We Have a Conversation?" Written by Commissioner Robert Mack.</u>  Asserted that Gutcheon had communicated with HUD and CHFA instead of bringing the alleged residents' complaints to the WHA Board.

(c) In the same publication (January 2022**1**), <u>and the next page of the same edition of the WJW-Letter to the Editor, "It's Time for Action-Not Words." Written by Adam Gutcheon."</u>  "This piece was written as a rebuttal to Robert Mack's letter and asserted that 'the WHA received a copy of the petition on December 10, 2020; the WHA went nine (9) months without holding a meeting; that the complaints arising from the petition was shared with the WHA Board of Commissioners, over a month ago. That, he communicated with HUD and CHFA, he was the only commissioner who did a course on housing, and that he talked with the residents."

(d) December 22, 2020, <u>Hartford Courant Article – "Officials Disagree Over Cause of</u>

**Delay to $3.8 million Public Housing Renovation Project." written by Steven Goode**. "That

the petition was published by the Town Council to the Hartford Courant," rather than to the

WHA Board.

    (e) **December 16, 2020, Hartford Courant Article- "Tenants of Windsor Housing**

**Project Allege Years of Poor Treatment," written by Steven Goode. (detailing seven**

**recurring specific misrepresentations):** "That tenants were forced to pay to move their

belongings from their old units to newly renovated units; that the petition's allegations include

poor or no response from the maintenance department on needed repairs like lack of heat and

waste from toilets rising up through plumbing in other rooms, as well as threats and harassment

of residents by the management team and executive director; that [tenants needed] to go buy

[themselves] a house and . . . [they needed] to be grateful to have a roof over their head(s) at all;

and threats were made to tenants."

    (f) **January 22, 2021, WJW Article, authored by Anthony Zepperi- "Chair of WHA**

**Board of Commissioners Resigns Member Calls for Good Faith Investigation."** Alleged

that "fifty (50) tenants signed the petition and the **(detailing seven recurring specific**

**misrepresentations as (e) above)**.

    (g) **March 26, 2021, WJW Article, authored by Anthony Zepperi, "WHA Commission**

**Has a New Chair. Lawsuit Filed."**

    (h) **January 29, 2021, WJW Article, authored by Anthony Zepperi- "WHA**

**Tenants ask for Safety and Respect."** This article detailed the same **seven recurring specific**

**misrepresentations in (e and f) above**.

    (i) **January 27, 2021, Journal Inquirer, authored by Joe Chaisson- "Protests Held**

**before Windsor Housing Authority Meeting."**

(j)   April 1, 2021, **Journal Inquirer, authored by Joe Chaisson-** "Windsor Housing

Director: Attacks are Race-Based."

(k)   April 13, 2021, **Journal Inquirer, authored by Joe Chaisson- "Windsor Residents:**

**Authority Executive Director tried to Intimidate them out of Complaining."** In this article,

Defendant Brian Smith wrote a letter asserting that the Executive Director terminated the

previous landscaper and 'hired her own people;' that from spring 2019, no cleaning was being

done; that the lawn at Fitch Court Apartments were no longer being taken care of; that Naughton

threatened not to renew his lease if he wasn't quiet; that to threaten people with their lease was

abuse; and that the executive director told him 'he was lucky to [have] gotten [into] his

[apartment], *inter alia.*

(l)   January 28, 2021, **Hartford Courant Article- "Millbrook Village Residents rally**

**against Housing Authority Leadership amidst Board Leadership Changes.  Written by**

**Steven Goode.**  This article detailed the same **seven recurring specific misrepresentations in**

**(e, f and h) above.**

(m)  May 10, 2021, **Hartford Courant ". . . Executive Director Terminated, Committee**

**formed to Investigate Tenure." Written by Steven Goode.**  In this article, defendant

Gutcheon detailed that he intended to investigate the tenure of the former executive director,

Urleen Naughton [in term of] the books, papers, records, accounts, contracts, deeds, regulations,

or documents relating to official misconduct committed by or at the will of Ms. Naughton."

(n) May 11, 2021, **Journal Inquirer, "After Firing of Housing Authority Director,**

**Windsor Tenants hope for a Change," Written by Joe Chaisson.**  The article outlined that

Ms. Naughton was terminated for "lack of candor and violation of the Commissions personnel

policy, for her failure to turn over a copy of her contract (while she was on official sick leave)."

The article also reinforced the allegations that under Naughton, "the WHA allegedly provided slow maintenance . . . and [presented] a general attitude of disrespect to tenants;" and that "Naughton had not responded to multiple requests for comment."

    **(o) March 28, 2021, Hartford Courant "Windsor Housing Authority Executive Director files Federal Lawsuit." Written by Steven Goode.**  In this article, Defendant Gutcheon was asked for a comment and referred to Ms. Naughton as "depraved, for filing suit against low-income residents of Windsor public housing."  This article further detailed the same **seven recurring specific misrepresentations detailed in (e, f, h and l) above.**

    **(p) March 26, 2021, Journal Inquirer, "Windsor Housing Authority director sues Officials, Tenants, Accusing Them of Bias." Written by Joe Chaisson.**  The lawsuit made reference to the fact that Ms. Naughton through her attorney had filed a suit against officials, and tenants based on racism. It also quoted Defendant Garibay as saying that their [meeting held on March 21, 2021] was not a secret, and did not include discussion of Naughton's removal . . ., was called at the last minute because U.S. Rep. John Larson was in the area, and that all she did was contact Taariq Jamaal, the resident commissioner. . . ." The article also quoted Defendant Gutcheon who stated that "the lawsuit could have a serious ripple effect on other communities. . . [especially by her suing} several public officials, two of her own tenants, two members of the commission and a state representative for doing their jobs in a way she doesn't approve of . . . just the cost of defending this, is  going to make people in other communities think twice about speaking up against power."  The article also mentioned that "Ms. Naughton previously sued the Salvation Army, her former employer . . . for violations of her civil rights . . . ."

    **(q) March 26, 2021, and March 28, 2021, Hartford Courant "Executive Director files**

**Federal Lawsuit." Written by Steven Goode.**  In this article, Defendant Gutcheon was asked

for a comment and referred to Ms. Naughton as "depraved, for filing suit against low-income

residents of Windsor public housing."  This article further detailed the same **seven recurring**

**specific misrepresentations in (e, f, h, l and o) above.**

(r)     **On or around March 19, 2021, Article and Publication by Defendant Smith**

**On or around March 19, 2021, Defendants Smith and Grossman, jointly published an**

**article in the WJW,** which was replete with falsities about Ms. Naughton.  In this article,

Defendant Smith represented that as soon as Ms. Naughton was hired as the executive director,

"she terminated the contract of an existing landscaping company and instead 'hired her own

people;' he noticed "that cleaning was no longer being done. That the lawn outside Fitch Court,

which had always been mowed and maintained properly, was no longer being taken care of."

That "there were areas of grass that were mowed just once in the summer of 2019 and then again

once in the summer 2020, meaning that several areas of grass had grown over a foot long and

remained so for the majority of the summer."

Added to this, "we often have overflowing garbage and recycle bins, much of the excess

trash [got] blown away into the lawn surrounding our building. There has been a huge pile of

broken glass right by the dumpster that has been there for over a year. Broken tree limbs from

last year's storm litter the property to this day."

In the Spring of 2019, "I talked to the Executive Director about these issues. I was falsely

told that everything was better than ever under her management, despite the obvious

deteriorating state of the grounds. Since the lawn was about a foot and a half high at the time, I

pointed to it and pressed the issue."  He also claimed Ms. Naughton "told [him] that this is the

best it ever looked, and I (sic) wasn't quiet, my lease would not be renewed. Instead of

addressing resident concerns, the Executive Director is confrontational and threatening. When hearing from residents about their concerns, Ms. Naughton attacks the messenger, with no regard for the message."

(s)       **On February 26, 2021, Article and Publication by Defendants Grossman**

        **In an editorial published by the WJW on February 26, 2021:**

"Dozens of Millbrook Village residents signed a petition detailing allegations of abuse by the Windsor Housing Authority."   These allegations also brought to light "issues having been ongoing since 2019, including threats of eviction for residents who spoke out about living conditions, lack of handicapped accessibility, non-functioning toilets in single bathroom units, and moving residents into units without functioning stove or refrigerator."   Rather than resolve these issues, "employees of the Windsor Housing Authority have called residents drug dealers and liars and indicated a lack of desire to investigate these allegations further."   They have "also demanded residents tell them whether or not they've signed the petition."

    That "the executive director . . . , Urleen Naughton, who was directly  named by several residents in their complaints, has hired an outside law firm to conduct an investigation into these allegations.  However, this same firm represented Ms. Naughton in a law suit (sic) against the Salvation Army, in a case that was later dismissed.  The Housing Commission was not notified of such a hire and did not give authorization."  Ms. Grossman further asserted that  . . . "a new tenant commissioner, who is required to be a resident of the Windsor Housing Authority has been appointed by the Town Council to replace a commissioner whose term ended last summer.  Despite the fact that the Town Council has the sole authority to appoint commissioners, his appointment is being contested by the Windsor Housing Authority because of his involvement with the petition." (Please see Exhibit # 21, 22, and Affidavit of Della

Rondinone, item # 29.)  More recently, . . . "there has been a substantial rent increases (sic), in access (sic) of 30%, imposed on certain residents who has chosen to speak out about these allegations, in a move that appears to be retaliatory in nature."

Ms. Naughton did not respond to any of the attacks that were made against her at the Town Council Meetings, or any of the scandalous pieces written about her in the local papers. Neither of the local newspapers or their reporters checked the veracity of the claims made against Ms. Naughton, the content of the petition, nor did they secure her "side of the story, or the WHA's Board," before going to print.

On March 19, 2021, Grossman and Smith jointly wrote a letter to the editor of the Windsor Journal, which Grossman then sent to every member of the WHA Board of Commissioners to damage Naughton's reputation and have her removed as Executive Director of the WHA.  In this jointly authored letter, Smith and Grossman made many false statements, including but not limited to: "Naughton terminated the existing landscaping contractor immediately upon being hired and instead hired 'her people;' that Naughton threatened not to renew Smith's lease if he wasn't quiet; and that Naughton bullied, harassed and threatened residents."  Smith and Grossman also specifically asked the Board to terminate Naughton's employment.  All the while, Defendant Trinks was in contact with Smith and Grossman prior to the letter being printed, and he sent a congratulatory text to his two codefendants after publication of the letter to the WJW, "commending Grossman that 'the Smith letter was extraordinarily well written.'"

On Sunday, March 21, 2021, Defendants Gutcheon, Garibay, Trinks, Bress, McAllister, Grossman, Jamaal, Smith and Engelmann held a meeting at 1:00 p.m. with residents of Millbrook Village Apartments to discuss Naughton's removal.  Ms. Naughton nor the two

African American commissioners, Robert Mack ("Mack") and Herman Woodard ("Woodard," who was chairman of the WHA at the time), were neither invited to, nor informed of this meeting.

At this meeting, "a plan was discussed to replace either Mack or Woodard with a new commissioner who would vote along with Gutcheon and Jamaal first to suspend Naughton and then to terminate her," contrary to the terms of her contract with the WHA. **Affidavit of Nelson Sylvia, items # 10-15, 21-27.** Commissioner Woodard resigned on March 22, 2021, the day after Trinks promised that a "change was coming soon at the WHA." **Affidavit of Nelson Sylvia, item # 11.**

In February 2021, newly appointed Commissioner Jamaal (Rondinone's replacement on the WHA Board), reiterated his intent to have "the whole staff of the WHA fired, including Ms. Naughton." In April 2021, the WHA Board which comprised Gutcheon, Englemann, Jamaal, and Mack (did not approve of Ms. Naughton's firing) convened to terminate Ms. Naughton but suspended their action for the time being, pending Gutcheon securing a copy of Naughton's contract. Added to this fact, Gutcheon and Jamaal also learned that Engleman's appointment would not be effective until April 1, 2021, because her appointment could only take effect, thirty (30) days after March 1, 2021, the date of her appointment.

### (ii)    DEFENDANTS OTHER "ACTS IN FURTHERANCE"

The defendants engaged in conduct in furtherance of their conspiracy to terminate Ms. Naughton, which included but were not limited to:

**Jamaal** was a major contributor to the defamatory contents of the petition, and he continued to garner signatures for his petition into April 2021, albeit on a fraudulent basis. **Exhibit # 33, The petition and Affidavit of Urleen Naughton, item # 62.** He actively

manipulated tenants from moving from their old apartments to newly renovated ones, in order to make Naughton look ineffective, and incompetent, consistent with the allegations made in the petition. **Affidavit of Robert Berman, items # 36-43.** He also attended, participated, and assisted in planning the meeting to oust Naughton on March 21, 2021. **Affidavit of Nelson Sylvia, items # 7-8, 23.**

<u>Gutcheon</u> continued to call tenants up to and including April 4, 2021, "instructed them that they should not speak to Ms. Naughton, and insisted on occasions that, ". . . Naughton told tenants, they were lucky to be living in their home/apartment?" He also planned, attended, assisted, and participated in the meeting to oust Naughton's on March 21, 2021. **Affidavit of Brandy Cook, items # 10-19 and Affidavit of Robert Berman, items # 15-28.**

<u>Schumsky</u> continued to provide misrepresentations to Gutcheon and Engleman about Ms. Naughton, including her assertion that "Ms. Naughton was not sick," while she was on doctor prescribed sick leave, right up to May 2021. **Affidavit of Shelly McDougall, item # 17 and 19 and Affidavit of Nelson Sylvia, items # 7-8, 23.**

<u>Bress</u> sent a letter to the Windsor Board of Health stating that Naughton had left a tenant without heat (during the fall/winter 2020-21) and air conditioning for months (during the summer of 2020), where the tenant did not know how to turn on the controls- "he did not know how to turn on the heat in the apartment." Planned, attended, and assisted in the meeting to oust Naughton's on March 21, 2021. **Affidavit of Commissioner Della Rondinone, items # 15-19.** She also took an active role in replacing Della Rondinone on the WHA Board with Englemann and Jamaal, who were both partial to removing Naughton as executive Director of the WHA. **Exhibits # 17 and # 19 and Affidavit of Della Rondinone, item # 20-36.**

**Grossman and Smith** wrote letters to the local newspapers calling for Naughton's removal as executive director of the WHA, attended, assisted and participated in planning the meeting to oust Naughton on March 21, 2021. **Exhibit # 11 (r) and (s).**

**Garibay** sent letters to HUD and CHFA in January 2021 to give the appearance Ms. Naughton was incompetent and ineffective, and she planned, attended, assisted, and participated in the meeting to oust Naughton on March 21, 2021.  **Exhibit # 9 and Affidavit of Randy McKenney, items # 28-33.**

**Trinks** received Attorney Howard's findings that there were "no wrongdoing by Naughton," praised Naughton for "doing good work, in December 2021," yet Bress and he, approved Jamaal and Engleman to the WHA Board of Commissioners to affect Naughton's termination, as he later promised on March 21, 2021, that "a change was coming at the WHA soon." He attended, assisted, and participated in planning the meeting to oust Naughton on March 21, 2021. **Affidavit of Nelson Sylvia, item # 11, Exhibit # 19, appointments of Jamaal and Engleman, and Affidavit of Randy McKenney, items # 28-33.**  In January 2021, Trink and Councilman Joe McAuliffe "feigned concern for McKenney and urged McKenney to resign as chairman of the WHA, because things were getting bad there.'" **Affidavit of Randy McKenney, items # 31.**

**McAllister** was one of the original authors of the petition published in October 2020.  He also attended, assisted and participated in the planning meeting to oust Naughton on March 21, 2021. **Exhibit # 33, The petition, and Affidavit of Nelson Sylvia, items # 7-11.**

**Engleman,** was committed to terminating Ms. Naughton by assisting Gutcheon and Jamaal to vote for Ms. Naughton's termination, and she attended, assisted and actively

participated in planning the meeting to oust Naughton on March 21, 2021.  **Affidavit of Nelson Sylvia, items # 7-11.**

### (iii)     Naughton's Termination-May 10, 2021

On or around May 6, 2021, Defendant Gutcheon offered the job of "interim executive director to Ms. Shelly McDougall," Ms. Naughton's second in charge at the WHA, while Ms. Naughton was six (6) weeks into her sick leave from the WHA.  **Affidavit of Shelly McDougall, items # 14.**  On May 8, 2021, the Board of the WHA comprising Defendants Gutcheon, Englemann and Jamaal served Ms. Naughton with notice of an emergency meeting of the WHA Board they planned to convene on Monday, May 10, 2021, despite the fact Ms. Naughton was on active sick leave, prescribed by her doctor, which was documented at the WHA.

The legitimacy of Ms. Naughton's sick leave was contradicted by Defendant Schumsky, on the basis "Naughton was not sick."  **Affidavit of Urleen Naughton, items # 60.**   Thereafter, Defendants' Gutcheon, Jamaal and Englemann summoned Ms. Naughton to an "emergency meeting" on May 10, 2021, to terminate her employment as executive director of the WHA. **Exhibit # 4, Termination by Timothy Fitzgerald, Esq., May 10, 2021.**

On Monday, May 10, 2021, Defendant Gutcheon, Jamaal and Englemann went forward with their "emergency meeting of the WHA Board at 10:00 am, absent Ms. Naughton, and voted to terminate her employment at approximately 10:30 am.  Mr. Mack was the third democrat of the WHA Board, he was present and abstained from the termination resolution.  **Exhibit # 4, Termination by Timothy Fitzgerald, Esq., May 10, 2021.**

At or around 11:30 am, on May 10,2021, Gutcheon cancelled Ms. Naughton's "access to the WHA's bank accounts, cancelled her car, demanded she return WHA property in her possession, warned her to stay away from WHA properties, and cancelled her access to WHA

emails.  Defendant Gutcheon also simultaneously cancelled Ms. McDougall's access to payroll information, and all WHA email systems, despite the fact she was still employed by the WHA as the official "second in charge," and was offered the position of "Interim Executive Director" only four days earlier on May 6, 2021.  **Affidavit of Shelly McDougall, items # 11-17, and Affidavit of Urleen Naughton, item # 61.**

All the while, Defendant Gutcheon was the Chairman of the WHA and maintained his positions as the Democratic Chairman of the Town of Windsor, and President of the Windsor Chamber of Commerce, despite Connecticut General Statute § 8-41 which provides in pertinent parts, that "No commissioner of an authority may hold any public office in the municipality for which the authority is created."

Prior to noon, on Monday May 10, 2021, Defendant Gutcheon communicated to Ms. McDougall informing her that Ms. Naughton's employment had been terminated, hours before Ms. Naughton was noticed at 4:42 pm on Monday, May 10, 2021.  **Affidavit of Shelly McDougall, items # 11-17, and Affidavit of Urleen Naughton, item # 61.**

Later on the night of Monday, May 10, 2021, Naughton was informed by a letter signed by the purported WHA's "General Counsel," Mr. Timothy Fitzgerald, Esq., (also a member of the Democratic Town Counsel with Gutcheon), which provided that "her employment with the WHA had been terminated, after a vote of the Windsor Housing Board of Commissioners-Gutcheon, Jamaal and Englemann (voted to terminate Naughton), for 'insubordination, lack of candor and violations of the Personnel Policy of the Housing Authority of the Town of Windsor.'"  **Exhibit # 4, Termination by Timothy Fitzgerald, Esq., May 10, 2021.**

The Windsor Housing Authority bylaws do not provide for, nor does the title "General Counsel" appear anywhere in its various clauses, and the lawyer firm contracted to handle WHA

business, Matson, Prestley and Parenteau, LLC., was not informed of Naughton's termination before it occurred, or that new board of Defendants Gutcheon, Englemann and Jamaal had invented the new title of "General Counsel of the WHA," without amending the WHA bylaws. **Exhibit # 23, WHA Bylaws.**  Significantly, Ms. Naughton's termination letter was only signed by the purported "General Counsel," Attorney Fitzgerald, but not by any of the three WHA Defendants, who on May 10, 2021, presumably acted as the legal representatives of the Windsor Board of Commissioners (Chairman-Gutcheon, Jamaal, and Englemann-Vice Chair).   **Exhibit # 4, WHA Termination Notice.**

Within one hour of terminating Ms. Naughton, Defendant Gutcheon removed her, as well as Shelley McDougal, the WHA's Housing Program Manager (an African American, who was still employed there) from all bank accounts, access to payroll information, and all WHA email systems.  Gutcheon had previously attempted to remove Ms. Naughton from the WHA bank accounts in March 2021, but his intended actions were denied by the WHA bank, and Ms. Naughton was thus left as a signatory on the WHA bank accounts until May 10, 2021. **Affidavit of Urleen Naughton, item #55, and Affidavit of Shelly McDougall, item #15, and Affidavit of Randy McKenney, items # 27-33.**

The three defendants on the Windsor Board of Commissioners, Gutcheon, Jamaal, and Englemann, did not provide Naughton with the basis for "insubordination, lack of candor, nor the specific Personnel Policy" she allegedly violated, though a previous letter sent to Naughton dated April 5, 2021, referenced her absence due to "medical leave," and her "refusal to produce documents listed in a duly passed resolution, constituted insubordination. . .."  Additionally, the letter also stated that ". . . withholding essential information from [the Board], refusing to communicate with it, and refusing to attend its meetings constitute[ed] serious misconduct . . . ."

All the while, Ms. Naughton was absent from work on doctor prescribed sick leave.   **Exhibit # 4,**

**WHA Termination Notice.**

The defendants' purported termination document also left open the fact that the Board

"reserved the right to assert additional grounds for termination as additional facts came to light."

**Exhibit # 4, WHA Termination Notice.**   True to form, the WHA has since been on a death-

spiral, based on mismanagement arising after May 10, 2021.

Ms. McDougall was employed at the WHA for fifteen (15) years, as its Section-8 manager

and the second in charge under Ms. Naughton.  She states that while she was employed there, the

WHA treated Ms. Naughton differently than her Caucasian predecessors.  She "learned that

neither of the two Caucasian females who operated as executive director of the WHA were

treated like Ms. Naughton, in that neither one was subjected to a probationary period when they

were hired, as Ms. Naughton, who was presented with a 90-day probationary period and given

specific tasks to accomplish," as a condition of being hired full time in 2018.  **Affidavit of**

**Shelly McDougall, item # 24-29.**

One of the two Caucasian females who were executive directors, preceding Ms. Naughton

"'did not know very much about housing,' yet, she was not terminated from the WHA, nor were

they treated as Jermika Williams and Ms. Naughton (both are African Americans) were."  For

example, "some of us on staff learned that Ms. Williams was not allowed to speak in WHA

meetings, and the same requirement was also placed on Ms. Naughton, soon after she was hired,

while neither of the two Caucasian executive directors were subjected to the same treatment, at

least during my fifteen (15) year employment at the WHA."  **Affidavit of Shelly McDougall,**

**item # 29.**

Because of the conduct of the defendants, the WHA staff, including Ms. Naughton were

in constant fear for their physical safety.  Based on the lies that were published in the petition, the conduct of the defendants in whipping up the tenants based on these lies, the newspaper articles containing misrepresentations, the tension and threat level at the WHA's Millbrook and Fitch Court properties reached fever pitch.  Routinely, some WHA staffers left the office in the evenings, to find that their **car tires** were flattened. **[emphasis added] Exhibit # 8(c), Notarized letter from staff.**  In one instance, while a WHA staffer was on routine business on the subject WHA properties, a tenant confronted her and asked, "what do you do when you see an animal you want to shoot, and you don't have a gun?" **Exhibit # 8 (a), Notarized letter from staff.**  In Ms. Naughton's words, "she felt threatened to the point, she found herself looking over her shoulder, each evening she left the WHA office, and as a result, she developed anxiety and depression from those experiences." **Affidavit of Urleen Naughton, item # 10.**

On March 28, 2021, Ms. Naughton sent a letter to members of the Windsor Town Council, comprising Defendants Trinks and Bress.  In that letter she expressed her concerns for to the council about her staff's safety and hers from threats of physical violence, a hostile work environment, their being referred to as in racial epithets, but Ms. Naughton specifically as "Nigger, Bullwinkle, the black moose, Evil Queen, a bitch, and a piece of shit," Ms. Naughton has never received a response from Mayor Trinks or Councilwoman Bress regarding her fears and concerns. **Affidavit of Urleen Naughton, item # 52-54, Exhibit # 10, Letter from Naughton to the Town Council, March 28, 2021, and Exhibit # 8, Notarized Letter from Staff.**  When Counselman Lenworth Walker attempted to read Ms. Naughton's letter into the record, the was promptly shut down and ruled out of order, by his colleagues.

All the defendants knew that the allegations contained in the petition were contrived by some of their fellow codefendants, especially after Attorney Howard's findings, were published

in or around January 17, 2021.  Defendant Trinks in December 2020 acknowledged that "Ms. Naughton did very good work," yet he along with Defendant Bress (Removed Ms. Rondinone from the WHA Board) and approved Englemann and Jamaal for the WHA board in February and March 2021, so they would team up with Defendant Gutcheon to terminate Ms. Naughton.  Ms. Howard's findings were published to the WHA Board, of which Defendant Gutcheon was a member, and a recipient of the letter, yet none of the letter's revelations served to temper or stopped his march to destroy Ms. Naughton's reputation, her thirty (30) year career in housing, and terminate her employment.  Quite the contrary, Gutcheon acting as agent for the other defendants, doubled down on his efforts to destroy Ms. Naughton.  All the defendants contributed to rase in the threat level for violence at the WHA by the tenants, even after they knew or should have known that the allegations contained in the petition were untrue.

Defendant McAllister and Jamaal as tenants did not submit their alleged grievances contained in the petition to the WHA Board, even anonymously, instead, they bypassed the procedures that all tenants were aware of (through notices from the WHA) and took their "allegations" directly to the Windsor Town Counsel, to expand their contrived controversy, and to publicly embarrass the WHA and Ms. Naughton.in the public sphere.  The petition's content, form and context were intended to vault their alleged issues into the public sphere in a manner designed to maximize mischief and injury.

## D. <u>LEGAL STANDARD</u>

When deciding a motion to dismiss for failure to state a claim upon which relief may be granted under Rule 12(b)(6), the court accepts as true all factual allegations in the complaint and draws inferences from these allegations in the light most favorable to the plaintiff. *See* Scheuer v. Rhodes, 416 U.S. 232, 236, (1974); Flores v. Southern Peru Copper Corp., 343 F.3d 140, 143 (2d

Cir.2003). The court's review is limited to "the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." Samuels v. Air Transport Local 504, 992 F.2d 12, 15 (2d Cir.1993). The court considers not whether the plaintiff ultimately will prevail, but whether he has asserted sufficient facts to entitle him to offer evidence to support his claim. *See* York v. Ass'n of Bar of City of New York, 286 F.3d 122, 125 (2d Cir.), *cert. denied*, 537 U.S. 1089, 123 S.Ct. 702, 154 L.Ed.2d 633 (2002).

In reviewing the complaint in response to a motion to dismiss, the court applies a "plausibility standard," which is guided by two working principles. *See* Ashcroft v. Iqbal, 556 U.S. 662, 678, (2009). First, the requirement that the court accept as true the allegations in the complaint " 'is inapplicable to legal conclusions,' and 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' " Harris v. Mills, 572 F.3d 66, 72 (2d Cir.2009) (*quoting* Iqbal, 556 U.S. at 678).

Second, to survive a motion to dismiss, the complaint must state a plausible claim for relief. Determining whether the complaint states a plausible claim for relief is " 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.' " Id. (*quoting* Iqbal, 556 U.S. at 679).

A court faced with a motion to dismiss pursuant to . . . 12(b)(6) is a decision on the merits and, therefore, an exercise of jurisdiction." Magee v. Nassau Cnty. Med. Ctr., 27 F.Supp.2d 154, 158 (E.D.N.Y.1998) (citing Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n, 896 F.2d 674, 678 (2d Cir.1990)).

## E.  ARGUMENT

1.     **The *Noerr Pennington* immunity is Inapplicable to the Defendants' Fraudulent and illegal Conduct.**

The *Noerr–Pennington* doctrine "establishes a party's right to petition all branches of the government by providing broad antitrust immunity to a petitioning defendant despite an anti-competitive purpose." Jackson Hill Road Sharon CT, LLC v. Town of Sharon, 561 F.Supp.2d 240, 245 (Dist. Conn 2008) and T.F.T.F. Capital Corp. v. Marcus Dairy, Inc., 33 F.Supp.2d 122, 125 (D.Conn.1998). It does not, however, protect conduct that amounts to a "sham." The sham exception includes "unethical conduct in the setting of the adjudicatory process or the pursuit of a pattern of baseless, repetitive claims." Jackson Hill Road Sharon CT, LLC at 245, see also Landmarks Holding Corp. v. Bermant, 664 F.2d 891, 896 (2d Cir.1981). Specifically, it involves examining whether defendants acted "with or without probable cause, and regardless of the merits of the cases." California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 512, (1972). The gravamen of the inquiry is whether defendants' conduct had "a purpose to deprive the competitors of meaningful access to the agencies and courts." Id.

In Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 60, (1993), the Court explained how the "sham" exception applies to court proceedings. In doing so, the Court "outline[d] a two-part definition of 'sham' litigation." Id.  First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham,

the court should focus on whether the baseless lawsuit conceals "an attempt to interfere directly with the business relationships of a competitor through the use [of] the government process—as opposed to the outcome of that process—as an anticompetitive weapon."

The Court of Appeals for the Fourth Circuit has recognized that "misrepresentations made with intent to abuse the administrative processes, so as to deny [a plaintiff] meaningful access ... would fall within the sham exception." Jackson Hill Road Sharon CT, LLC at 246 and Hospital Bldg. Co. v. Trustees of Rex Hospital, 691 F.2d 678, 687 (4th Cir.1982).  In this District, Judge Edginton found in Jackson Hill Sharon Road CT, LLC, that "While, the conduct of [a defendant] would generally fall under the protection of the Noerr–Pennington doctrine, plaintiffs allege that [the defendant] intentionally misled the Commission through his misrepresentations and, in doing so, denied plaintiffs meaningful access to the Commission. Therefore, [under those circumstances, a] dismissal is inappropriate. . ..  Jackson Hill Road Sharon CT, LLC at 246.

Under the *Noerr–Pennington* doctrine, the United States Supreme Court has held that no cause of action may be pursued when based solely on citizens' attempts to influence the legislature to pass laws or to influence the executive to enforce the laws. Pathways, Inc v. Dunne, 172 F. Supp. 3d 357, 365 (D. Conn.  2001), also see United Mine Workers of Am v. Pennington, 381 U.S. 657, 670, (1965) and E. R.R. Presidents Conference v. Noerr, 365 U.S. 127, 135–36 (1961). However, Noerr–Pennington is not an absolute bar to claims based upon a defendant's petitioning of the courts for redress. "Just as false statements are not immunized by the First Amendment right to freedom of speech, . . . baseless litigation is not immunized by the First Amendment right to petition." Pathways, Inc v. Dunne, 172 F. Supp. 3d at 365 and Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 743, (1983). Thus, the Noerr–Pennington doctrine does not apply where petitioning activity, "ostensibly directed toward influencing governmental action, is a mere sham

to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Noerr*, 365 U.S. at 144. Pathways, Inc v. Dunne, 172 F. Supp. 3d at 365  citing California Motor Transport, the Supreme Court characterized this "sham exception" as "a pattern of baseless, repetitive claims ... [that] lead[ ] the factfinder to conclude that the administrative and judicial processes have been abused." 404 U.S. 508, 513, (1972).

Though the instant action is the first formal "litigation" of the subject issues, the defendants have alternately taken their claims to other forums, including the local newspapers, public opinion, social media, and the Town of Windsor Council.  All the while, the claims remain baseless that Ms. Naughton stole WHA funds, she hired a law firm without WHA Board authorization, she has terrorized the WHA tenants, and that she is depraved, *inter alia*.  Here, the alleged "attempts to influence the legislature to pass laws or to influence legislation, or to enforce the law" involve the State Representative and Town Council Representative-actors, who at various points engaged in the illegal conduct complained about by Ms. Naughton-Defendants Garibay, Trinks, and Bress.

At no point has the defendants furnished any results of an investigation proving the truthfulness of their baseless claims.  Instead, the facts show that the claims made in the alleged petition were contrived by Defendant Gutcheon and company, months before their publication in October 2020, and that the succeeding signatories to the document numbering 27 were fraudulently garnered, including residents who cannot not see, some who cannot write, and some who cannot read, amounting to "90 % signing the petition."  **Exhibit # 11, (a) Defendant Gutcheon's representations.**

All the defendants' claims were effectively rebutted and showed to fraud they were by Attorney Claire Howard's exhaustive investigation, which was published on January 12, 2021, to the Windsor Town Council, including Defendants Trinks and Bress, the WHA Board which

included Defendant Gutcheon, the CHFA, HUD and the local newspapers. The revelations from Attorney Howard's investigations did not cause a change in the defendants' numerous and various assaults upon Ms. Naughton. In fact, the frequency and the intensity of their "sorties" to the local press and their demonstrations intensified.

Though the case at bar does not sound in antitrust litigation, the defendants conduct in terminating Ms. Naughton's employment can be analogized as a "competitor," whose business relationship they have directly interfere with through fraud, deceit, misrepresentations, collusive actions, bad faith, and illegal motives, that of, "getting their hands on the Coffers of the WHA for their enrichment," after she produced a substantial surplus in two short years, from a previous deficit. **Affidavit of Urleen Naughton, item # 56 and Affidavit of Della Rondinone, items # 5-6.**

The Noerr-Pennington immunity is inapplicable to the defendants under the circumstances. The Defendants' petition was a sham, and their intent was to "mount pressure" on Naughton until she was terminated or quit. The plaintiff pleaded, an exhaustive investigation showed no wrongdoing, and tenants stated they were tricked into signing the petition. Added to this, the defendants took to the newspapers, one of whom the defendants had a business relationship with (WJW and Defendant Gutcheon on the Chamber of Commerce), in order to destroy the plaintiff's reputation in the town and made her continued employment untenable. When this strategy failed to cause the Plaintiff's quit, the defendants "whipped up" the tenants, who took to threatening Naughton and her staff with intimidation, physical violence and referring to Naughton as a "Nigger," bitch, piece of shit, and an "Evil Queen." **Affidavit of Urleen Naughton, items 53-54, 57-59 and Exhibit # 10, Naughton's letter to Town Council on threats to self and staff.**

In this instance, the defendants did not take the claims in the petition to the WHA for adjudication and remedy, instead they took it to the Town Council, HUD, CHFA, the public, and to the newspapers, thereby bypassing "proper parties and proper forum," as a technique designed to maximize damage to Ms. Naughton, rather than affect resolution.  At the December 7, 2020, Town Council Meeting, Councilwoman, Lisa Bress promised the Council "she would send a copy of the petition to the WHA Randy McKenney.  However, by December 16, 2020, and again on December 22, 2020, the defendants had sent the petition to the Hartford Courant for general publication, and Defendant Gutcheon wrote a self-serving editorial to the Windsor Journal Weekly on December 20, 2020, calling for the African American board member to resign.

Immediately following the December 7, 2020, Town Council Meeting, the Plaintiff met Defendant Trinks at his restaurant, and after she introduced herself to him, he exclaimed, "Randy says you do very good work."  Randy McKenney served ten (10) years as a fellow Democrat, and colleague of Defendant Trinks on the Town Council.  Despite this episode, Defendant Trink's acknowledgement of Ms. Naughton's performance did not serve to inform him that the petition was a sham.  The result was, the Defendants "upped the ante," as stated by Defendant Gutcheon on January 7, 2021- "We will mount media pressure on Naughton until she is terminated, and we will get the Windsor Town Council to appoint commissioners who will vote to terminate her."  From December 16, 2020, to May 10, 2021, the defendants produced twenty-four (24) different articles, editorials and newspaper publications adverse to Ms. Naughton's performance, her competence, and that she stole WHA funds.

**2.  Defendants Gutcheon, Jamaal, Engleman, and Schumsky Engaged in Concerted Action to Intentionally Deprived Ms. Naughton's Rights to Equal Protection Based on her Race in violation of Law.**

42 USC § 1981(a) provides that All persons within the jurisdiction of the United States shall have the same right in every State . . . to make and enforce contracts, , , and to the full and equal benefit of all laws . . . and property as is enjoyed by white citizens, (b) and . . . the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship(,and (c) . . . are protected against impairment by nongovernmental discrimination and impairment under color of State law.

An individual may be held liable under §§ 1981 and 1983 only if that individual is "personally involved in the alleged deprivation." Back v. Hastings On Hudson Union Free Sch. Dist., 365 F.3d 107, 127 (2d Cir.2004) (§ 1983); Patterson v. Cnty. of Oneida, 375 F.3d 206, 229 (2d Cir.2004) (§ 1981); see also Raspardo v. Carlone, 770 F.3d 97, 116 (2d Cir. 2014) ("[Section] 1983 requires individual, personalized liability on the part of each government defendant.... '[B]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' "(second ellipsis in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009),)).

 Personal involvement can be established by showing that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing

to act on information indicating that unconstitutional acts were occurring.  Back at 127.  In

addition to fulfilling one of these requirements, "a plaintiff must also establish that the

supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation. Finally,

as with individual liability, in the § 1983 context, a plaintiff must establish that a supervisor's

behavior constituted intentional discrimination on the basis of a protected

characteristic...."  Raspardo at 116.

　　　To state a valid cause of action under the Equal Protection Clause of the Fourteenth

Amendment, a plaintiff must allege that: (1) compared with others similarly situated, the plaintiff

was selectively treated; and (2) such selective treatment was based on impermissible

considerations, such as race, religion, intent to inhibit or punish the exercise of constitutional

rights, or malicious or bad faith intent to injure a person. Crawley v. Courville, 76 F.3d 47, 52-53

(1996), Zahra v. Town of Southold, 48 F.3d 674, 683 (2d Cir.1995) and see FSK Drug Corp. v.

Perales, 960 F.2d 6, 10 (2d Cir.1992).

　　　The court concluded that an offense under [the statute] is properly stated by allegations of

willful deprivation, under color of law, of life and liberty without due process of law, when private

persons, jointly engaged with state officials in prohibited action, [and] are acting 'under color' of

law for purposes of the statute.  US. v. Price, 383 U.S. 787, 793 (1966). To act 'under color' of

law does not require that the accused be an officer of the State. It is enough that he is a willful

participant in joint activity with the State or its agents. Id. At 794, accord Ortolaza v. Capitol

Region Ed. Council, 384 F. Supp 3d. 109, 117 (D. Conn 2019).   Once formed, all the

coconspirators' conduct are "attributable to all, for purposes of 1983, because all willfully

participated in every phase of the alleged venture." Price at 795.

　　　The Supreme Court of the United States has held that an offense under [the statute] is

properly stated by allegations of willful deprivation, under color of law, of life and liberty without due process of law, when private persons, jointly engaged with state officials in prohibited action, [and] are acting 'under color' of law for purposes of the statute. US. v. Price, 383 U.S. 787, 793 (1966). To act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents. Id. At 794, accord Ortolaza v. Capitol Region Ed. Council, 384 F. Supp 3d. 109, 117 (D. Conn 2019).  Once formed, all the coconspirators' conduct are "attributable to all, for purposes of 1983, because all willfully participated in every phase of the alleged venture."  Price at 795.

The defendants' unconstitutionally deprived Ms. Naughton of her right to her employment, bringing their conduct within the ambit of the fourteenth amendment, equal protection clause.  A unanimous Court in *Price,* that when private persons act in concert with state officials, they all act under color of law, because they willfully participate in the prohibited deprivation of with the state or its agents.  Thus, the evidence shows the defendants initially held planning meetings early in 2020, recruited coconspirators along the way, contrived the subject matter of their plan, implemented a strategy to destroy Naughton's reputation as a means to drive her from her employment, or made her firing more palatable to the public, discharged members of the, called for resignations of others, and placed members partial to terminating Naughton, and then terminated her on May 10, 2021.

Once the conspiracy was formed, the on-scene defendants Gutcheon, Jamaal, and Engleman acted on May 10, 2021, and terminated Ms. Naughton.  The plan to terminate Ms. Naughton could not have been accomplished singularly by Defendant Garibay, Gutcheon, Trinks, Bress, by any non-state actors, McAllister, Smith, Grossman, or any other defendant by him/herself, but by a carefully orchestrated segmenting of the roles that each had to play within

See Case 3:21-cv-00402-KAD Document 93 Filed 11/01/21 Page 39 of 70

the larger context, which was Ms. Naughton's termination.  Furthermore, there is not one scintilla of proffered evidence any of the defendants in this case took steps prior to, or during commission of the deprivation to terminate the conclusive actions of their on-scene coconspirators.  To partition the various individual conspirator's action, without viewing that action within their grand scheme, would fail to credit each defendant's contribution to the whole, in accomplishing the ultimate end of them all-terminate Naughton, by any means necessary!

The plaintiff "need not identify an express rule or regulation," but can show that "a discriminatory practice of municipal officials was so persistent or widespread as to constitute a custom or usage with the force of law, **or** that a discriminatory practice of subordinate employees was so manifest as to imply the constructive acquiescence of senior policy-making officials." Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 733–36, (1989) (§ 1981).  The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent. Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples. Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st Cir.1989) (applying the standard in the context of a section 1981 claim).

The plaintiff [must also] show that the employer treated him or her 'less favorably than a similarly situated employee' outside of the protected group." (quoting Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir.2000);

But the Plaintiff must establish by a preponderance of the evidence, a prima facie case consisting of four elements: (1) that Plaintiff falls within the protected group, (2) that Plaintiff was qualified, (3) that Plaintiff was subject to an adverse employment decision and (4) that the adverse employment decision was made under circumstances giving rise to an inference of unlawful discrimination.  Pippin v. Town of Vernon, 660 F. Supp. 2d 354 363 (D. Conn. 2009).

("A showing of disparate treatment ... is a recognized method of raising an inference of

discrimination  for the purposes of making out a prima facie case."); Berube v. Great Atl. & Pac.

Tea Co., 348 Fed. Appx. 684, 686 (2d Cir.2009).  "Liability must be predicated on the actor's

personal involvement in the claimed violation and discriminatory purpose.  Patterson v. county

of Oneida, 375 F. 3d 206, 229 (2d Cir 2004).

A plaintiff may satisfy the third prong of this test by "demonstrating that she was treated

differently from similarly situated employees who are not part of the protected class," id. (citing

Holbrook v. Reno, 196 F.3d 255, 261 (D.C. Cir. 1999)).  Lanphear v. Prokop, 703 F.2d 1311, 1315

(D.C. Cir. 1983)  One category of evidence indicating that "there is something `fishy' about the

facts of the case at hand that raises an inference of discrimination." Harding, 9 F.3d 150, 153 (D.C.

Cir 1993).

To survive a motion to dismiss, the complaint must state a plausible claim for relief.

Determining whether the complaint states a plausible claim for relief is a context-specific task.

Iqbal, 556 U.S. at 679, (1937).

Ms. Naughton was intentionally and personally treated unequally by the policymaking

Defendants on the WHA Board, Gutcheon, Jamaal, and Engleman, who by virtue of their

collusive conduct with state-policy making defendants were acting under color of law.  Shelly

McDougall in her sworn statement, states that Ms. Naughton was treated differently from the two

prior Caucasians who were executive directors at the WHA.  'Neither one was hired part time as

Ms. Naughton; one didn't know what she was doing, yet they were allowed to speak in and at

WHA Board Meetings, where Ms. Naughton and Jermika Williams (also an African American

female who preceded the plaintiff) were not allowed to do so.   Unlike her comparators, Ms.

Naughton is a highly competent female, who has a master's degree, thirty years' experience in

housing, has been a Housing Hearing Officer into housing issues for twenty-five years, and she took the WHA from a deficit to a substantial surplus in just two short years. **Affidavit of Shelly McDougall, items # 24-26 and Affidavit of Della Rondinone, items # 5-6.**

Over the past fifteen years, the WHA has had four executive directors, the last two of whom are African Americans, including Ms. Naughton. The record shows that the defendants intentionally treated Ms. Naughton unequally to her White comparators. The defendants have personally acted, as well as in concert with policymaking defendants to incite the racial passions of the WHA tenants, they personally made racially hostile comments, that they did not disavow during the period of months leading up to termination of Ms. Naughton. In or around November 2020, Mayor Trinks was heard to say that "some citizens in town wanted things to return to the way things used to be during the 1960s and 70s when there were less minorities and that some are upset by the fact that the school system now comprised 65% minorities." These comments by the mayor, in concert with his lack of response to Ms. Naughton's letter to the Town Council in April 2021 complaining that the WHA staff and she were bombarded by racial epithets from residents/tenants, where she in particular was referred to as a "Nigger, and Bullwinkle, the black moose." Defendant Trinks was also alerted by way of a letter from Ms. Naughton to the fact that one resident/tenant asked a member of her staff, "what do you do when you want to shoot an animal and you don't have a gun?" **Exhibit # 10, Letter from Naughton to the Town Council, March 28, 2021, and Exhibit # 8, Notarized Letter from Staff.** This threat was insufficient to cause a response from Defendant Trinks or Councilwoman Bress.

For his part, Defendant Gutcheon stated at the November 17, 2020, WHA Board Meeting that "Windsor is a racist town, and they try to sweep it under the rug like it doesn't exist." He has also noted that "there have been many racist statements from the residents

towards and about the [WHA] staff members." **Exhibit # 18, WHA Meeting, November 17,**

**2020.** Of significance here, is the fact that, Defendant Gutcheon knew about the discriminatory

conduct that the tenants were actively engaging in, yet, instead of quelling these sentiments, he

purposefully incited them against Ms. Naughton. The defendants did not subject Ms. Naughton's

White comparators to the same or similar treatment.

Additionally, the defendants have falsely claimed that "Ms. Naughton fired a qualified

landscaper and 'hired her own people'" which Mr. Sylvia understood to mean, "she hired her

own 'Black People,' over the Caucasian landscaper that was allegedly fired." Furthermore, Mr.

Berman, a Caucasian (Bloomfield Executive Director and a friend of Trinks) stated that Mayor

Trinks stated that "people in Windsor want things to return to the way they used to be in the

1960's and 1970's," and that "people were not happy about the fact that the school system is now

65% minority." Mr. Berman stated that he "understood both statements to mean, 'when the town

was mostly white.'" **Affidavit of Robert Berman, items # 6, 12-15, 32-35.** For his part,

Defendant Gutcheon, "the driver of the process," as represented by Mr. Sylvia in his affidavit,

stated in his first WHA Board Meeting on November 17, 2020, that "the Town of Windsor is

racist, and they try to sweep it under the rug as if it doesn't exist." **Affidavit of Nelson Sylvia,**

**item # 115, and Della Rondinone, item # 13**. In December 2020 and January 2021, Gutcheon

publicly called "for all four WHA board members to resign," where three of the four were

African Americans, and the remaining White female, Della Rondinone who had spoken in

support of Ms. Naughton.

In January 2021, Defendant Trinks and Councilman McAuliff asked WHA Chairman

McKenney (an African American) feigning concern for him, on the basis "he needed to leave the

WHA and would be good for [him], because things were getting bad at the WHA, 'so they can

> their training and their knowledge of New York law on domestic
> violence. To the extent that the police officers were not aware of
> the seriousness of domestic violence, this reflects a deficiency in
> the officers' training, an issue we discuss infra. Given that
> domestic violence is a known danger that the officers were
> prepared to address upon the expected occurrence of incidents, the
> officers who responded to Okin's complaints had ample time for
> reflection and for deciding what course of action to take in
> response to domestic violence."
> Lombardi v. Whitman, 485 F.3d 73, 83 (2d Cir.2007).

This is a case where deliberate indifference is the requisite state of mind for showing that

defendants' conduct shocks the conscience. See Lewis, 523 U.S. at 851.

As one court observed, "no inferential leap [is required], in light of what the defendants

must have known, for a reasonable juror to conclude that the defendants' conduct demonstrated a

willful disregard of the obvious risks of a charged-up-angry violent incident situation."- The

serious implications of Ms. Naughton's complaints over a concentrated period of a six-month

period, and the likelihood that the defendants' misconduct would enhance the danger to

her. See Pena, 432 F.3d at 114 (indicating that proof of "deliberate indifference" requires

showing that the defendant "deliberately assumed or acquiesced in [the] risk" of unconstitutional

conduct) (quotation marks omitted); see also Farmer v. Brennan, 511 U.S. 825, 837

(1994) (explaining, . . . that a government official acts with "deliberate indifference" when he or

she "knows of and disregards an excessive risk"). For the reasons already discussed, the officers'

conduct is not necessarily attributable to a failure to appreciate the gravity of the situation, and

thus cannot definitively be characterized as mere negligence. Neither can the officers' conduct in

this case be explained away by "the pull[ ] of competing obligations," Lewis, 523 U.S. at 853, as

there is no indication that "equally important governmental responsibilities," Id. at

852, (quotation marks omitted), could justify an investigation that instead of mitigating the

violence, actually may have contributed to increasing the risk. A reasonable factfinder, therefore,

46

could find that the officers' affirmative creation or enhancement of the danger to Okin was the product of deliberate indifference.

The defendants collusive conduct was deliberative, conscience shocking and violative of Ms. Naughton's rights to her job. Gutcheon publicly and personally embarked upon a strategy to turn the citizens of the town against the Plaintiff, by "pressuring the Plaintiff via the media with misrepresentations and contrived tenant grievances, and then colluding with the policymaking defendants from the Town of Windsor to remove and replace the existing commissioners (mostly African Americans), and then replace them with commissioners who were partial to terminating Ms. Naughton." **Affidavit of Nelson Sylvia, item # 27 and Gutcheon's (Newspaper article (a) – last paragraph, Editorial to the WJW on December 20, 2020- "There is a Problem in Housing Authority."** Furthermore, Defendants Trinks, Bress, Garibay, Gutcheon, Jamaal, Englemann, Smith and Grossman took affirmative step to "whip up the sentiments of the residents/tenant, such that the Plaintiff in particular, and her staff generally, feared for their physical safety." **Exhibit # 10, Urleen Naughton letter to Council and Exhibit # 8 (a) Darleen West, (b) Janel Rios, (c) Shelly McDougall notarized letters from WHA Staff**.

More particularly, and based on the intentional conduct of the town and state official at issue, the residents/tenants began engaging in conduct, including but is not limited to, but which could only be characterized as terrorism of the WHA staff and the Plaintiff: their car tires were flattened; they were constantly subjected to a hostile work environment, one tenants asked, "what do you do when you want to shoot an animal, and you don't have a gun;" and the Plaintiff was referred to as "Evil Queen, Nigger, bitch, and Bullwinkle the Black Mosse," by tenants. **Exhibit # 8 (c), notarized letter of Janel Rios, from WHA Staff and Affidavit of Urleen Naughton, items #53, 57-59.** In the words of an angry Defendant Brian Smith, "she destroyed

my home, and then told me I was lucky to be here." **Exhibit # II (r), Letter to the WJW, jointly written by Brian Smith and Sally Grossman, February 26, 2021**.

After these series of unlawful acts that were brought about by the intentional conduct of the defendants, Ms. Naughton developed anxiety and depression, as diagnosed by her doctors-suffered hair loss, and substantial weight loss.  After the Plaintiff's doctors prescribed medication and a sick leave to facilitate her recovery, Defendants Gutcheon, Jamaal and Englemann summoned her to a meeting on May 10, 2021, and fired her for her-doctor-prescribed-absence, due to the very conduct of these same defendants, and the injuries they caused.

Within the context of *Lewis and its progenies, Farmer and Pena*, the defendant's conduct was deliberative and conscience shocking.  To paraphrase the *Pena Court*, "it requires no inferential leap, in light of what the defendants must have known, for a reasonable juror to conclude that the defendants' conduct demonstrated a willful disregard of the obvious risks of a charged-up-angry violent incident situation, where they spent months deliberating their intentional actions.  The serious implications of Ms. Naughton's *Okin's-like* complaints over a concentrated six-month period (December-May 10, 2021), and the likelihood that the defendants' misconduct would enhance the danger to her, are well documented. *See Pena*, 432 F.3d at 114.  The salience of the sordid affairs in this case is that the entire stratagem of the defendants was entirely based on lies contrived by their collective imagination.

Ms. Naughton was terminated on May 10, 2021, by Attorney Timothy Fitzgerald and Defendant Gutcheon and company, who were persons lacking the legal authority to terminate her.  After Attorney Woodard resigned as chairman of the WHA on March 22, 2021, Defendant Gutcheon muscled his way to leadership of the WHA Board, to unlawfully terminate Ms.

Naughton, despite the fact his tenure violated CGS Section 8-41's provision prohibition that "no

commissioner of an authority may hold any public office in the municipality for which the

authority is created" and the WHA Bylaws.  Defendant Gutcheon was the Democratic Town

Chairman when he was appointed by Defendants Trinks and Bress, on November 3, 2020, and he

was told by Attorney Claire Howard that he could not serve on the WHA Board, until he

resigned as Democratic Town Chairman. **Exhibit # 23, WHA Bylaw, Art. VI, Sec. 2, and**

**Conn. Gen. Stat. § 8-41.**

   Purported "General Counsel," Timothy Fitzgerald, Esq., (also a member of the

Democratic Town Counsel with Gutcheon), was the sole signatory to Ms. Naughton's

termination letter noticing her that she was fired on May 10, 2021.  The WHA bylaws do not

provide for, nor does the title "General Counsel" appear anywhere in its various clauses, and the

lawyer firm contracted to handle WHA business on May 10, 2021, was Matson, Prestley and

Parenteau, LLC.  Besides, there are no evidence showing that Mr. Fitzgerald or the WHA

engaged in the usual "procurement procedures" that is required to engage vendor/service

providers, as hiring a law firm would have been.  **Exhibit # 4, WHA Termination Notice.**

   **4.     Defendants Gutcheon, Garibay, Trinks and Bress Conspired to Violate Ms.**
**Naughton's Constitutional Right to Equal Protection Under Law Pursuant to 42 U. S. C.§**
**1985(3).**

   To state a valid cause of action under § 1985(3), Ms. Naughton must allege: "(1) a

conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of

the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of

the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right

or privilege of a citizen of the United States." Thomas v. Roach, 165 F.3d 137, 146 (2d

Cir.1999).

To withstand a motion to dismiss a . . . § 1985(3) conspiracy claim, a plaintiff "must

provide some factual basis supporting a meeting of the minds, such as that defendants entered

into an agreement, express or tacit, to achieve the unlawful end," augmented by "some details of

time and place and the alleged effects of the conspiracy." Romer v. Morgenthau, 119 F.Supp.2d

346, 363 (S.D.N.Y.2000) (quoting Warren v. Fischl, 33 F.Supp.2d 171, 177 (E.D.N.Y.1999))

(internal quotation marks omitted); see also Fisk v. Letterman, 401 F.Supp.2d 362, 376

(S.D.N.Y.2005) ("A plaintiff is not required to list the place and date of defendants['] meetings

and the summary of their conversations when he pleads conspiracy, but the pleadings must

present facts tending to show agreement and concerted action." (internal citation and quotation

marks omitted)).  Additionally, it is settled law that "a nonstate actor . . . act[s] under color of

state law when he acts with a state actor to commit a constitutional act."  Ciambriello v. Cnty. of

Nassau, 292 F.3d 307, 324–25 (2d Cir.2002)

At all relevant times, all the non-state actors in this case were acting in concert with state

actors, and therefore were acting under color of law.    On January 19, 2021, Defendant Garibay

sent letters to HUD and CHFA, masquerading as concerns for the tenants, and requested they

look into the tenants' complaints arising from the petition. **Exhibit # 9, Defendant Garibay's**

**letter to HUD.** Not surprising, Defendant Garibay's letter were met with derision by HUD, and

CHFA, where HUD informed her that "Ms. Naughton is one of a 'few high performing HUD

executive directors, nationwide.'"  This revelation by HUD did not cause this defendant to

change her ways, because she dutifully went "full steam ahead" on March 21, 2021 (The meeting

was planned, assisted and participated in by all natural person defendants except Defendant

Schumsky and the newspaper reporter defendants), with her codefendants to institute their plan

to terminate Ms. Naughton.  When Defendant Garibay was asked about the March 21, 2021,

meeting, she "conveniently claimed," "the meeting was unplanned, was set up at the last minute,

all she did was contact Taariq Jamaal, the resident commissioner, and got a few tenants, and they

did not discuss Ms. Naughtons removal." **March 26, 2021, WJW article by Joe Chaisson**

Racial Animus  -  **Defendants Trinks and Gutcheon** have made racial comments giving rise to

an inference of discrimination, and they assisted, participated, and planned Ms. Naughton's

removal on Sunday, March 21, 2021. – "Some people want Windsor to return to the way it used

to be in the 1960's and 70's; Some are not happy with the fact that the school system is 65 %

minority;" **Affidavit of Nelson Sylvia, item # 11 and Affidavit of Robert Berman, items # 6,**

**12-15, 32-35.   On December 20, 2021, Defendant** Gutcheon called for all commissioners to

resign; **Exhibit # 11 (a) Gutcheon's (Newspaper article – last paragraph), Editorial to the**

**WJW on December 20, 2020:  "There is a Problem in Housing Authority."**  Later in March

2021, he unsuccessfully attempted to block Ms. Naughton's access to WHA Bank accounts and

asserted he had stolen WHA funds.  Earlier on November 17, 2020, he proclaimed "Windsor. . .

a racist town that sweep it under the rug as if it doesn't exist." **Exhibit # 18, Gutcheon's**

**statement at WHA Board Meeting, November 17, 2020.**

On March 21, 2021, while all the defendants (except Defendant Schumsky) were in

attendance, and they outlined their plan to terminate Ms. Naughton's employment.  At this

meeting, Defendant Trinks announce to the gathering that "a change was coming soon."

**Affidavit of Nelson Sylvia, items # 7-9, 11-12, 20-24.**

On January 7, 2021, Gutcheon told Defendant Smith, "he intended to mount media pressure, and get the Town to change the incumbent commissioners and appoint ones partial to terminating Ms. Naughton." **Affidavit of Nelson Sylvia, items # 7-11 and 27.**   He also called for all three African American WHA commissioners (Mack, McKenney, and Woodard) and Della Rondinone, the White female on the board (because she had spoken in support of Ms. Naughton) to resign, except himself. **Exhibit # 11 (a) Gutcheon's (Newspaper article – last paragraph, Editorial to the WJW on December 20, 2020:  "There is a Problem in Housing Authority."**

It is important to recognize that, all the codefendants had differing roles in the conspiracy, all geared towards their personal contribution to the ultimate goal, which at first was targeted to destroy Ms. Naughtons personal and professional reputation, and then terminate her.

In November 2020, Defendants Trinks and Bress reapproved Ms. Rondinone's for the WHA Board as a Republican and tenant commissioner, but after she spoke in support of Ms. Naughton, they withdrew her reappointment; After not receiving her usual reappointment letter, she made numerous calls and months' long written inquiries about her reappointment letter, without response from either defendant, only to discover on February 2, 2021, that they had revoked her reappointment." **Affidavit of Della Rondinone, item # 20-29, 33-36.**  On February 2, 2021, Defendants Trinks and Bress sent Ms. Rondinone a "revocation of reappointment letter" and at first attempted to appoint Defendant Jamaal to the WHA Board as a tenant commissioner (he was not elected by the tenants in violation of Connecticut law); after Commissioner Mack pointed out that Jamaal could not serve as a tenant commissioner, Defendants Trinks and Bress had him change his political affiliation from Democrat to Unaffiliated (he could not serve as a democrat, because there were already three (3) democrats on the five person board (Gutcheon,

Mack (he did not support terminating Ms. Naughton, and said so in board meetings), and Woodard), so he could join the WHA Board. **Exhibit # 17-19 (Windsor Town Council Meeting), minutes on Jamal's unaffiliated status, and Affidavit of Della Rondinone, item # 20-29, 33-36.** Jamaal is a vociferous and outspoken advocate on firing the entire staff at the WHA, a contributor to the contents of the petition, and he is accused of "fraudulently compiling residents/tenants' signatures for the petition," *inter alia.* **Affidavit of Shelly McDougall, item # 6-9 and Affidavit of Robert Berman, items # 36-43.** With Jamaal, Gutcheon and Englemann in place on the WHA Board, Defendant Trinks states at the March 21, 2021, meeting, that "a change is coming soon." **Affidavit of Nelson Sylvia, item # 10-11.**

At this stage of the case, the Plaintiff has pled and demonstrated that she was subjected to intentional discrimination based on her race by the defendants, and that she was selectively treated as compared to her White predecessors. That the defendants publicly proclaimed Windsor a racist town and where "some citizens of the town desired for things to return to the way it used to be in the 1960s and 70s." That when Ms. Naughton pleaded with town officials to intervene to protect her and her staff from physical violence, the defendants demonstrated deliberated indifference to her plea by their failure to disavow the conduct that they incited.

That the defendants have also purposefully engaged in referring to Ms. Naughton with racial epitaphs.

5. **The Plaintiff Pleaded Valid Claims Pursuant to 42 U.S.C. § 1986 Against Defendant Gutcheon, Garibay, Trinks and Bress.**

To set forth a violation of § 1986, a plaintiff must first prove a violation of § 1985, its predicate, which prohibits discriminatory conspiracies. Brown v. City of Oneonta, New York, 221 f.3d 329, 341 (2d Cir. 2000). A plaintiff need not prove that a § 1986 defendant had the

discriminatory intent requirement of § 1985. Rather, the plaintiff need only demonstrate: (1) the defendant had actual knowledge of the § 1985 conspiracy; (2) the defendant had the power to prevent or aid in preventing the commission of the § 1985 violation; (3) the defendant neglected or refused to prevent the § 1985 conspiracy; and (4) a wrongful act was committed by the conspirators.  Clark v. Clabaugh, 20 F.3d 1290, 1295 (3d Cir. 1994).

The defendants are liable for all damages they could have prevented with reasonable diligence.  Clark, 20 F.3d at 1298.  Knowledge of rumors may satisfy the first element.  Id. at 1296-97.  While "a showing of negligence suffices to prove a violation of the section."  Park v. City of Atlanta, 120 F.3d 1157, 1160 (11thCir. 1997) (citing Clark v. Clabaugh, 20 F.3d 1290 (3d Cir. 1994)).  To escape liability, a defendant needs to show that he "exercise[d] reasonable diligence to prevent commission of the § 1985 conspiracy."  Bell v. City of Milwaukee, 746 F.2d 1205, 1258 (7th Cir. 1984).

On the question of whether, or to what extent, § 1985(3) covers private conspiracies to violate protected rights, rather than conspiracies involving only state action. The United States Supreme Court in Griffin adverted to the statutory language "going in disguise," mentioned that it referred to private conduct, and noted that the statute's failure to include a state action requirement was a significant indication of legislative intent to include private conduct.  Griffin v. Breckenridge, 403 U.S. 88, 96-97 (1971).  Not all private conspiracies, however, are included within the scope of the statute. Actionable private conspiracies must aim at "interfering with rights" that are "protected against private, as well as official, encroachment." Carpenters v. Scott, 463 U.S. 825, 826 (1983); accord Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 274 (1993) ("A section 1985(3) private conspiracy... requires an intent to deprive persons of a right guaranteed against private impairment.").   If the object of a conspiracy is to deprive a

victim of constitutional rights protected only against state infringement, § 1985(3) is not violated

"unless it is proved that the State is involved in the conspiracy or that the aim of the conspiracy is

to influence the activity of the State.  United Bhd. of Carpenters and Joiners of Am., Local 610 v.

Scott, 463 U.S. 825, 830 (1983). Whether § 1985 encompasses conspiracies to violate federal

civil rights statutes, rather than constitutional rights, is not entirely clear. But see Fisher v.

Shamburg, 624 F.2d 156, 159 (10th Cir. 1980) (finding that private racist conspiracy to deprive

plaintiff of right to public accommodation is actionable).

The defendants conspiratorially violated Ms. Naughton's rights pursuant to § 1985.  As

indicated in Section four (4) above, the defendants participated in, led, and planned, and

executed actions to terminate Ms. Naughton as the executive director of the WHA.  All the

defendants engaged in and committed acts in furtherance of their conspiracy, as such, they all

possessed knowledge of the conspiracy to destroy Ms. Naughton's thirty-year personal

reputation, her good character, her standing among peers, and to terminate her employment

based on their racial animus.  From that standpoint, all the defendants had the legal duty, as

deputized by § 1986 to intervene to prohibit, or stop the conspiracy before it happened and while

it was happening.  By virtue of their respective positions and the roles they played in the

conspiracy, Defendants Gutcheon, Trinks, Garibay, and Bress were in the best position, because

they had the power to stop the conspiratorial violence visited upon Ms. Naughton by their

conspirators. None of the four named defendants took any affirmative action to stop the actions

complained of, and as a result, all the defendants are liable for the injuries they caused Ms.

Naughton pursuant to § 1986.

6.       **The Defendants Took Adverse Action Against the Plaintiff by Terminating her Employment for Engaging in Protected Activity**

[F]or a retaliation claim under § 1983 to survive a ... motion to dismiss, "[a] plaintiff must plausibly allege that: (1) she was engaged in protected activity; (2) that the employer was aware of the activity; (3) that she suffered an adverse action; (and) (4) that there was a causal connection between the protected activity and the adverse activity."  Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 91 (2d Cir. 2015), *also see* Rivera v. Rochester Genesee Reg'l Transport. Auth., 743 F.3d11,243 (2d Cir. 2014).  As "the elements of a retaliation claim based on an equal protection violation under § 1983 mirror those under Title VII[,]" an "adverse employment action [in a retaliation claim based on the Equal Protection Clause] is any action that could well dissuade a reasonable worker from making or supporting a charge of discrimination[,] ... [and] covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII." Id. at 90–91. "Unlike Title VII discrimination claims, however, for an adverse retaliatory action to be 'because' a plaintiff made a charge, the plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action[,]" or "that the adverse action would not have occurred in the absence of the retaliatory motive." Id. at 90.

"A retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action." Id. (citation omitted).

Though "the Second Circuit Court of Appeals has declined to draw 'a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action,'" courts in this Circuit have inferred a causal relationship when three

or fewer months have elapsed. See Lewis v. Roosevelt Island Operating Corp., 246 F.Supp.3d

979, 991 (S.D.N.Y. 2017) (quoting Littlejohn, 795 F.3d at 319); see also Day v. City of New

York, 2015 WL 10530081, at *13 (S.D.N.Y. Nov. 30, 2015) (citing Vega, 801 F.3d at 92)

("[T]he Second Circuit has [also] held that an adverse action that occurs within two months or

less of a protected activity ... is sufficient to survive a motion to dismiss on the issue of

causation."). Courts in the Second Circuit "have found a causal connection where there were

even longer gaps [between the protected activity and the adverse employment action] but it was

plausible that there was no earlier opportunity to retaliate." EEOC v. Day & Zimmerman NPS,

Inc., No. 15-CV-01416-VAB, 2016 WL 1449543, at *4 (D. Conn. Apr. 12, 2016) (internal

quotation marks and citation omitted).

   Ms. Naughton filed her initial complaint to the United States District Court on March 23,

2021, alleging discrimination by the defendants, and detailed violations of her rights by

Defendants, Gutcheon, Trinks, Garibay, Bress, Smith, Grossman, and Taariq Jamaal, including

racial discrimination, harassment and by virtue of a hostile work environment.  Ms. Naughton

further alleged that as a result of her complaint, the defendants subsequently took numerous

adverse employment actions against her including intensifying their media pressure against her,

holding meetings about terminating her employment, attempting to terminate her access to WHA

bank accounts in March 2021, asserting that she had stolen WHA funds, placing her and her staff

in imminent physical threat of harm, from December 2020 through May 2021, causing tenants to

refer to her as a "Nigger," Evil Queen, "Bullwinkle the Black Moose," "a piece of shit, "bitch,"

and "what do you when you see an animal you want to shoot, and you don't have a gun?"  That,

she was forced to instruct her staff to "pair-up" while they traversed the apartment grounds to

fulfill their job responsibilities.  **Exhibit # 10, Letter from Naughton to the Town Council, March 28, 2021, and Exhibit # 8, Notarized Letter from Staff.**

Ms. Naughton sufficiently pleaded that the defendants were acting under the color of state law in taking these actions, and these allegations meet the pleading standard for retaliatory "adverse employment action" under Section 1983, and that the facts plausibly supporting an inference that these actions were taken "because she complained of or otherwise opposed discrimination," i.e., that these actions "would not have occurred in the absence of the retaliatory motives of the defendants."

Ms. Schumsky cannot be excluded as engaging in retaliation against Ms. Naughton, as her conduct began in or around November 2020 and continued unabated up to her termination on May 6, 2021, and in the ensuring weeks thereafter.  Ms. Naughton asserts that retaliation was one of the motivating factors underlying Ms. Schumsky's conduct throughout this matter.


## SUPPLEMENTAL STATE LAW CLAIMS

The court should exercise jurisdiction over Ms. Naughton's state law claims. "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine - judicial economy, convenience, fairness, and comity - will point toward declining to exercise jurisdiction over the remaining state-law claims."  Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7, (1988), quoted in Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305 (2d Cir. 2003).

Here, considerations of economy, convenience and fairness militate in favor of supplemental jurisdiction. Although discovery is incomplete, aside from the usual exchange of documents and depositions, on the issues, the case is close to adjudication. There are no novel

issues of state law questions in this case and the parties have already expended considerable financial resources.  Under the circumstances of this case, declination of pendent jurisdiction should not attend, in the event the Court dismisses Ms. Naughton's substantial federal claims.

Here, all Ms. Naughton's claims relate to her termination and the activities the defendants engaged in to bring about destroying her personal and professional reputation, in effecting, the defendants violently defamed and interfering with her contractual relations-28 U.S.C. § 1367(a). The state law claims therefore form part of the same case or controversy, "derived from a common nucleus of operative fact, as Ms. Naughton's § 1983 claims.  United Mine Workers v. Gibbs, 383 U.S. 715, 726, (1966).

As set forth in more detail below, the Court should retain jurisdiction over Ms. Naughton's state law claims sounding in defamation, false light, tortious interference of contractual relations, intentional infliction of emotional distress and negligent infliction of emotional distress. The court should exercise jurisdiction over Ms. Naughton's the state law claims. "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine - judicial economy, convenience, fairness, and comity - will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7, (1988), quoted in Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305 (2d Cir. 2003).

Here, considerations of economy, convenience and fairness militate in favor of supplemental jurisdiction. Although discovery is incomplete, aside from the usual exchange of documents and depositions, on the issues, the case is close to adjudication. There are no novel questions of state law questions in this case and the parties have already expended considerable

financial resources in the case. Under the circumstances, declination of pendent jurisdiction

should attend, in the event the Court dismisses Ms. Naughton's substantial federal claims.

**7.** **Ms. Naughton Denies Defendants' Claim that She was a Public Figure, and She Alternately Pleaded "Actual Malice" with Respect to her Claims for Defamation and False Light against the Defendants, in the Event they Asserted She was a Public Figure as a Defense.**

### (a) Defamation

To establish a claim for defamation under Connecticut law, a Plaintiff must show that

"(1) the defendants published a defamatory statement; (2) the defamatory statement identified the

plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4)

the plaintiff's reputation suffered injury as result of the statement." Gambardella v. Apple Health

Care, Inc., 291 Conn. 620, 627-28 (2009), *see also* Cweklinsky v. Mobil Chemical Co., 267

Conn. 210, 217, 837 A.2d 759 (2004).

If the plaintiff is a public figure, however, the plaintiff also must prove that the

defamatory statement was made with actual malice, such that "the statement, when made, [was]

made with actual knowledge that it was false or with reckless disregard of whether it was false."

(Internal quotation marks omitted.)  Gambardella v. Apple Health Care, Inc., 291 Conn at 628,

Woodcock v. Journal Publishing Co., 230 Conn. 525, 535, (1994), cert. denied, 513 U.S. 1149,

(1995), *citing* New York Times Co. v. Sullivan, 376 U.S. 254, 279–80 (1964).  Additionally, to

recover punitive damages, a plaintiff must prove actual malice, regardless of whether the

plaintiff is a public figure. Gambardella 291 Conn. at 628, *also See* Triangle Sheet Metal Works,

Inc. v. Silver, 154 Conn. 116, 127 (1966); Proto v. Bridgeport Herald Corp., 136 Conn. 557, 571

(1950).

"[L]ibel is actionable per se if it charges improper conduct or lack of skill or integrity in one's profession or business and is of such a nature that it is calculated to cause injury to one in his profession or business." Miles v. Perry, 1 Conn. App. 584, 602 (1987), Charles Parker Co. v. Silver City Crystal Co., 142 Conn. 605, 612, 116 A.2d 440 (1955) Slander is actionable per se if it charges incompetence or dishonesty in office, or charges a professional person with general incompetence. Miles 1 Conn. App. at 602, Proto v. Bridgeport Herald Corporation, supra, 136 Conn. at 567, Corsello v. Emerson Bros., Inc., 106 Conn. 127, 130–31, (1927); Wynne v. Parsons, 57 Conn. 73, 75, (1888).

Libel or slander [are] also actionable per se if [they] charge a crime involving moral turpitude or to which an infamous penalty is attached. Miles 1 Conn. App. at 602, Proto v. Bridgeport Herald Corporation, supra. Statements accusing a plaintiff of theft are libelous or slanderous per se. Miles 1 Conn. App. at 602 , Yavis v. Sullivan, 137 Conn. 253, 259, (1950); Ventresca v. Kissner, 105 Conn. 533, 537 (1927); Battista v. United Illuminating Co., 10 Conn. App. 486, 492–93 (1987).

Once the plaintiff has established that the words are false and actionable per se, barring any statutory provision to the contrary, she is entitled under Connecticut law to recover general damages without proof of special damages. Miles 1 Conn. App. at 602,  Charles Parker Co. v. Silver City Crystal Co., supra, 142 Conn. at 612, Battista at 492. This is because the law presumes general damages where the defamatory statements are actionable per se. Battista v. United Illuminating Co., supra.

In the words of one NY court, one useful general rule is that "'a writing which *tends* to disparage a person in the way of his office, profession or trade'" is defamatory per se and does not require proof of special damages. Celle, et al., v. Filipino Reporter Enterprises Inc., 209 F.3d

163, 180 (2d Cir. 2000).  "If, on their face, they (the words) are susceptible in their ordinary

meaning of such a construction as would tend to injure him in that capacity, they are libelous per

se and the complaint, even in the absence of allegation of special damage, states a cause of

action."  Like Connecticut, "It has long been the law in New York that a defamatory statement

that is a direct attack upon the business, trade or profession of the plaintiff is considered

defamation 'per se,' and therefore actionable without any proof of special damages.") Id and W.

Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 112, at 791 (5th ed. 1984) ("[I]t is

actionable without proof of damage to say of a physician that he is a butcher ..., of an attorney

that he is a shyster, of a school teacher that he has been guilty of improper conduct as to his

pupils, of a clergyman that he is the subject of scandalous rumors, of a chauffeur that he is

habitually drinking, of a merchant that his credit is bad or that he sells adulterated goods, of a

public officer that he has accepted a bribe or has used his office for corrupt purposes ...—since

these things discredit [one] in his chosen calling.").  Id.

 The defendants violated Ms. Naughton's right to privacy by defaming her good character,

in her personal life, and in her professional life.  Ms. Naughton has also provided ample evidence

of the statements the defendants made concerning "her lack of competence, her lack of

performance, as well as her alleged professional deficiencies."  When the defendants did not and

were not able to draw Ms. Naughton into an undignified public squabble, they resorted to

making allegations that she stole WHA funds, she was incompetent, and unqualified for the

position she held. On January 17, 2021, Ms. Claire Howard published her exhaustive

investigation into the petition's allegations and found there was no wrongdoing committed by

Ms. Naughton or the WHA; the results of the investigation were published to the Windsor Town

Council, The WHA Board, *inter alios,* in late January 2021, and it was available to both

Defendants Englemann and Jamaal at least, when they assumed their offices as commissioners on March 1, 2021 and April 1, 2021 respectively.  But for all relevant times thereafter, the defendants continued their unrelenting assault upon Ms. Naughton's integrity and professional standing.

Association with matters or "controversies of interest to the public" does not of itself make one a public figure.  Jensen v. Times Mirror Company, 634 F. Supp. 304, 311 (D. Conn 1986) *and* Time, Inc. v. Firestone, 424 U.S. 448, 454, (1976). . . .

> One is not a "public figure" for purposes of [a] defamation action if one is drawn into a public forum largely against her will. Allegedly defamed individual's commenting in response to allegedly defamatory publication is not enough to make [one] a "public figure" for purposes of defamation action; defendants may not act to create "public figure" status and thus obtain enhanced protection that would then be given to their publications. . . .  In contrast, one may become a public figure (a) by virtue of "pervasive fame or notoriety" or (b) "[m]ore commonly [by] ... voluntarily inject[ing] [one]self or [being] drawn into a particular public controversy."  Gertz v. Robert Welch, Inc., 418 U.S. 323, 351  (1974). A private individual ordinarily "has not accepted public office nor assumed an influential role in ordering society," i.e., has not occupied a role of "especial prominence in the affairs of society." Id. at 345.  Public figures are numerous and include one "who is famous or infamous because of who he is or what he has done." Cepeda v. Cowles Magazines & Broadcasting, Inc., 392 F.2d 417, 419 (9th Cir.), cert. denied, 393 U.S. 840.

Jensen at 311.

Mere public and media interest in an event and the persons related to it does not create a "public figure," for First Amendment and defamation purposes.  Whether allegedly defamed individual was a "public figure" for purposes of defamation action was to be determined as of the time of the allegedly defamatory publications. Jensen at 312.

There is no proffered evidence by the defendants, that Ms. Naughton was ever a public figure, nor did she attain public figure status outside of their self-serving conclusionary

assertions that she is one, to obtain enhanced protection to their publications, and themselves from liability.  Ms. Naughton was drawn into the instant controversy against her will, and she has never once commented on, or responded to the defendants' defamatory statements about her, slanderous though they were.  The record shows that Ms. Naughton sent one letter to the Windsor Town Council on March 28, 2021, months into this controversy, for the sole purpose of protecting herself and her staff against the threats of physical violence whipped up by the defendants.  The gravity of the situation reflected in Ms. Naughton's letter was not enough to elicit concern, or a response from the Mayor, Lisa Bress, or any member of the Town Council. When Councilman Walker attempted to read Ms. Naughton's letter into the record, he was promptly shut down by Defendants Trinks, Bress and others**.  Affidavit of Urleen Naughton, item # 52.**

There is also no evidence Ms. Naughton had ever held herself out to the public on any issue of public concern, nor had she suffered from, or enjoyed "pervasive fame and notoriety," by voluntarily injected herself into a public controversy.  Moreover, Ms. Naughton "'has never accepted public office' nor assumed an influential role in 'ordering society,'" as provided by *Gertz.*  There is also no evidence Ms. Naughton contacted any of the offending newspapers, their reporters, or taken to the public sphere to defend herself against the scandalous and damaging allegations touted by the defendants.

Lastly, Ms. Naughton has pleaded the fact that all defendants at all times acted with "reckless disregard" to the truth, and publication of their contrived falsities in this case.

The defendants' defamatory violence was widespread and complete.  In or around September 2021, Ms. Naughton attended the funeral of a friend from her community, and while

there, others in attendance could be heard referring under their breaths that "someone has let out Lynn the thief out."

The WHA is a quasi-public entity and Ms. Naughton is a private person. Though she has validly pleaded actual malice against the defendants, there is ample evidence showing that all three (3) natural person defendants at issue (Gutcheon, Jamaal, and Schumsky) published numerous defamatory statements; that the defamatory statement identified Ms. Naughton to third persons, that the defamatory statements were published to third persons; that Ms. Naughton's reputation suffered injury; and that the defendants are liable for defamation and defamation per se.

**(b) <u>False Light</u>.**

The essential elements of the claim are (1) a publication (2) about plaintiff (3) unreasonably placing her in a false light before the public.  Jensen v. Times Mirror Company, 634 F. Supp. 304, 310 (D. Conn 1986); Goodrich v. Waterbury Republican-American, Inc., 188 Conn. 107, 131-132 (1982); 3 Restatement (Second), Torts § 652E.

If the Plaintiff is deemed to be a public figure, she bears the burden of proving that the defendants made the statements with actual malice in publishing [the] false statement[s] concerning [her,] proving malice by knowledge of the falsity or by reckless disregard of whether or not it was false.  New York Times Co. v. Sullivan, 376 U.S. 254, 279–80 (1964).   The rule is applicable to both public figures and public officials.  Curtis Publishing Co. v. Butts, 388 U.S. 130, 162–65, (1967).   Reckless disregard for the truth may be tested by whether "defendant in fact entertained serious doubts as to the truth of his publication," or by whether defendant was aware to a high degree "of probable falsity." St. Amant v. Thompson, 390 U.S. 727, 731 (1968).

Ms. Naughton is not a public figure, and she is not a public official.  As the executive director of the WHA, Ms. Naughton for all time before her employment was a private person who resided in the town of Windsor.  She was a mere wife and mother and went about her business without injecting herself in public controversies and affairs.  **Affidavit of Urleen Naughton, item # 13-19.**  The essence of the defamatory remarks made by the defendants trampled not only upon Ms. Naughton's qualifications and integrity in the position she held, but also denigrated her honesty and integrity as an individual in the eyes of her community, to the point, her kids resorted to defending her against articles their friends had sent them. **Affidavit of Urleen Naughton, item # 27.**

There is no proffered evidence by the defendants that Ms. Naughton was ever a public figure, nor did she attain public figure status outside of their self-serving conclusionary assertions that she is one, to obtain enhanced protection to their publications, and themselves from liability. Ms. Naughton was drawn into the instant controversy against her will and she has never once commented on, or responded to the defendants' defamatory statements about her, slanderous though they were.  Furthermore, all counts sounding in defamation of character and false light/invasion of privacy were pleaded on the basis that all the defendants "acted with reckless disregard for the truth, and falsities of their statements.

### 8.    The Defendant are Liable to the Plaintiff for Negligent Infliction of Emotional Distress.

Under Connecticut law, "negligent infliction of emotional distress in the employment context arises only where it is based upon unreasonable conduct of the defendant in the termination process." Parsons v. United Tech., 243 Conn. 66, 88–89, 700 A.2d 655 (1997) (citations and quotation marks omitted). Thus, "the mere termination of employment, even where it is wrongful, is

therefore not, by itself, enough to sustain a claim for negligent infliction of emotional distress." Id.

Generally, the mere act of firing an employee, "even if wrongfully motivated does not transgress the

bounds of socially tolerable behavior." Id.

"[N]egligent infliction of emotional distress in the employment context arises only where it

is 'based upon unreasonable conduct of the defendant in the termination process.'" Perodeu v. City

of Hartford, 259 Conn. 729, 752  (2002) and Parsons v. United Technologies Corp., 243 Conn. 66,

700 A.2d 655 (1997).

In Smith v. Hartford, Superior Court, complex litigation docket at Tolland, Docket No.

X07 CV 980070792S, 2000 WL 1058877 (July 14, 2000) the court held that termination is not

required to bring claim of negligent infliction of emotional distress). Perodeau at 752, also citing

Benson v. Northeast Utilities, Superior Court, judicial district of Hartford, Docket No. CV

9905896997, 2000 WL 151203 (January 20, 2000).

Since a "termination may give rise to a claim for negligent infliction of emotional distress

if the conduct under review "involved an unreasonable risk of ... emotional distress ... that ... might

result in illness or bodily harm." Montinieri v. Southern New England Telephone Co., supra, 175

Conn. at 345, 398 A.2d 1180.  The salience of this ruling is that "implicit in [the court's] conclusion

is a recognition that emotional distress that might result in illness or bodily harm is a foreseeable

consequence of particularly egregious conduct involving a termination, which would, in turn, give

rise to a duty to avoid such conduct."   Perodeu at 755-56

The Court concluded that "an individual municipal employee may not be found liable for

negligent infliction of emotional distress arising out of conduct occurring within a continuing

employment context, as distinguished from conduct occurring in the termination of employment.

Perodeu at 763.

The Defendants jointly engaged in unreasonable conduct during the termination process and up Ms. Naughton's termination on May 10, 2021.  Ms. Naughton's injuries began during the termination process and continued after May 10, 2021, when she was finally and formally terminated.  The move to terminate Ms. Naughton began in December 2020, with Defendant Gutcheon and in January 2021 with Taariq Jamaal, who called for the termination of "all staff members, including Ms. Naughton."   On December 20, 2020, Gutcheon called for Ms. Naughton's termination, and for all commissioners to resign, except himself.  This call, was followed by his informing Defendant Brian Smith that the defendants intended to "mount media pressure on Ms. Naughton, and he would get the Town Council to appoint new commissioners who were partial to terminating Ms. Naughton."

The defendants' unreasonable conduct was a foreseeable cause of Ms. Naughton's injuries, and they breached the duty they owed her due to the nature of the conduct they engaged in leading to the termination.  In this case, Defendants, Gutcheon, Jamaal, and Englemann were informed well in advance of May 10, 2021, that Ms. Naughton was on sick leave; Defendant Schumsky for her part, informed the defendants that "Ms. Naughton was not ill!"  In March 201, Defendant Gutcheon, removed Ms. Naughton from the WHA Bank Accounts, without authorization, he accused her of stealing WHA funds, and he continued to marginalize her in the media as incompetent, unqualified for her position, and that she did not perform on the job.  As a result, Ms. Naughton's doctors diagnosed her with anxiety and depression, hair loss and the fact she had lost over 30 pounds, months prior to her termination, due to the defendants,' which was caused by the defendants' egregious and outrageous conduct.

Ms. Naughton was not a Town of Windsor municipal employee, regardless of the threadbare recital of the defendants.  The Town of Windsor, did not interview Ms. Naughton for

her job, pay her salary or benefits, exercise any administrative authority over her work, it did not

terminate her employment, and the WHA was not an arm of the town, as the housing authority is

in some cities and towns, such as Hartford, where its housing authority is a city agency.

### 9.   Defendants are Liable for Intentional Infliction of Emotional Distress Against the Plaintiff

It is well settled that, in order to state a claim of intentional infliction of emotional

distress, "[i]t must be shown:  (1) that the actor intended to inflict emotional distress or that he

knew or should have known that emotional distress was the likely result of his conduct;  (2) that

the conduct was extreme and outrageous;  (3) that the defendant's conduct was the cause of the

plaintiff's distress;  and (4) that the emotional distress sustained by the plaintiff was severe."

Petyan v. Ellis, 200 Conn. 243, 253, (1986).

To be actionable, the defendants' conduct must be "so outrageous in character, and so

extreme in degree as to go beyond all possible bounds of decency, and to be regarded as

atrocious, and utterly intolerable in a civilized community."  Hafez v. Avis Rent-a-Car 242 F.3d

364 (2d Cir. 2000), (quoting Restatement (Second) of Torts § 46, subd. (1)).

The defendants' conduct was intentional, and they knew that the likely result of their

extreme and outrageous conduct would cause the injuries to Ms. Naughton.  Ms. Naughton has

always pleaded that relevant, the defendants acted jointly and intentionally to cause Ms.

Naughton's injuries.  The facts show that the defendants joined in a conspiracy to "mount media

pressure on Ms. Naughton, and to have the Town Council appoint new commissioners partial to

terminating her employment."  In the end, over twenty (20) articles and editorial were written and

published by three separate newspapers to the local community, in which Ms. Naughton lives and

worked.  Leading up to these events, the Defendants "incited the tenants, who flattened the car

tires of some WHA staff member and threatened them with physical violence." Ms. Naughton

was routinely referred to as a "Nigger, Bullwinkle-the black moose, and the Evil Queen." **Exhibit**

**# 10, Letter from Naughton to the Town Council, March 28, 2021, and Exhibit # 8, Notarized**

**Letter from Staff.**

In one instance, a tenant asked a WHA staffer, "what do you do when you want to shoot

an animal and you don't have a gun?" When Ms. Naughton sent a letter to the Town Council out

of concern for her physical safety and that of her staff, she was ignored, and Counselman Walker

attempts to read the letter into the record, was promptly shut down, by Defendants Trinks, Bress,

and others. As a result, the defendants' extreme and outrageous conduct caused Ms. Naughton to

develop the injuries complained of.

### 10.    The Plaintiff has Pleaded a Valid Claim for Tortious Interference with Contractual Relations against the Defendants.

"'[F]or a plaintiff [to] successfully . . . prosecute a [claim for tortious interference with

contractual relations, he] . . . must prove that the defendant's conduct was in fact tortious. This

element may be satisfied by proof that the defendant[s] [were] guilty of fraud, misrepresentation,

intimidation or molestation . . . or that the defendant acted maliciously.' (Citations omitted.)"

Robert S. Weiss and Associates, Inc., v. Wiederlight, 208 Conn 525, 535-36 (1988) quoting Kecko

Piping Co. v. Monroe, 172 Conn. 197, 201–202, (1977).

"[A]n action for intentional interference with business relations ... requires the plaintiff to

[also] plead and prove at least some improper motive or improper means.... '[A] claim is made out

[only] when interference resulting in injury to another is wrongful by some measure beyond the

fact of the interference itself.'" (Citations omitted.) Robert S. Weiss and Associates, Inc., at 535-

36; Kakadelis v. DeFabritis, 191 Conn. 276, 279–80 (1983); see also Sportsmen's Boating

Corporation v. Hensley, 192 Conn. 747, 753, (1984) (liability in tort imposed only if defendant acted maliciously).

The Defendants engaged in fraud, misrepresentation, intimidation, and molestation in garnering the signatures of tenants with respect to the petition.  At all times relevant, the defendants were acting in concert, to terminate Ms. Naughton, and garnering the signatures of the tenants with respect to the allegations contained in the petition underlying the foundation of and provided legitimacy to the defendants' drive to terminate Ms. Naughton-that 90% of the tenants signed the petition."  Compl., ¶ 360. The schemes required the defendants to defame Ms. Naughton's reputation, performance, and qualifications for the job of executive director. Thereafter, the defendants prevailed upon the unsuspecting disabled, aged, and special needs tenants to fraudulently secure their signatures.

The facts show that some of these tenants could not read, write, or see, while some were told they were signing a petition in celebration of fact "they liked their unit."  On or around Sunday, April 4, 2021, Defendant Gutcheon called Bloomfield Housing tenant, Brandy Cook and tried to "intimidate her into saying that 'Ms. Naughton told her, 'she was lucky to be living in her house/apartment . . . ,' and that 'did not have to deal with Ms. Naughton or Ms. McDougall anymore (Naughton was still employed by the WHA and was on sick leave and McDougall was also still employed as the WHA's second in charge).'"  **Affidavit of Brandy Cook, items # 9-27.**  Ms. Cook also recounted that she "told him no, Ms. Naughton had always been nice to her, and she realized Gutcheon was growing frustrated with her answer."

For her part, defendant Schumsky was appointed as "the liaison to the WHA Board" in March 2021, while Ms. McDougall was still the second in charge at the WHA.  In Ms. McDougall's view, "everyone on the WHA staff knew that Ms. Schumsky was a collaborator

71

with the defendants, where some of her collaborations formed the basis of their defamatory statements," against Ms. Naughton.   Affidavit of Shelly McDougall, item # 17 and 19.

In January 2021, Defendant Trinks and Councilman McAuliff asked WHA Chairman McKenney (an African American) and feigning concern for him, on the basis "he needed to leave the WHA, and it would be good for [him] to do so, because things were getting bad at the WHA, 'so they can replace him with someone partial to removing Ms. Naughton.'" **Affidavit of Randy McKenney, item # 31**.

The request to Mr. McKenney, coincided with Gutcheon's statement to Defendant Brian Smith on January 7, 2021, that "he would mount pressure against Ms. Naughton in the media, and then get the Town Council to appoint commissioners partial to removing Ms. Naughton" - Jamaal and Englemann's respective appointments to the WHA Board.  In March 2021, Defendant Gutcheon went to the bank and tried to remove Ms. Naughton from the WHA bank accounts, despite the fact he was not authorized to manage the WHA's operations.  In the meantime, Jamaal and Defendant Smith continued to gather additional signatures, contrary to their original representation that 90% of the tenants/residents had signed the petition, while Defendant Schumsky continued to pass information to the defendants, they to serve their purpose to defame Ms. Naughton.

As a result of the defendants' interference, Ms. Naughton suffered injuries.  In or around March 24, 2021, Ms. Naughton's doctors placed her sick leave from the WHA, when she developed anxiety and depression, and began losing weight and her hair.  Ultimate, the defendants terminated Ms. Naughton's employment on May 10, 2021, causing substantial injuries.

## E.  PRAYER FOR RELIEF

For the foregoing reasons, the defendants' Motion to Dismiss must be denied.

**FOR THE PLAINTIFF,**
**URLEEN NAUGHTON,**

BY_____/S/_____          Dated:  October 30, 2021
Richard C. Gordon, Esq.,
Fed Bar No.: ct27288
40 Court Street
Windsor, CT 06095
Tele: (860) 534-0547
Email:  rcgordonlaw@gmail.com.

## CERTIFICATION OF SERVICE

The undersigned counsel certifies that a copy of the foregoing Memorandum of Law in

Opposition to Defendants' Motion to Dismiss will be served upon the Defendants on or

immediately after October 30, 2021, via the Court's electronic filing system in accordance with the

Local Rules to all counsel of record.

**FOR THE PLAINTIFF,**
**URLEEN NAUGHTON,**

BY_____/S/_____          Dated:  October 30, 2021
Richard C. Gordon, Esq.,
Fed Bar No.: ct27288
40 Court Street
Windsor, CT 06095
Tele: (860) 534-0547
Email:  rcgordonlaw@gmail.com.