**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| URLEEN NAUGHTON ) | CASE NO.: 3:21-cv-402 (KAD) |
| **Plaintiff** ) | |
| ) | |
| v. ) | **PLAINTIFF'S MEMORANDUM OF LAW IN** |
| ) | **OPPOSITION TO DEFENDANTS' WINDSOR,** |
| ) | **JOURNAL ENQUIRER, ANTHONY ZEPPERI,** |
| ) | **JOURNAL INQUIRER, AND JOE CHAISSON'S** |
| ADAM GUTCHEON, et al., ) | **MOTIONS TO DISMISS** |
| **Defendants.** ) | |
| ) | **October 30, 2021.** |
| _) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**WINDSOR JOURNAL ENQUIRER, ANTHONY ZEPPERI, JOURNAL INQUIRER,**
**AND JOE CHAISSON'S MOTION TO DISMISS**

**COMES NOW THE PLAINTIFF**, Urleen Naughton by and through counsel moves

pursuant to the Federal Rules of Civil Procedure, and Rule 7 of the Local Rules in opposition to

Defendants' Journal Inquirer, its reporter, Anthony Zepperi, The Journal Inquirer, and Joe

Chaisson, its reporter's (hereinafter, the Defendant) Motions to Dismiss her First Amended

Complaint, dated May 17, 2021.

As a preliminary matter, Ms. Naughton requests that the Court incorporate by reference the

five other memoranda in opposition to the non-media defendants, and all the exhibits used in

reference to her opposition to those memoranda, filed in opposition to the motions to dismiss

filed by the other eleven (11) defendants.  Because the issues surrounding the media defendants

are similar, Ms. Naughton will treat their claims in one memorandum herein.

Further, Ms. Naughton (hereinafter, the Plaintiff) filed a Second Amended Complaint in this

matter on October 27, 2021, on the basis she did not have access to the alleged defamatory

1

articles and some "letters to the Editor," that were published by the non-media defendants. As a result, Ms. Naughton's Second Amended Complaint, remains the same, except that the media defendants are now attached to specific Counts in her Second Amended Complaint. Although Ms. Naughton, has filed a Second Amended Complaint, she will confine her opposition, only to the media-defendants' Motion to Dismiss the First Amended Complaint.

## A. **PRELIMINARY STATEMENT**

. Ms. Naughton asserts that there is ample evidence showing that both her First and Second Amended Complaints provide plausible claims for relief on the basis of conspiracy, violation of privacy-defamation and false light, as well as tortious interference with her contractual relations with the Windsor Housing Authority (Hereinafter, WHA). Ms. Naughton asserts that the natural person, nonmedia defendants acted in concert with the media defendants at first to assail her character, her integrity, and her standing in her community, and in her chosen industry.

That based on the defendants' joint conduct, Ms. Naughton's thirty-year (30) reputation in her chosen industry was ruined by the collective defendants.

For all relevant times, Ms. Naughton was a private person, and she has been a resident of the Town of Windsor for the past twenty (20) years. Ms. Naughton is a highly competent-African American woman, who holds a master's degree, speaks Spanish, French, Creole, she has worked for twenty-five (25) years as a Housing Hearing Officer, and she has a stellar thirty (30) year career in the housing industry.

The WHA is a quasi-public corporate entity which provides housing for the aged, disabled and the indigent. The WHA came into existence in Windsor, based on a cooperative agreement signed by the parties in February 1968. **Exhibit # 13, Agreement between Windsor**

**and WHA, February 1968.** As part of this agreement, the town consented to "furnish normal services and facilities," like it does to all other tax paying entities in the town. **Exhibit # 13, Agreement between Windsor and WHA, February 1968.** Essentially, the WHA is a landlord that manages three apartment complexes in Windsor, Fitch Court Apartments, Millbrook Village and Shad Run Apartments. **Affidavit of Urleen Naughton, item # 7.** By statute, the WHA is considered a quasi-public corporate entity, primarily because it accepts Section-8 from the Housing and Urban Development (hereinafter, HUD). The WHA's Section-8 program comprise a mere 12 percent (12 %) of its annual revenue, while the remaining 88 percent (88%) derives from the entity's private rental units in the three named apartment complexes. For example, the Fitch Court Apartments is a wholly private LLC, and the WHA Executive Director is the president of the LLC. **Affidavit of Urleen Naughton, item # 7.** The Connecticut Housing and Finance Association (Hereinafter CHFA) is a financial organization, and the Mortgagee to the WHA loans. In other words, makes loans to the WHA and has no administrative authority over the WHA's day-to-day operations.

The WHA operates independently from the Town of Windsor. Although the WHA is located in the Town of Windsor, the town does not contribute any funds to the WHA's operation, it does not own the WHA, it does not maintain any administrative responsibilities over the entity, it has no jurisdiction over the affairs of the WHA, and the executive director does not serve at the pleasure of the Town of Windsor's Town Council, or the mayor. In fact, in or around 2017, the Housing Authority changed its name from the Housing Authority of Windsor (HAW) to the Windsor Housing Authority (WHA) in an attempt to change the perception that the authority was a Windsor operated entity.

By state statute, the town merely interviews, recommend, and appoints "commissioners

to the WHA Board of Commissioners," and the commission has oversight responsibilities over the WHA.  Once appointed, the Board operates independently of the Town of Windsor.  Based on the size of the WHA's apartment holdings, the board consists of five members, and it is led by a chairman, who is elected by the board members.  The Board's primary responsibility is to ensure that the WHA executive director perform "her job" in accordance with the WHA's bylaws.  **Affidavit of Randy McKenney, item # 6-9.**  Any report the WHA makes to the Town of Windsor, is done as a mere courtesy, and is not mandated by state statute, local ordinance, or the entity's bylaws.  As a landlord, the WHA pays and maintains its own liability insurance, maintains employee benefits, and pays the salaries of its staff exclusively from funds it collects from its rental units.  The physical administrative office of the WHA is located in a refurbished school building, which was also converted into the Fitch Court Apartments.

The defendants' conspiracies were tainted with racially discriminatory animus, hostile work environment, retaliation, incessantly harassing conduct towards Ms. Naughton, leading to threats of physical violence against her and her staff.  The facts show that the defendants took acts in furtherance of their agreement to terminate Ms. Naughton's employment, based on the misrepresentation and lies they contrived in the document referred to as "the petition."  That after the defendants agreed on their joint action to terminate the Plaintiff, they took to the media to destroy her personally and professional, some stated so publicly, while others resorted to similar destructive sorties to the local newspapers (Windsor Journal Weekly, Hartford Courant, the Journal Inquirer (hereinafter, WJW, the Courant, and JI), as well as the Windsor Town Council, social media, and by word of mouth.  **Affidavit of Randy McKenney, item # 35.**

For all times relevant, the Plaintiff was a private citizen, and remained out of the public sphere as she had done for all her adult life inside and outside of the Town of Windsor, even

during the times the defendants publicly trammeled and destroyed her reputation.  Ms. Naughton

did not respond to any of the defendants "stated goal and conduct to assail and destroy her

reputation," at any point.  At all relevant times, the four (4) public-official defendants, The Town

of Windsor's Mayor Trinks, Councilwoman Bress, State of Connecticut Representative Garibay,

and Chairman of the Windsor Democratic Town Committee Gutcheon engaged in concerted

actions with their private-party defendants, three members of the press and their employers to put

their plans and schemes into effect to terminate Ms. Naughton.  **Affidavit of Urleen Naughton,**

**items #17-22 and Affidavit of Randy McKenney, item # 19, 23, 26, 29-33.**

Essentially, the defendants' goal was to ultimately terminate Ms. Naughton's

employment, but at all times leading up to that event, they "mounted pressure" on her, and

destroy her thirty-year reputation in housing industry.

The Plaintiff believes that the motive underlying the defendants'' conduct is that "they

wish to get their hands on the WHA funds for their personal enrichment," and to return the WHA

to the days when it admitted unqualified residents to the WHA facilities in violation of HUD

rules, and the WHA's.  **Affidavit of Urleen Naughton, item # 55, Affidavit of Randy**

**McKenney, item # 26-30, Affidavit of Robert Berman, items # 11-13, and Affidavit of Shelly**

**McDougall, items # 17-23.**  In her view, "why else would they contrive the allegations in their

petition, destroy my reputation, attempt to block my access to WHA bank accounts, when the

evidence shows I have never logged into the WHA accounts, not once!" **Affidavit of Urleen**

**Naughton, item # 55.**

At all relevant times, the Windsor Journal Weekly has been a member of the Windsor

Chamber of Commerce, of which Defendant Gutcheon is the executive director.

## B.  FACTS

The defendant's quest to terminate Naughton was various, continuous, and unrelenting, and the media defendants were an integral part of this conspiracy.

Beginning in October 2020, Defendants Gutcheon, Trinks, Bress, Garibay, Jamaal, McAllister, Englemann, and Grossman began a concerted effort to oust Naughton from her position as Executive Director of the WHA, because of her race.  Defendant Smith joined the group in January 2021, while Defendant Schumsky is believed to have joined the group surreptitiously in or around late November 2020.

The facts show that the defendants, Gutcheon, Garibay, Trinks, Bress, Jamaal, McAllister, Englemann, and Grossman began assembling as a group, around September 2020. Defendant Smith who joined in or around January 7, 2021, after holding discussions with Defendant Gutcheon on the group's plans to terminate the Plaintiff.  **Affidavit of Nelson Sylvia, item # 26.**  The defendants' concerted effort was intended to oust Ms. Naughton from her position as Executive Director of the WHA, based on her race, and by destroying her reputation. **Affidavit of Nelson Sylvia's, item # 26.**  More particularly, on January 7, 2021, Defendant Gutcheon explained to Defendant Smith that "the group intended to mount pressure against Ms. Naughton until she resigned, or she was terminated."  According to Defendant Smith, Gutcheon explained that "[they] intended to remove either Commissioner Mack, or Woodard from the WHA Board and replace them with commissioners who would terminate Ms. Naughton."

The Defendants' plans to oust Ms. Naughton manifested from a document referred to as "a petition," in which they alleged was drafted and published by Defendants McAllister and Jamaal, in or around October 2020, two residents of WHA's Millbrook Village Apartments. This document sought, *inter alia,* to have Ms. Naughton removed as Executive Director of the WHA due to alleged problems and issues with the WHA's property at Millbrook Village

("Millbrook"), and Fitch Court as alleged by Defendant Smith.   **Exhibit # 3, Petition and Exhibt # 11 (s), Defendant Smith's Letter to the Journal Inquirer, April 13, 2021.**

The "petition" was a twelve-page (12) document, including two pages of alleged signatories to the grievances outlined in it.   **Exhibit # 3, Petition.**  The document was contrived with, and was riddled with intentional falsehoods, including but not limited to:

*i.*         **Summary of the Petition**.  **Exhibit #** 3.

Naughton was harsh and abusive towards residents; that Naughton told residents they should be glad they have a roof over their heads and that if they did not like things they should go buy a house; that Naughton clandestinely removed two computers from the Community Room; that Naughton relentlessly bashed and smeared the previous Executive Directors; that Naughton fired experienced and competent employees and replaced them with ineffective and incompetent workers of her own choosing; that Naughton lies recklessly and shamelessly; that **Naughton threatened and defrauded tenants**; and that Naughton frequently threatened residents with eviction if they disagreed with her; that **she was dishonest**; that she towed visitor's vehicles; that she rejected the sound recommendations of WHA contractors; that she underestimated dangerous electrical problems; left tenants without heat for weeks, and even months; maintained a bodyguard on the Millbrook premises. **[Emphasis added] Exhibit # 33, The Petition.**

Other sections of "the petition" claimed that the Plaintiff viewed maintenance as tenant's financial responsibilities; **extorted ill-gained revenue** from tenants through **usurious profit oriented collection practices backed by illegal, harassing threats**; that she regularly terrorized indigent aged, mentally and physically disabled tenants with eviction; **wasted administration expenditures** by purchasing a new lawnmower, new truck, new snow blowers, a new covered,

enclosed truck trailer, a new cavernous prefabricated shed, and most notably, a ridiculous and unnecessary deluxe golf-cart for management to use when touring the [small] grounds; that she provided below standards moving services done by **non-professional paid under-the-table laborers** that arrived with no equipment whatsoever and use [sic] a derelict shopping cart to haphazardly move tenants; that she regularly overlooked existing tenants and generously renovated units to **preferred outsiders;** that new handicapped units hazardous to disabled tenants-flooring [had] raised strips of vinyl between floor sections . . . and tenant complaints were ignored; that she maintained a failed strategy of dividing and isolating tenants from one another-an isolated tenant is a weakened and vulnerable tenant and that is what this adversarial management wants; that the tenants [stood] together [in] protest  . . .the hurtful policies and practices of the abusive, corrupt, and dishonest Executive Director.  **[Emphasis added] Exhibit # 33, The Petition.**

#### *ii.*  <u>**Defendant Gutcheon, the Lead Conspirator.**</u>

Defendant Gutcheon was appointed to the WHA Board of Commissioner on November 3, 2020, by the Windsor Town Council, at the behest of Defendants Garibay, Bress and Trinks. At his first WHA Board meeting on November 17, 2020, Gutcheon stated on the record, in earshot of all present via ZOOM that "Windsor is a very racist town, and they try to sweep it under the rug as if it does not exist." **Exhibit # 18, transcript WHA November 17, 2020, Meeting.**  He also acknowledged that "there have been many racism [sic] statements from residents towards and about the [WHA] staff members." **Exhibit # 18, transcript WHA November 17, 2020, Meeting.**

At the next meeting, held on December 17, 2020, Defendant Gutcheon moved to have the statements stricken from the official Board minutes, claiming "he was either misquoted or

misunderstood." Commissioners Della Rondinone (vice-chair), Randy McKenney (Chairman), and Robert Berman from the Bloomfield Housing Authority (a guest at the meeting) heard the attempted retraction. **Affidavits of Randy McKenney, items # 15, Della Rondinone, items # 13, and Robert Berman, items # 29-30, Chairman of the Bloomfield Housing.** All three, attendees at the November meeting, WHA Chairman Randy McKenney, WHA Vice-Chairman, Della Rondinone, and Mr. Berman swore in individual affidavits about the statements they heard in both the November meeting, as well as the meeting held on December 15, 2020. **Affidavits of Randy McKenney, items # 15, Della Rondinone, items # 13, and Robert Berman, items # 29-30, Chairman of the Bloomfield Housing.**

From the beginning of Defendant Gutcheon's tenure on the WHA Board, he made it clear that his goal was to force Naughton out of her position as Executive Director. Prior to the December 15, 2020, WHA's Board meeting, Gutcheon sent an email to fellow commissioners in which he sought to add to the meeting's agenda "a motion to go into executive session to discuss the appointment, employment, performance, evaluation, health or dismissal of a public officer or employee." This was the same notice he sent out around May 8, 2021, leading to Ms. Naughton's eventual termination on May 10, 2021. **Exhibits # 4 and 24.** May 8, 2021, marked the third time in six (6) months that Defendant Gutcheon had introduced a resolution to the WHA Board, calling for Ms. Naughton's termination of employment. **Exhibits # 4 and 24.**

Former chairman of the WHA, Randy McKenney informed Ms. Naughton in or around September 2021 that during the summer of 2020, at the height of the Covid-19 Pandemic state mandated lockdown, Defendant Gutcheon showed up unannounced at his home, and made inquiries about her competence, and performance as the executive director of the WHA.

**Affidavits of Urleen Naughton, item # 50 and Affidavit of Randy McKenney, items #  19, 26, 29-33, 35.**

This unannounced visit by Defendant Gutcheon occurred approximately four (4) months prior to publication of the petition (publication to the Windsor Town Council) in late October 2020.  At all times relevant, Mr. McKenney informed Defendant Gutcheon that "Ms. Naughton did her job very well."  **Affidavit of Randy McKenney, items # 6.**

> ### *iii.* <u>Annual Report of WHA to Windsor Town Council, December 7, 2020.</u>

On December 7, 2020, at the Town Council meeting, "Mr. McKenney was bushwhacked," by the Windsor Town Council, comprising Defendants Trinks and Bress!  Mr. McKenney was not apprised about the existence of the petition before the meeting, and when it was clear he could not respond to Council members' questions directed to the grievances noted int the petition, Defendants Bress and Trinks agreed on the record they would provide him a copy of the petition.  At not point did they inform Mr. McKenny, they had sent, or would send a copy of the petition to the Housing and Urban Development (herein referred to as HUD), and the Connecticut Housing Finance Administration (herein referred to as CHFA), prior to sending a copy to Mr. McKenney. The WHA is not statutorily required to provide "an Annual Report," and does so to the Windsor Town Council as a mere courtesy.

Before McKenney and the WHA received a copy of the petition, the defendants sent copies to HUD, CHFA, the Windsor Journal Weekly (herein referred to as WJW), the Journal Inquirer (herein referred to as JI), and the Hartford Courant Newspaper (herein referred to as the Courant).  The WHA did not obtain a copy of the petition until weeks later on January 11, 2021, when the defendants including Defendant Gutcheon knew the necessity of the WHA responding to HUD and the CHFA, regarding the alleged allegations arising from the petition.  **Please see**

Exhibits # 17, Windsor Council Minutes, December 7, 2020, Page 9, para #2, "Councilor Rumpella Bress' comment and Exhibits # 11(a), 11(d) and 11(e)-Letter to the editor by Gutcheon, and two articles by the Hartford Courant.

### iv. Publication by Defendants Gutcheon, Trinks, Bress, and Garibay

The WHA was required to respond to inquiries posited from the CHFA and HUD about the claims made in the petition, by the end of December 2020, which necessitated the WHA's attorney, Ms. Claire Howard to request two extensions, prior to her published findings on January 17, 2021.  In other words, the WHA was totally bypassed with a publication of the petition, until January 12, 2021, while the document was being sent around at the Windsor Town Hall, to the local newspapers-WJW, JI, the Hartford Courant, to town residents, and among the defendants, by Defendants Garibay, Gutcheon, Trinks, Bress, and the other non-state official defendants. In the end, it was the CHFA which sent a copy of the petition to the WHA, for a response on January 11, 2021.   Neither Defendants Trinks nor Bress sent a copy of the document to the WHA as they promised at the December 7, 2020, Town Council Meeting. **Please see Exhibits # 17, Windsor Council Minutes, December 7, 2020, Page 9, para #2, "Councilor Rumpella Bress' comment and Exhibits # 11(a), 11(d) and 11(e)-Letter to the editor by Gutcheon, and two articles by the Hartford Courant.**

On or around January 7, 2021, Defendant Gutcheon met with Defendant Smith and during that meeting, he outlined his group's game plan to terminate Ms. Naughton.  After recruiting Smith into his group of conspirators, Defendant Gutcheon informed Defendant Smith that he was committed "to terminate Ms. Naughton's employment as the executive director of the WHA, as well as, her entire staff, once the Windsor Town Council had replaced enough commissioners with new commissioners, who would side with him to vote out Naughton."

**Sylvia's Affidavit, item # 26.**  By the end of January 2021, over nine (9) articles or Letters to the Editor had been published by, the local newspapers.  **Exhibit # 11 (a), (b), and (e)**

As the lead person on the plan to terminate Ms. Naughton, Defendant Gutcheon further outlined the defendants' strategy to Smith that, "he intended to use the media to mount pressure on Naughton," though this aspect of his plan had already begun at this point, by virtue of the fact that The Courant, WJW and JI had already produced articles about the petition, prior to December 31, 2020. **Affidavit of Nelson Sylvia, item # 26 and Exhibit # 11 (a), 11 (b), 11 (c), 11 (d),  11 (e), 11 (f), 11 (h) 11 (i) and 11 (l).**

Immediately upon joining the WHA Board, Gutcheon embarked upon a campaign to criticize Ms. Naughton harshly, always lacking context, was domineering and unrelenting, and was always out of order, despite the fact he had only been a member of the WHA Board mere weeks, and admittedly knew little about housing.  **Affidavit of Della Rondinone, items # 24-29.**

On multiple occasions, Gutcheon has made false statements about Naughton, including but not limited to the following: "that **Naughton was running a deficit at the WHA**," (when in fact, she was running a surplus); that "she **forced residents to pay to have their belongings moved from one unit to another to accommodate renovations**."  Most damaging of all, Gutcheon and his co-defendants alleged, and published statements that "Naughton harassed and intimidated residents, and **she stole WHA funds, and engaged in securing 'ill-gotten fees from tenants to tenants/residents**.'" **Exhibit # 33.  [Emphasis added]**

At all times relevant, all the defendants, including Garibay, Gutcheon, Trinks and Bress took steps ensuring Ms. Naughton's termination, and at no point did any of these policymaking individual (Garibay, Trinks Bress and Gutcheon) make any inquiries to Naughton as to the truthfulness of the petition, initially published by Defendants McAllister's and Jamaal's, or at the

least, stopped the other defendants from destroying Naughton's excellent thirty-year (30) reputation through the falsities represented in the petition.

At various points, all the defendants, including Garibay, Trinks, Bress and Gutcheon acted in furtherance of their plan to destroy, defame, and terminate the Plaintiff, employment. That Defendants Gutcheon, Jamaal, and Englemann, as agents/representatives/officials of the WHA acted *ultra vires* to terminate the Plaintiff on May 10, 2021, in violation of the contract she signed in August 2020 with the WHA. For her part, Defendant Schumsky concocted lies, and fed them to Gutcheon, who then published them to the other defendants. It was Defendants Trinks and Bress who in concert interviewed, recommended, accepted for appointment, voted on, and ultimately appointed their co-conspirators, Englemann and Jamaal, after they had done the same in Gutcheon's case. Defendants Bress and Trinks appointed Englemann, Jamaal and Gutcheon to the WHA Board of Commissioners for the singular purpose of destroying and then terminating Ms. Naughton. **Affidavit of Randy McKenney, items # 19, 26, 29-33, 35.** When Defendant Bress was informed in November 2020 by the **Town Manager's Office** that, Jamaal was a democrat and therefore he could not serve on the WHA Board, because there were already three democrats (McKenney, Mack, and Gutcheon) on the WHA Board, she stated "I will interview him for the board anyway!" **[Emphasis added]**

### *v.*  Acts in Furtherance.

All the defendants engaged in specific acts in furtherance of their conspiracy to terminate Ms. Naughton. Other defendants also acted in furtherance of the plan to destroy Ms. Naughton's reputation and terminate her employment, prior to May 10, 2021, when their goal was finally accomplished. The facts show that Defendants Trinks and Bress colluded to remove Commissioner Della Rondinone, a longstanding "Republican" member from the WHA Board of

Commissioners, because she spoke in support of Ms. Naughton in the November 2020 WHA board Meeting when she was attacked by Gutcheon, and for them to stack the Board of Commissioners with "newly appointed members who were partial to their goal to terminate Naughton," as stated by Gutcheon. **Affidavit of Nelson Sylvia, item # 26.** More specifically, Trinks sent a letter to Ms. Rondinone removing her from the WHA Board of Commissioner on February 1, 2021, then appointed Jamaal to the WHA board on the very next day, on February 2, 2021. **Affidavit of Della Rondinone, item # 34-35.**

Ms. Rondinone's removal by Defendants Trinks and Bress was executed simultaneously with their interviewing, recommending, and participated in appointing Defendant Jamaal (interviewed, November 2020) and Defendant Engleman's respective appointments to the Windsor Housing Board of Commissioners on February1, 2021 and March 1, 2021. As earlier asserted, Defendant Jamaal was one of the two authors of the "petition," while Defendant Englemann was an active participant in the drive to oust Naughton months before October 2020. **Affidavit of Randy McKenney, items # 19, 26, 29-33, 35.**

When Defendant Bress was informed **by the Town Manager's Office** in November 2020 that, Jamaal was a democrat and therefore he could not serve on the WHA Board because there were already three democrats (McKenney, Mack, and Gutcheon) on the WHA Board, she stated "I will interview him for the WHA board anyway!" Thereafter, Defendant Jamaal, tried to join the WHA board as a "tenant commissioner," but found he could not serve because he was not elected by the tenants at Millbrook Village, in violation of the WHA Bylaws and State law. **Exhibits # 21, 22, and Exhibit # 23,** It is believed at this point, Defendants Trinks and Bress instructed Defendant Jamaal to change his party affiliation to "unaffiliated." **Exhibits # 17 and**

**19.** Defendants Trinks and Bress then prepared Jamaal for approval before the Windsor Town Council.  **Exhibits # 17 and 19.  [Emphasis added]**

After Commissioner Woodward resigned as Chairman of the WHA on March 22, 2021, Defendant Gutcheon maneuvered his way to, and ascended to the chair of the WHA.  At this point, held the position of Windsor Democratic Town Chairman, and Executive Director of the Windsor Chamber of Commerce.  His membership on the WHA Board was a clear violation of Connecticut General Statute § 8-41, Appointment. Qualifications and Tenure of Commissioners, which provides in pertinent parts that "no commissioner of an authority may hold any public office in the municipality for which the authority is created," and the WHA Bylaws.  **Exhibit # 23, WHA Bylaw, Art. VI, Sec. 2, and Conn. Gen. Stat. § 8-41.**  Since the Windsor Journal Weekly was a member of the Chamber of Commerce, Defendant Gutcheon headed, it was not surprising when Defendant Gutcheon informed Defendant Smith in January 2021, that "he would mount media pressure on Ms. Naughton until she was terminated," and that "Defendants Trinks and Bress provided Commissioners committed to the plan to fire Naughton."

### *vi.*     Newspaper Publications-Exhibit # 11

All articles were written with the same thematic interconnectedness and in concert with the defendants plans to destroy Ms. Naughton, on the basis she was incompetent, failed to perform her job, was an angry Black woman who threatened, retaliated against residents/tenants, and who stole WHA funds.  **Exhibits # 11 (e), (f), (h), (i), (o), (q), (r), and (s).**

Defendants Gutcheon, Grossman, and Smith mounted their campaign against Ms. Naughton through the Windsor Journal Weekly, the Hartford Courant, and the Journal Inquirer Newspaper.  Articles were written by Defendant Joe Chaisson of the Journal Inquirer, Steven Goode of the Hartford Courant (not a defendant in this case), and Anthony Zepperi of the

Windsor Journal Weekly, affectively parroting the false claims from the "petition." Gutcheon, Smith and Grossman timed their scandal-laden letters to the editor, and opinion-hit-pieces (Op-eds) to the newspapers (JI, the Hartford Courant and WJW) to coincide with their stated plans to "pressure" Ms. Naughton until she was terminated. **Affidavit of Nelson Sylvia, item # 26.** Between December 16, 2020, and May 11, 2021, over twenty-four (24) articles were written about and concerned Ms. Naughton and her stewardship of the WHA, which were published by the WJW, JI, and the Courant. **Exhibit # 11 (a---s), Exhibit # 12, and Exhibit # 32.** In one instance, the WHA Board of Commissioners Chairman, Robert Mack, wrote a "letter to the Editor," of the WJW, only to see a rebuttal by Defendant Gutcheon on the succeeding page of the same edition of the paper. **Exhibit # 2(a) and 2(b).**

    *vii.*      **Summary of all related Articles, Opinion Pieces, and Dates of Publication.** **Exhibit # 11 (a through s): The statements listed here include the following but are not limited to:**

    **(a) December 20, 2020, WJW- Letter to the Editor, "There is a Problem in Housing Authority," Written by Adam Gutcheon.** In this piece, he represented that "ninety (90) percent of the residents signed the petition; that tenant feared retaliation if they approached the WHA Board; that, members of the Town Council were mocked and reviled in their absence by the WHA Board; they were complicit in the abandonment of their duties, they should resign."

    **(b) January 2021, WJW- Letter to the Editor, "Can We Have a Conversation?"** **Written by Commissioner Robert Mack.** Asserted that "Gutcheon had communicated with HUD and CHFA instead of bringing the alleged residents' complaints to the WHA Board. . . "

    **(c) In the same publication (January 20221), and on the next page of the same edition of**

**the WJW-Letter to the Editor, "It's Time for Action-Not Words." Written by Adam**

**Gutcheon."**  "This piece was written as a rebuttal to Robert Mack's letter and asserted that 'the

WHA received a copy of the petition on December 10, 2020; the WHA went nine (9) months

without holding a meeting; that the complaints arising from the petition was shared with the

WHA Board of Commissioners, over a month ago. That, he communicated with HUD and

CHFA, he was the only commissioner who did a course on housing, and that he talked with the

residents. . . ."

(d) December 22, 2020, **Hartford Courant Article – "Officials Disagree Over Cause of**

**Delay to $3.8 million Public Housing Renovation Project." written by Steven Goode.** "That

the petition was published by the Town Council to the Hartford Courant," rather than to the

WHA Board.

(e)  December 16, 2020, **Hartford Courant Article- "Tenants of Windsor Housing**

**Project Allege Years of Poor Treatment," written by Steven Goode.  (detailing seven**

**recurring specific misrepresentations):** "That tenants were forced to pay to move their

belongings from their old units to newly renovated units; that the petition's allegations include

poor or no response from the maintenance department on needed repairs like lack of heat and

waste from toilets rising up through plumbing in other rooms, as well as threats and harassment

of residents by the management team and executive director; that [tenants needed] to go buy

[themselves] a house and  . . . [they needed] to be grateful to have a roof over their head(s) at all;

and threats were made to tenants."

(f)  January 22, 2021, **WJW Article, authored by Anthony Zepperi- "Chair of WHA**

**Board of Commissioners Resigns Member Calls for Good Faith Investigation."** Alleged

that "fifty (50) tenants signed the petition and the **(detailing seven recurring specific**

**misrepresentations as (e) above)**.

   **(g) March 26, 2021, WJW Article, authored by Anthony Zepperi, "WHA Commission**

**Has a New Chair. Lawsuit Filed."**

   **(h) January 29, 2021, WJW Article, authored by Anthony Zepperi- "WHA**

**Tenants ask for Safety and Respect."**   This article detailed the same **seven recurring specific**

**misrepresentations in (e and f) above.**   In this article, Defendant Garibay stated that "she knew

why residents have been shy to have their concerns brought to the forefront and have been afraid

to speak up on these matters.  'They [the residents] haven't had a voice.' – 'They've been

afraid," Garibay [further] said, "they've been terrorized the whole time to ever say anything

because they're told 'you'll get kicked out.'"

   **(i) January 27, 2021, Journal Inquirer, authored by Joe Chaisson- "Protests Held**

**before Windsor Housing Authority Meeting."**

   **(j) April 1, 2021, Journal Inquirer, authored by Joe Chaisson- "Windsor Housing**

**Director: Attacks are Race-Based."**

   **(k) April 13, 2021, Journal Inquirer, authored by Joe Chaisson- "Windsor Residents:**

**Authority Executive Director tried to Intimidate them out of Complaining."** In this article,

Defendant Brian Smith wrote a letter, which was quoted by Ms. Chaisson, and asserted that "the

Executive Director terminated the previous landscaper and 'hired her own people;' that from

Spring 2019, no cleaning was being done; that the lawn at Fitch Court Apartments were no

longer being taken care of; that Naughton threatened not to renew his lease if he wasn't quiet;

that to threaten people with their lease was abuse; and that the executive director told him 'he was lucky to [have] gotten [into] his [apartment]," *inter alia.*

(l)   **January 28, 2021, <u>Hartford Courant Article- "Millbrook Village Residents rally against Housing Authority Leadership amidst Board Leadership Changes.  Written by Steven Goode</u>.**  This article detailed the same **<u>seven recurring specific misrepresentations in (e, f and h) above</u>.**

(m)  **May 10, 2021, <u>Hartford Courant ". . . Executive Director Terminated, Committee formed to Investigate Tenure."  Written by Steven Goode</u>.**  In this article, Defendant Gutcheon detailed that "he intended to investigate the tenure of the former executive director, Urleen Naughton [in term of] the books, papers, records, accounts, contracts, deeds, regulations, or documents relating to official misconduct committed by or at the will of Ms. Naughton."

(n) **May 11, 2021, <u>Journal Inquirer, "After Firing of Housing Authority Director, Windsor Tenants hope for a Change</u>," Written by Joe Chaisson.**  The article outlined that Ms. Naughton was terminated for "lack of candor and violation of the Commissions personnel policy, for her failure to turn over a copy of her contract (while she was on official sick leave)." The article also reinforced the allegations that under Naughton, "the WHA allegedly provided slow maintenance . . . and [presented] a general attitude of disrespect to tenants;" and that "Naughton had not responded to multiple requests for comment."   The thrust of Ms. Naughton's letter dealt with racial issues, a hostile work environment, threats of physical violence, vandalism (nails in staff's car tires) of staff's property.  None of these issues brought to the Council by Ms. Naughton were mentioned in the article.

(o) **March 28, 2021, <u>Hartford Courant "Windsor Housing Authority Executive Director</u>**

**files Federal Lawsuit." Written by Steven Goode.**  In this article, Defendant Gutcheon was asked for a comment and referred to Ms. Naughton as "depraved, for filing suit against low-income residents of Windsor public housing."  This article further detailed the same **seven recurring specific misrepresentations detailed in (e, f, h and l) above.**

(p) March 26, 2021, **Journal Inquirer, "Windsor Housing Authority director sues Officials, Tenants, Accusing Them of Bias." Written by Joe Chaisson.**  The lawsuit made reference to the fact that Ms. Naughton through her attorney, had filed a suit against officials, and tenants based on racism. It also quoted Defendant Garibay as saying that "their [meeting held on March 21, 2021] was not a secret, and did not include discussion of Naughton's removal . . ., was called at the last minute because U.S. Rep. John Larson was in the area, and that all she did was contact Taariq Jamaal, the resident commissioner. . . ." The article also quoted Defendant Gutcheon who stated that "the lawsuit could have a serious ripple effect on other communities. . . [especially by her suing] several public officials, two of her own tenants, two members of the commission and a state representative for doing their jobs in a way she doesn't approve of . . . just the cost of defending this, is  going to make people in other communities think twice about speaking up against power."   The article also mentioned that "Ms. Naughton previously sued the Salvation Army, her former employer . . . for violations of her civil rights . . . ."

(q) March 26, 2021, and March 28, 2021, **Hartford Courant "Executive Director files Federal Lawsuit." Written by Steven Goode.**  In this article, Defendant Gutcheon was asked for a comment and referred to Ms. Naughton as "depraved, for filing suit against low-income residents of Windsor public housing."  This article further detailed the same **seven recurring specific misrepresentations in (e, f, h, l and o) above.**

(r)      **On February 26, 2021, Article and Publication by Defendants Grossman**

   **In an editorial published by the WJW on February 26, 2021:**

which was replete with falsities about Ms. Naughton.  In this article, Defendant Smith

represented that "as soon as Ms. Naughton was hired as the executive director, she terminated

the contract of an existing landscaping company and instead 'hired her own people;'" he also

noticed "that cleaning was no longer being done." That, "the lawn outside Fitch Court, which

had always been mowed and maintained properly, was no longer being taken care of." That,

"there were areas of grass that were mowed just once in the summer of 2019 and then again once

in the summer 2020, meaning that several areas of grass had grown over a foot long and

remained so for the majority of the summer."

   Added to this, "we often have overflowing garbage and recycle bins, much of the excess

trash [got] blown away into the lawn surrounding our building. There has been a huge pile of

broken glass right by the dumpster that has been there for over a year. Broken tree limbs from

last year's storm litter [sic] the property to this day."

   In the Spring of 2019, "I talked to the Executive Director about these issues. I was falsely

told that everything was better than ever under her management, despite the obvious

deteriorating state of the grounds. Since the lawn was about a foot and a half high at the time, I

pointed to it and pressed the issue." He also claimed Ms. Naughton "told [him] that this is the

best it ever looked, and I [sic] wasn't quiet, my lease would not be renewed. Instead of

addressing resident concerns, the Executive Director is confrontational and threatening. When

hearing from residents about their concerns, Ms. Naughton attacks the messenger, with no regard

for the message."

(s)       On or around March 19, 2021, <u>Article and Publication by Defendant Smith</u>

**on or around March 19, 2021, Defendants <u>Smith and Grossman</u>, jointly published an**

**article in the JI,** "Dozens of Millbrook Village residents signed a petition detailing allegations

of abuse by the Windsor Housing Authority."   These allegations also brought to light "issues

having been ongoing since 2019, including threats of eviction for residents who spoke out about

living conditions, lack of handicapped accessibility, non-functioning toilets in single bathroom

units, and moving residents into units without functioning stove or refrigerator."  Rather than

resolve these issues, "employees of the Windsor Housing Authority have called residents drug

dealers and liars and indicated a lack of desire to investigate these allegations further."  They

have "also demanded residents tell them whether or not they've signed the petition."

That "the executive director . . . , Urleen Naughton, who was directly  named by

several residents in their complaints, has hired an outside law firm to conduct an investigation

into these allegations.  However, this same firm represented Ms. Naughton in a law suit (sic)

against the Salvation Army, in a case that was later dismissed.  The Housing Commission was

not notified of such a hire and did not give authorization."  Ms. Grossman further asserted that . .

. "a new tenant commissioner, who is required to be a resident of the Windsor Housing Authority

has been appointed by the Town Council to replace a commissioner whose term ended last

summer.  Despite the fact that the Town Council has the sole authority to appoint

commissioners, his appointment is being contested by the Windsor Housing Authority because

of his involvement with the petition."  **Please see Exhibit # 21, 22, and Affidavit of Della**

**Rondinone, item # 29.**  More recently, . . . "there has been a substantial rent increases (sic), in

access (sic) of 30%, imposed on certain residents who has chosen to speak out about these

allegations, in a move that appears to be retaliatory in nature."

Ms. Naughton did not respond to any of the attacks that were levelled against her at the

Town Council Meetings, or any of the scandalous pieces written about her in the local papers.

Neither of the local newspapers or their reporters checked the veracity of the claims made

against Ms. Naughton, the content of the petition, nor did they secure her "side of the story, or

the WHA's Board," before going to print.

On March 19, 2021, Grossman and Smith jointly wrote a letter to the editor of the

Windsor Journal, which Grossman then sent to every member of the WHA Board of

Commissioners to damage Naughton's reputation and have her removed as Executive Director of

the WHA.  In this jointly authored letter, Smith and Grossman made many false statements,

including but not limited to: "Naughton terminated the existing landscaping contractor

immediately upon being hired and instead hired 'her people;' that Naughton threatened not to

renew Smith's lease if he wasn't quiet; and that Naughton bullied, harassed and threatened

residents."  Smith and Grossman also specifically asked the Board to terminate Naughton's

employment.  All the while, Defendant Trinks was in contact with Smith and Grossman prior to

the letter being printed, and he sent a congratulatory text to his two codefendants after

publication of the letter to the WJW, "commending Grossman that 'the Smith letter was

extraordinarily well written.'"

On Sunday, March 21, 2021, Defendants Gutcheon, Garibay, Trinks, Bress, McAllister,

Grossman, Jamaal, Smith and Engelmann held a meeting at 1:00 p.m. with residents of

Millbrook Village Apartments to discuss Naughton's removal.  Ms. Naughton nor the two

African American commissioners, Robert Mack ("Mack") and Herman Woodard ("Woodard,"

who was chairman of the WHA at the time), were neither invited to, nor informed of this

meeting.

At this meeting, "a plan was discussed to replace either Mack or Woodard with a new commissioner who would vote along with Gutcheon and Jamaal first to suspend Naughton and then to terminate her," contrary to the terms of her contract with the WHA. **Affidavit of Nelson Sylvia, items # 10-15, 21-27.** Commissioner Woodard resigned on March 22, 2021, the day after Trinks promised the residents and his codefendants at the March 21, m2021 meeting that a "change was coming soon at the WHA." **Affidavit of Nelson Sylvia, item # 11.**

In February 2021, newly appointed Commissioner Jamaal (Rondinone's replacement on the WHA Board), reiterated his intent to have "the whole staff of the WHA fired, including Ms. Naughton." In April 2021, the WHA Board which comprised Gutcheon, Englemann, Jamaal, and Mack (did not approve of Ms. Naughton's firing) convened to terminate Ms. Naughton but suspended their action for the time being, pending Gutcheon securing a copy of Naughton's contract. Added to this fact, Gutcheon and Jamaal also learned that Engleman's appointment would not have been effective until April 1, 2021, because her appointment could only take effect, thirty (30) days after March 1, 2021, the date of her appointment.

### *viii.*   DEFENDANTS OTHER "ACTS IN FURTHERANCE"

The defendants engaged in conduct in furtherance of their conspiracy to terminate Ms. Naughton, which included but were not limited to:

**1. Jamaal** was a major contributor to the defamatory contents of the petition, and he continued to garner signatures for the petition into April 2021, albeit on a fraudulent basis. **Exhibit # 33, The petition and Affidavit of Urleen Naughton, item # 62.** He actively manipulated tenants from moving from their old apartments to newly renovated ones, in order to make Naughton look ineffective, and incompetent, consistent with the allegations made in the petition. **Affidavit of Robert Berman, items # 36-43.** He also attended, participated, and

assisted in planning the meeting to oust Naughton on March 21, 2021. **Affidavit of Nelson Sylvia, items # 7-8, 23.**

2. **Gutcheon** continued to call tenants up to and including April 4, 2021, "instructed them that they should not speak to Ms. Naughton, (she was still employed as the Executive Director of the WHA) and insisted on occasions that, ". . . Naughton told tenants, they were lucky to be living in their home/apartment?" He also planned, attended, assisted, and participated in the meeting to oust Naughton's on March 21, 2021. **Affidavit of Brandy Cook, items # 10-19 and Affidavit of Robert Berman, items # 15-28.**

3. **Schumsky** continued to provide misrepresentations to Gutcheon, Jamaal, and Engleman about Ms. Naughton, including her assertion that "Ms. Naughton was not sick," while she was on doctor prescribed sick leave, right up to May 2021. **Affidavit of Shelly McDougall, item # 17 and 19 and Affidavit of Nelson Sylvia, items # 7-8, 23.**

4. **Bress** sent a letter to the Windsor Board of Health stating that Naughton had left a tenant without heat (during the fall/winter 2020-21) and air conditioning for months (during the summer of 2020), where the tenant did not know how to turn on the controls- "he did not know how to turn on the heat in the apartment." **Affidavit of Commissioner Della Rondinone, items # 15-19.** Planned, attended, and assisted in the meeting to oust Naughton's on March 21, 2021. **Affidavit of Commissioner Della Rondinone, items # 15-19.** She also took an active role in replacing Della Rondinone on the WHA Board with Englemann and Jamaal, who were both partial to removing Naughton as executive Director of the WHA. This Defendant acted with Trinks to have Defendant Jamaal change his political affiliation from Democratic to Unaffiliated, so he could serve and provide a majority on the WHA Board of Commissioner committed to

terminate Ms. Naughton.  **Exhibits # 17 and # 19 and Affidavit of Della Rondinone, item # 20-36.**

5-6.    **Grossman and Smith** wrote letters to the local newspapers calling for Naughton's removal as executive director of the WHA, attended, assisted and participated in planning the meeting to oust Naughton on March 21, 2021. **Exhibit # 11 (r) and (s).**

7.    **Garibay** sent letters to HUD and CHFA in January 2021 giving the appearance Ms. Naughton was incompetent, unfeeling, and ineffective, and she planned, attended, assisted, and participated in the meeting to oust Naughton on March 21, 2021.  **Exhibit # 9 and Affidavit of Randy McKenney, items # 28-33.**

8.    **Trinks and (Bress)** received Attorney Howard's findings that there were "no wrongdoing by Naughton," praised Naughton for "doing good work, in December 2021," yet Bress and he, approved Jamaal and Engleman to the WHA Board of Commissioners to affect Naughton's termination; he later promised on March 21, 2021, that "a change was coming at the WHA soon." Both attended, assisted, and participated in planning the meeting to oust Naughton on March 21, 2021. **Affidavit of Nelson Sylvia, item # 11, Exhibit # 19, appointments of Jamaal and Engleman, and Affidavit of Randy McKenney, items # 28-33.**  In January 2021, Trink and Councilman Joe McAuliffe "feigned concern for McKenney and urged McKenney to resign as chairman of the WHA, because things were getting bad there.'" **Affidavit of Randy McKenney, items # 31.**

9.    **McAllister** was one of the original authors of the petition published in October 2020.  He also attended, assisted and participated in the planning meeting to oust Naughton on March 21, 2021. **Exhibit # 33, The petition, and Affidavit of Nelson Sylvia, items # 7-11.**

10. **Engleman,** was committed to terminating Ms. Naughton by assisting Gutcheon and Jamaal to vote for Ms. Naughton's termination, and she attended, assisted and actively participated in planning the meeting to oust Naughton on March 21, 2021. **Affidavit of Nelson Sylvia, items # 7-11.**

11-14. **Journal Inquirer, Windsor Journal Weekly, Joe Chaisson (Reporter II), and Anthony Zepperi (Reporter I).** Both newspaper publications and their respective reporters agreed to provide news coverage, but more particularly, they provided public dissemination of the falsities concerning Ms. Naughton by publishing numerous articles detailing the petition's misrepresentations. These defendants failed to investigate the allegations of the petition, and at no point did they secure Ms. Naughton's view regarding the allegations, even after receiving copies of Attorney Claire Howard's findings discrediting the allegations in the petition.

*ix.* **Naughton's Termination-May 10, 2021**

On or around May 6, 2021, Defendant Gutcheon offered the job of "interim executive director to Ms. Shelly McDougall," Ms. Naughton's second in charge at the WHA, while Ms. Naughton was six (6) weeks into her sick leave from the WHA. **Affidavit of Shelly McDougall, items # 14.** On May 8, 2021, the Board of the WHA comprising Defendants Gutcheon, Englemann and Jamaal served Ms. Naughton with notice of an emergency meeting of the WHA Board they planned to convene on Monday, May 10, 2021, despite the fact Ms. Naughton was on active sick leave, prescribed by her doctor, which was documented at the WHA.

The legitimacy of Ms. Naughton's sick leave was contradicted by Defendant Schumsky, on the basis "Naughton was not sick." **Affidavit of Urleen Naughton, items # 60.** Thereafter, Defendants' Gutcheon, Jamaal and Englemann summoned Ms. Naughton to an "emergency

meeting" on May 10, 2021, to terminate her employment as executive director of the WHA.

**Exhibit # 4, Termination by Timothy Fitzgerald, Esq., May 10, 2021.**

On Monday, May 10, 2021, Defendant Gutcheon, Jamaal and Englemann went forward with their "emergency meeting of the WHA Board at 10:00 am, absent Ms. Naughton, and voted to terminate her employment at approximately 10:30 am.  Mr. Mack was the third democrat on the WHA Board, he was present and abstained from the termination resolution.  **Exhibit # 4, Termination by Timothy Fitzgerald, Esq., May 10, 2021.**

At or around 11:30 am, on May 10,2021, Gutcheon cancelled Ms. Naughton's "access to the WHA's bank accounts, cancelled her car, demanded she return WHA property in her possession, warned her to stay away from WHA properties, and cancelled her access to WHA emails.  Defendant Gutcheon also simultaneously cancelled Ms. McDougall's access to payroll information, and all WHA email systems, despite the fact she was still employed by the WHA as the official "second in charge," and was offered the position of "Interim Executive Director" only four days earlier on May 6, 2021.  **Affidavit of Shelly McDougall, items # 11-17, and Affidavit of Urleen Naughton, item # 61.**

All the while, Defendant Gutcheon was the Chairman of the WHA (in violation of state statute) and maintained his positions as the Democratic Chairman of the Town of Windsor, and Executive Director of the Windsor Chamber of Commerce, despite Connecticut General Statute § 8-41 which provides in pertinent parts, that "No commissioner of an authority may hold any public office in the municipality for which the authority is created."

Prior to noon, Monday May 10, 2021, Defendant Gutcheon communicated to Ms. McDougall informing her that Ms. Naughton's employment had been terminated, hours before

Ms. Naughton was noticed at 4:42 pm on Monday, May 10, 2021. **Affidavit of Shelly McDougall, items # 11-17, and Affidavit of Urleen Naughton, item # 61.**

Later on the evening of Monday, May 10, 2021, Naughton was informed by a letter signed by the purported WHA's "General Counsel," Mr. Timothy Fitzgerald, Esq., (also a member of the Democratic Town Counsel with Gutcheon), which provided that "her employment with the WHA had been terminated, after a vote of the Windsor Housing Board of Commissioners-Gutcheon, Jamaal and Englemann (voted to terminate Naughton), for 'insubordination, lack of candor and violations of the Personnel Policy of the Housing Authority of the Town of Windsor.'" **Exhibit # 4, Termination by Timothy Fitzgerald, Esq., May 10, 2021.**

The Windsor Housing Authority bylaws do not provide for, nor does the title "General Counsel" appear anywhere in its various clauses, and the lawyer firm contracted to handle WHA business, Matson, Prestley and Parenteau, LLC., was not informed of Naughton's termination before it occurred, or that new board of Defendants Gutcheon, Englemann and Jamaal had invented the new title of "General Counsel of the WHA," without amending the WHA bylaws. **Exhibit # 23, WHA Bylaws.** Significantly, Ms. Naughton's termination letter was only signed by the purported "General Counsel," Attorney Fitzgerald, but not by any of the three WHA Defendants, who on May 10, 2021, presumably acted as the legal representatives of the Windsor Board of Commissioners (Chairman-Gutcheon, Jamaal, and Englemann-Vice Chair). **Exhibit # 4, WHA Termination Notice.**

Within one hour of terminating Ms. Naughton, Defendant Gutcheon removed her, as well as Shelley McDougal, the WHA's Housing Program Manager (an African American, who was still employed there) from all bank accounts, access to payroll information, and all WHA email

systems.  Gutcheon had previously attempted to remove Ms. Naughton from the WHA bank accounts in March 2021, but his intended actions were denied by the WHA bank, and Ms. Naughton was thus left as a signatory on the WHA bank accounts until May 10, 2021.  **Affidavit of Urleen Naughton, item #55, and Affidavit of Shelly McDougall, item #15, and Affidavit of Randy McKenney, items # 27-33.**

The three defendants on the Windsor Board of Commissioners, Gutcheon, Jamaal, and Englemann, did not provide Naughton with the basis for "insubordination, lack of candor, nor the specific Personnel Policy" she allegedly violated, though a previous letter sent to Naughton dated April 5, 2021, referenced her absence due to "medical leave," and her "refusal to produce documents listed in a duly passed resolution, constituted insubordination. . .."  Additionally, the letter also stated that ". . . withholding essential information from [the Board], refusing to communicate with it, and refusing to attend its meetings constitute[ed] serious misconduct . . . ." All the while, Ms. Naughton was absent from work on doctor prescribed sick leave.  **Exhibit # 4, WHA Termination Notice.**

The defendants' purported termination document also left open the fact that the Board "reserved the right to assert additional grounds for termination as additional facts came to light." **Exhibit # 4, WHA Termination Notice.**  True to form, the WHA has since been on a death-spiral, based on mismanagement arising after May 10, 2021.

## C. LEGAL STANDARD

When deciding a motion to dismiss for failure to state a claim upon which relief may be granted under Rule 12(b)(6), the court accepts as true all factual allegations in the complaint and draws inferences from these allegations in the light most favorable to the plaintiff. *See* Scheuer v. Rhodes, 416 U.S. 232, 236, (1974); Flores v. Southern Peru Copper Corp., 343 F.3d 140, 143 (2d Cir.2003). The court's review is limited to "the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." Samuels v. Air Transport Local 504, 992 F.2d 12, 15 (2d Cir.1993). The court considers not whether the plaintiff ultimately will prevail, but whether he has asserted sufficient facts to entitle him to offer evidence to support his claim. *See* York v. Ass'n of Bar of City of New York, 286 F.3d 122, 125 (2d Cir.), *cert. denied*, 537 U.S. 1089, 123 S.Ct. 702, 154 L.Ed.2d 633 (2002).

In reviewing the complaint in response to a motion to dismiss, the court applies a "plausibility standard," which is guided by two working principles. *See* Ashcroft v. Iqbal, 556 U.S. 662, 678, (2009). First, the requirement that the court accept as true the allegations in the complaint " 'is inapplicable to legal conclusions,' and 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' " Harris v. Mills, 572 F.3d 66, 72 (2d Cir.2009) (quoting Iqbal, 556 U.S. at 678, 129 S.Ct. 1937).

Second, to survive a motion to dismiss, the complaint must state a plausible claim for relief. Determining whether the complaint states a plausible claim for relief is " 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.' " Id. (quoting Iqbal, 556 U.S. at 679, (1937).

A court faced with a motion to dismiss pursuant to . . . 12(b)(6) is a decision on the merits and, therefore, an exercise of jurisdiction." Magee v. Nassau Cnty. Med. Ctr., 27 F.Supp.2d 154,

158 (E.D.N.Y.1998) (citing Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n, 896 F.2d 674, 678 (2d Cir.1990)).

## D. ARGUMENT.

1. **The First Amendment and The Fair Reporting Privilege Did Not Grant the Right of Unfettered Transgressions to The Defendants to Destroy Ms. Naughton's Integrity, Reputation and Professional Standing by Publishing Unverified Statements About Her Intended to Cause Injury**.

The Defendants' false statements are not immunized by the First Amendment right to freedom of speech. . .." Pathways, Inc v. Dunne, 172 F. Supp. 3d 357, 365 (D. Conn. 2001), *and* Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 743, (1983)

Generally, defamatory, or false speech that is of a purely personal nature, such as speech related to the economic or business interests of the speaker, does not receive special protection under the first amendment, Dun & Bradstreet v. Greenmoss Builders, 472 U.S. 749 (1985), or the common law. Miles v. Perry, 11 Conn. App. 584, 596 (1987).  This is particularly true when both the defendant and the plaintiff are private parties. McPhee Electric LTD., LLC., v. Konover Construction Corp, 2009 WL 4846555 Sup. Ct Conn. Citing Fuller v. The Day Publishing Co., 89 Conn. App. 237, 241, (2009) cert. denied, 275 Conn. 921, (2005).  There is a grey area, however, when speech is directed at a matter of public concern, including matters that may be of concern to the community. DiMartino v. Richens, 263 Conn. 639, 667, (2003) (speech concerning airport security), Cited by McPhee Electric Ltd., LLC., at *39.  The court must apply a two-fold test and determine first, as a matter of law, whether the topic is a matter of public concern and second, as a matter of fact, whether [the defendant's] opinions addressed the topic by looking at their content, form and context. Daley v. Aetna Life & Casualty Co., 249 Conn. 766, 777, (1999), Cited by McPhee Electric Ltd., LLC., at *39.

Under the rule enunciated by the United States Supreme Court in New York Times Co. v. Sullivan, the first issue a court must address is whether a plaintiff is a public figure [, since that issue] is dispositive of the standard of proof and the degree of fault of the defendants which the plaintiff had to prove.   376 U.S. 254, (1964), Miles v. Perry, 11 Conn. App. 584, 588 (1987). The principle was later extended to public officials for defamatory falsehood, absent clear and convincing proof that the defamatory falsehood was published or broadcast with actual malice, that is, with knowledge that the statement was false or with reckless disregard for its falsity. Id. And  New York Times Co. v. Sullivan, supra, 376 U.S. at 280.  The standard of fault applicable to "private individuals," on the other hand, merely requires the plaintiff to prove a negligent misstatement of fact.  Rosenblatt v. Baer, 383 U.S. 75, 84, 86 (1966).

The United States Supreme Court's subsequent decision in Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974), refined the controlling standard in defamation suits when such suits are brought by private individuals. "[S]o long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." Id., Gertz at 347.  Thus, if the plaintiff is a public figure, she would need to prove actual malice. Id at 589 *Citing* Holbrook v. Casazza, 204 Conn. 336, 342, (1987).  [B]ut if she is a private individual, she need only prove, by a preponderance of the evidence, negligence in the failure to investigate the facts properly prior to publication.  Corbett v. Register Publishing Co., 33 Conn. Sup. 4, 10, (1975); 3 Restatement (Second), Torts § 580B, pp. 221–22.

In Gertz, the United States Supreme Court defined the meaning of "public figure" for the purposes of the first and fourteenth amendments: "For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of

such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.  Gertz v. Robert Welch, Inc., supra, 418 U.S. at 345.

In the Miles case, the defendants argued that the plaintiff was a church official and as such their actions should be viewed in the context of the church environment, she was a public figure. Miles at 591.  The defendants point out the following facts in support of their position. (A) [A] meeting called by the church's board of trustees was a "Special Meeting" to "Report on Discrepancies of Church Funds" before the membership. (B) The plaintiff was discussed or alluded to only in her official capacity as financial secretary or finance committee member. Id.

The Miles Court found that "we cannot say that 1. the plaintiff thrust herself into the forefront of the church's financial affairs merely by serving as financial secretary.  Id at 590; 2. [Further], the plaintiff in this case did not voluntarily expose herself to public comment. Public officials and public figures, it may be assumed, invite public attention and comment. 3; no such assumption is justified with respect to a private individual who "has relinquished no part of his interest in the protection of his own good name."   Miles at 592, *Citing* Gertz at 345.  4;  The plaintiff did not "assume any role of especial prominence" in the affairs of the church, she did not voluntarily "thrust herself into the forefront" of the controversy over the church's financial affairs, nor did she seek elective office in the church. See, e.g., *Time, Inc. v. Firestone,* 424 U.S. 448, 453, (1976); 5. In her position as the former financial secretary or as a former finance committee member, the plaintiff did not have access to an effective means of communication in which to rebut the accusations made by the defendants against her. The plaintiff, as a private individual, is

"more vulnerable to injury than public officials and public figures."  Miles at 593 *Citing* Gertz v. Robert Welch, Inc., supra, 418  at 345.

Liability for defamation, even defamation per se, . . . can be imposed only if the publication was not privileged.  McPhee Electric Ltd., Ltd 2009WL 4846555 *37 *and* Strada v. Connecticut Newspapers, Inc., 193 Conn. 313, 316, (1984). Truth is an absolute privilege.  Id. *Citing* Mercer v. Cosley, 110 Conn. App. 283, 301, (2008).  Miles v. Perry, supra, 11 Conn. App. at 595.  Whether a privilege applies is a question of law, Gambardella v. Apple Health Care, Inc., supra, 291 Conn. at 628, 969 A.2d 736, but its application must be determined in the context of the statement in its entirety.  Goodrich v. Waterbury Republican-American, Inc., 188 Conn. at 107, 120-21, 448 A.2d 1317 (1982).

The defendants must sufficiently prove five prerequisites in order to establish the defense of the fair comment privilege.  The essential elements of which are (1) an interest to be upheld, (2) a statement limited in its scope to this purpose, (3) good faith, (4) a proper occasion, and (5) a publication in a proper manner to proper parties only. Miles at *595 and Charles Parker Co. v. Silver City Crystal Co., 142 Conn. 605, (1955). Neither conditional privilege exists where the defamatory remarks are activated by malice, improper motive, or lack of good faith in making the statement. See id.

Although pure opinions enjoy virtually complete constitutional protection, such is not the case with the factual statements involved here.  In addition to the requirement of good faith, the defendants must show that the statements made concern a public interest.  Goodrich v. Waterbury Republican-American, Inc., 188 Conn. 107, 111 n. 4, 113, (1982).

"Whether ... speech addresses a matter of public concern must be determined by [the expression's] content, form, and context ... as revealed by the whole record.'"  Miles at 597

*quoting* Dunn & Bradstreet v. Greenmoss Builders, 472 U.S. 749 (1985); Connick v. Meyers, 461 U.S. 138, 147–48 (1983).  Miles at 597.  In Miles, the court found that the defendants' speech did not concern matters of public interest as defined in case law, and instead related to the defendants' interest in presenting the plaintiff's actions to her fellow parishioners. That speech warrants no special protection under the first amendment where, as here, the speech is proven false and clearly damaging to the plaintiff's personal, social and business reputations.  Id.

The contours of the press's right of neutral reportage are, of course, defined by the principle that gives life to it. Literal accuracy is not a prerequisite: if we are to enjoy the blessings of a robust and unintimidated press, we must provide immunity from defamation suits where the journalist believes, reasonably and in good faith, that his report accurately conveys the charges made. Edwards v. National Audubon Soc, Inc., 556 F. 2d 113 (120) (2d Cir. 1977).  *See* Time, Inc. v. Pape, 401 U.S. 279, (1971); Medina v. Time, Inc., 439 F.2d 1129 (1st Cir. 1971).

It is equally clear, however, that a publisher who in fact espouses or concurs in the charges made by others, or who deliberately distorts these statements to launch a personal attack of his own on a public figure, cannot rely on a privilege of neutral reportage. In such instances he assumes responsibility for the underlying accusations. Id. *See* Goldwater v. Ginzburg, 414 F.2d 324 (2d Cir. 1969), cert. denied, 396 U.S. 1049 (1970).

The fair reporting privilege is inapplicable to defendants WJW, JI and their respective reporters for the intentional harm they caused Ms. Naughton.  The thrust of the defendants' argument is that the plaintiff was discussed only in her official capacity as the executive director of the WHA, and that the subject of the WHA's affairs was of great interest to the members of the public.  Like the petition, the defendants' position is a sham!

The essence of the defamatory remarks made by the defendants trampled not only upon the competence, the qualifications, and the integrity of Ms. Naughton in her official capacities, but also denigrated her honesty and integrity as an individual. Public officials and public figures usually enjoy a significantly greater access than private individuals to the channels of effective communication which can then be used by them to either dispel false statements made about them or to advance their own position.  In this case, the defendants published facts which presented Ms. Naughton as an incompetent executive, who showed no feeling for the circumstances of the aged, disabled, and indigent residents she served.  **Please see Exhibits 11 (a-s).**

Although it is not disputed that the WHA has an interest in its finances, the statements made relating to that interest were not made in good faith and were made with malice and in an improper manner to improper parties.  Therefore, the privilege is unavailable to the defendants.  A cursory investigation into the facts by the defendants would have given pause to their conduct after Attorney Claire Howard published her findings from January 17, 2021, that there was no wrongdoing by Ms. Naughton or the WHA.  There is no evidence the defendants' reporters spoke to any residents/tenants, other than Defendant Smith on or around March 19, 2021/March 21, 2021. Defendants Jamaal, McAllister featured prominently in the alleged falsities contained in the petition, but neither was interviewed about their allegations at any point, despite the fact they were residents/tenants at Millbrook Village.  There is no evidence the defendants posited that Ms. Naughton had worked thirty years in the housing industry, and there is no evidence the defendants called, or made any inquiries to HUD or the CFHFA about Ms. Naughton.  The defendants' singular approach was to buy into the defendants' falsities, "lock stock and barrel," absent evidence of an investigation, despite Attorney Howard's findings.

The defendants assert that there was no evidence presented by Ms. Naughton proving that the statements were made with actual malice. They maintain that their statements were made "as good faith exercises of their responsibilities to report to the community, and not to disparage Ms. Naughton." Their contention, however, is in direct conflict with the factual findings of the Attorney Howard, especially here, where they conducted not investigation into the allegations in the petition. Further, the Windsor Journal's membership in the Windsor Chamber of Commerce, headed by Defendant Gutcheon, does not present this defendant and its reporter as having "clean hands." A reasonable diligent reporter would have seen that Defendant Gutcheon was appointed to the WHA Board on November 3, 2020; that, at his first meeting on November 17, 2020, he classified "the Town of Windsor as a racist place, which tries to sweep it under the rug, as if it doesn't exist;" and that Gutcheon also stated at the same meeting that "he was aware that residents had engaged in racist statements against WHA staffer." The minutes from the November 17, 2021, WHA meeting was public, and the minutes were available to the defendants, as they were to anyone else, as were the Town of Windsor's Council Meeting minutes which could easily be accessed online, evidencing the shenanigans of Defendants Bress and Trinks. [1]**Exhibit # 17, Town of Windsor Council Minutes, November 2, 2020, [2]Exhibit # 18, WHA Board Minutes, November 17, 2020, Page 1, and [3]Exhibit # 19, WHA Board Minute, November 17, 2020., Appointment Letters to the WHA.**

---

[1] Windsor Town Council Meeting Minutes, November 2, 2020, Page 12, Defendant Gutcheon appointed to WHA with Attorney Herman Woodard-Republican member of Board, December 7, 2020. Pages 6, 9-10, January 4, 2021, Page 9, (Bress) evidence recission of Della Rondinone's reappointment, January 19, 2021, Page 13, (See : "There are other entities that are looking into the allegations, and it should also be known that concerns have gone beyond our council and are now with State Representative Garibay." February 1, 2021, Page 13, Jamaal appointed to WHA Board as an unaffiliated member to WHA. March 1, 2021, Page 13, Engleman's appointment to WHA.

[2] WHA Board Minutes, November 17, 2020, Page 1 - - - Gutcheon – "Windsor is a racist town, and they try to sweep it under the rug like it does not exist." Also, "many racist statements from residents about and towards staff members."

[3] Appointment Letters to WHA:  - Jamaal, February 2, 2021, Mack, November 8, 2016, , Gutcheon, November 3, 2020, Englemann, March 3, 2021,  McKenney October 2, 2018, Rondinone, Initial appointment on October 6, 2015, and defendants' withdrawal of reappointment on February 2, 2021 in favor of Jamal instead (See Exhibit # 17 above), Woodard, November 3, 2020.

The evidence shows that The Journal Inquirer interviewed and quoted Defendant Smith on or around March 19 or 21, 2021, in which he made numerous false statements about Ms. Naughton, reflecting on her competence, honesty, and performance on the job.  **Exhibit # 11 (s).**  On May 11, 2021, the WJW, Anthony Zepperi published an article which presented "what Defendant Gutcheon expects to do going forward."  **Exhibit # 11 (n).**  Within the context of the articles published by the WJW, the implication is that "now that Ms. Naughton is terminated, the WHA was about to embark on a more progressive and competent course." One April 1, 2021, Defendant Joe Chaisson published an article entitled, "Windsor Housing Director:  Attacks are Race Based," in which he referenced Ms. Naughton's letter to the Town Council dated March 28, 2021.   He made no mention about Ms. Naughton's concerns about racism, (Bullwinkle, the black moose, Nigger, Evil Queen, asshole, bitch), or the threats of physical violence referenced in the letter.  **Exhibit # 11 (j).**   On January 27, 2021, ten days after Attorney Howard had published her finds of "no wrongdoing . . .." Defendant Joe Chaisson and the Journal Inquirer published an article entitled, "Protests held before Windsor Housing Authority Meeting," detailing seven (7) falsities, including Ms. Naughton's lack of competence, lack of empathy for residence, and poor performance.  These seven (7) specific falsities recurred in eight subsequent articles. **Exhibit # 11 (e, f, h, I, k, m, o, and q).**

There is ample evidence the defendants had in their possessions showing they entertained serious subjective doubts about the veracity of the allegations against Ms. Naughton, and the bad motives of the defendants.  Defendant Chaisson had Ms. Naughton's letter or was apprised about it as late as April 1, 2021. **Exhibit # 11 (j).**  All the defendants knew and received copies of Attorney Howard's finding of that there were no legitimate basis underlying the allegations in the petition, as well as evidence of the defendants' sham.  Despite these facts, the media-defendants

willfully published disparaging and damaging statements about Ms. Naughton, causing substantial damage to her in her personal and professional capacities.   Throughout, they interviewed and quoted Defendants Gutcheon, Bress, Trinks, Garibay, and Grossmann, who were not residents of the subject properties, and by their articles and publications of the falsities, they became active facilitators, and paid liars to the nefarious designs of the non-media defendants.

## 2.   Ms. Naughton's Complaints Pleaded Plausible Claims Sounding in Defamation and False Light Against Defendants Windsor Journal, Journal Inquirer, Anthony Zepperi, and Joe Chaisson.

### (a) Defamation

To establish a claim for defamation under Connecticut law, a Plaintiff must show that "(1) the defendants published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as result of the statement." Gambardella v. Apple Health Care, Inc., 291 Conn. 620, 627-28 (2009), *see also* Cweklinsky v. Mobil Chemical Co., 267 Conn. 210, 217, 837 A.2d 759 (2004).

If the plaintiff is a public figure, however, the plaintiff also must prove that the defamatory statement was made with actual malice, such that "the statement, when made, [was] made with actual knowledge that it was false or with reckless disregard of whether it was false." (Internal quotation marks omitted.)  Gambardella v. Apple Health Care, Inc., 291 Conn at 628, Woodcock v. Journal Publishing Co., 230 Conn. 525, 535, (1994), cert. denied, 513 U.S. 1149, (1995), *citing* New York Times Co. v. Sullivan, 376 U.S. 254, 279–80 (1964).  Additionally, to recover punitive damages, a plaintiff must prove actual malice, regardless of whether the plaintiff is a public figure. Gambardella 291 Conn. at 628, *also See* Triangle Sheet Metal Works,

40

Inc. v. Silver, 154 Conn. 116, 127 (1966); Proto v. Bridgeport Herald Corp., 136 Conn. 557, 571 (1950).

"[L]ibel is actionable per se if it charges improper conduct or lack of skill or integrity in one's profession or business and is of such a nature that it is calculated to cause injury to one in his profession or business." Miles v. Perry, 1 Conn. App. 584, 602 (1987), Charles Parker Co. v. Silver City Crystal Co., 142 Conn. 605, 612, (1955). On the other hand, "slander is actionable per se if it charges incompetence or dishonesty in office, or charges a professional person with general incompetence." Miles 1 Conn. App. at 602, Proto v. Bridgeport Herald Corporation, supra, 136 Conn. at 567, Corsello v. Emerson Bros., Inc., 106 Conn. 127, 130–31, (1927); Wynne v. Parsons, 57 Conn. 73, 75, (1888).

Libel or slander [are] also actionable per se if [they] charge a crime involving moral turpitude or to which an infamous penalty is attached. Miles 1 Conn. App. at 602, Proto v. Bridgeport Herald Corporation, supra. Statements accusing a plaintiff of theft are libelous or slanderous per se. Miles 1 Conn. App. at 602 , Yavis v. Sullivan, 137 Conn. 253, 259, (1950); Ventresca v. Kissner, 105 Conn. 533, 537 (1927); Battista v. United Illuminating Co., 10 Conn. App. 486, 492–93 (1987).

Once the plaintiff has established that the words are false and actionable per se, barring any statutory provision to the contrary, she is entitled under Connecticut law to recover general damages without proof of special damages. Miles 1 Conn. App. at 602,  Charles Parker Co. v. Silver City Crystal Co., supra, 142 Conn. at 612, Battista at 492. This is because the law presumes general damages where the defamatory statements are actionable per se. Battista v. United Illuminating Co., supra.

In the words of the Second Circuit, one useful general rule is that "'a writing which *tends* to disparage a person in the way of his office, profession or trade'" is defamatory per se and does not require proof of special damages. Celle, et al., v. Filipino Reporter Enterprises Inc., 209 F.3d 163, 180 (2d Cir. 2000). "If, on their face, they (the words) are susceptible in their ordinary meaning of such a construction as would tend to injure him in that capacity, they are libelous per se and the complaint, even in the absence of allegation of special damage, states a cause of action."

Like Connecticut, "It has long been the law in New York that a defamatory statement that is a direct attack upon the business, trade or profession of the plaintiff is considered defamation 'per se,' and therefore actionable without any proof of special damages.") *Id* and W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 112, at 791 (5th ed. 1984) ("[I]t is actionable without proof of damage to say of a physician that he is a butcher ..., of an attorney that he is a shyster, of a school teacher that he has been guilty of improper conduct as to his pupils, of a clergyman that he is the subject of scandalous rumors, of a chauffeur that he is habitually drinking, of a merchant that his credit is bad or that he sells adulterated goods, of a public officer that he has accepted a bribe or has used his office for corrupt purposes ...—since these things discredit [one] in his chosen calling."). *Id* at 180.

The defendants violated Ms. Naughton's right to privacy by defaming her good character, her personal life, and in her professional life. Ms. Naughton has also provided ample evidence of the statements the defendants made concerning "her alleged lack of competence, her alleged poor of performance, as well as her alleged professional deficiencies." When the defendants were not able to draw Ms. Naughton into an undignified public squabble, they resorted to making allegations that she stole WHA funds, she was incompetent, and unqualified for the

position she held.  On January 17, 2021, Attorney Claire Howard published her exhaustive

investigation into the petition's allegations and found there was no wrongdoing committed by

Ms. Naughton or the WHA; the results of the investigation were published to the Windsor Town

Council, The WHA Board, *inter alios,* in January 2021, and it was available to both Defendants

Englemann and Jamaal at least, when they assumed their offices as commissioners on March 1,

2021 and April 1, 2021 respectively.  But for all relevant times thereafter, the defendants

continued their unrelenting assault upon Ms. Naughton's personal integrity and professional

standing in her industry and in her community.

Association with matters or "controversies of interest to the public" does not of itself

make one a public figure.  Jensen v. Times Mirror Company, 634 F. Supp. 304, 311 (D. Conn

1986) *and* Time, Inc. v. Firestone, 424 U.S. 448, 454, (1976). . . .

> One is not a "public figure" for purposes of defamation action if
> one is drawn into a public forum largely against her will.
> Allegedly defamed individual's commenting in response to
> allegedly defamatory publication is not enough to make [one] a
> "public figure" for purposes of defamation action; **defendants
> may not act to create "public figure" status and thus obtain
> enhanced protection that would then be given to their
> publications. . . .**  In contrast, one may become a public figure (a)
> by virtue of "pervasive fame or notoriety" or (b) "[m]ore
> commonly [by] ... voluntarily inject[ing] [one]self or [being]
> drawn into a particular public controversy."  Gertz v. Robert
> Welch, Inc., 418 U.S. 323, 351  (1974). A private individual
> ordinarily "has not accepted public office nor assumed an
> influential role in ordering society," i.e., has not occupied a role of
> "especial prominence in the affairs of society." Id. at 345.   Public
> figures are numerous and include one "who is famous or infamous
> because of who he is or what he has done." Cepeda v. Cowles
> Magazines & Broadcasting, Inc., 392 F.2d 417, 419 (9th Cir.), cert.
> denied, 393 U.S. 840.  **[Emphasis added]**

Jensen at 311.

Mere public and media interest in an event and the persons related to it does not create a

"public figure," for First Amendment and defamation purposes.  Whether allegedly defamed

individual was a "public figure" for purposes of defamation action was to be determined as of the time of the allegedly defamatory publications.  Jensen at 312.

There is no proffered evidence by the defendants that Ms. Naughton was ever a public figure, nor did she attained public figure status outside of their self-serving conclusionary assertions that she is one, in order to obtain enhanced protection from liability.  Ms. Naughton was drawn into the instant controversy against her will, and she has never commented on, or responded to the defendants' defamatory statements about her in the media, slanderous though they were.  The record shows that Ms. Naughton sent a letter to the Windsor Town Council on March 28, 2021, for the sole purpose of protecting herself and her staff against threats of physical violence by residents, whipped up by the non-media defendants, facilitated by the media-defendants, the Windsor Journal Weekly, the Journal Inquirer, and their reporters, Chaisson and Zeperri.  The gravity of the situation reflected in Ms. Naughton's letter was not enough to elicit an investigation by these defendants, just as it did draw an affirmative response from the Defendants Garibay, Mayor Trinks, Councilwoman Lisa Bress, or from any member of the Town Council.  When Councilman Walker attempted to read Ms. Naughton's letter into the record, he was promptly "shut down" by Defendants Trinks, Bress and others**.  Affidavit of Urleen Naughton, item # 52, and Windsor Town Council April Meeting via Zoom.**

There is also no evidence Ms. Naughton had ever held herself out to the public on any issue of public concern, nor had she enjoyed "pervasive fame and notoriety," by voluntarily injected herself into a public controversy.  Moreover, Ms. Naughton "'has never accepted public office' nor assumed an influential role in 'ordering society,'" as provided by *Gertz.*  There is also no evidence Ms. Naughton contacted any of the offending newspapers, their reporters, or taken

to the public sphere to defend herself against the scandalous and damaging allegations touted by the Windsor Journal Weekly, the Journal Inquirer, Mr. Chaisson, or Mr. Zepperi.

Lastly, Ms. Naughton has pleaded the fact that all defendants acted in concert with respect to their coconspirators, and by virtue of their agreement, they were acting on behalf of each member of the group, with respect to the non-media defendants' stated goal to destroy her, and then terminate her employment. ***Please see First Amended Complaint-Defamation Counts: ¶ 299, 305, 311, 317, 323-24, 329-331, 347-48, and the Second Amended Complaint Counts 17, 18, 22, 23, 25, 26, 27, 28, 29, 31, and 32***. Furthermore, all counts sounding in defamation of character and false light/invasion of privacy were pleaded on the basis that all the defendants "acted with reckless disregard for the truth, and falsities of the statements contained in the petition, and publication of the document was ordered made by the defendants, while in other instances, they published ("circulated") the petition to multitudes of third parties, including HUD, CHFA, and the local newspapers." ***Please see First Amended Complaint- False Light: ¶ 299, 305, 311, 317, 323-24, 329-331, 347-48, and 359-60, 362-63, 370-72, 374-75, 381-82, 385, 392-93-95, 400-401, 419, 421-424, 457-458, 461-63, and the Second Amended Complaint Counts, 25, 26, 27, 28, 29, 31, and 32.*** All the defendants were informed of the falsities of the allegations by Ms. Howard's findings, by HUD's statement to Defendant Garibay and Gutcheon, Engleman and Jamaal at the WHA, Trinks and Bress at the Town Council, and Grossman, McAllister, and Smith at the March 21, 201 meeting. Besides, at all times relevant, all the non-media defendants acted in concert with, and in conformance with the plans they hatched from their many meetings, which were later communicated to, and published to the Journal Inquirer, the Windsor Weekly Journal and their respect reporters at issue.

The defendants' defamatory violence was widespread and complete.  In or around September 2021, Ms. Naughton attended the funeral of a friend from her community who had passed, and while there, one person in attendance could be heard referring under her breath that **"someone has let out, Lynn the thief."**  The person who uttered this defamatory remark lives in New York.  **[Emphasis added]**

The WHA is a quasi-public entity and Ms. Naughton is a private person. Though she has validly pleaded actual malice against the defendants, there is ample evidence showing that all three state official defendants-Garibay, Trinks and Bress published numerous defamatory statements about Ms. Naughton; that the defamatory statement identified Ms. Naughton to third persons; that the defamatory statements were published to third persons; and that Ms. Naughton's personal reputation, and her professional standing suffered injury as a result of the unlawful conduct of the Journal Inquirer, the Windsor Weekly Journal, joe Chaisson, and Anthony Zepperi; and they are liable for defamation and defamation per se.

**(b) <u>False Light</u>.**

The essential elements of the claim are (1) a publication (2) about plaintiff (3) unreasonably placing her in a false light before the public.  Jensen v. Times Mirror Company, 634 F. Supp. 304, 310 (D. Conn 1986); Goodrich v. Waterbury Republican-American, Inc., 188 Conn. 107, 131-132 (1982); 3 Restatement (Second), Torts § 652E.

If the Plaintiff is deemed to be a public figure, she bears the burden of proving that  the defendants made the statements with actual-malice in publishing [the] false statement[s] concerning [her,] proving malice by knowledge of the falsity or by reckless disregard of whether or not it was false.  New York Times Co. v. Sullivan, 376 U.S. 254, 279–80 (1964).   The rule is applicable to both public figures and public officials.  Curtis Publishing Co. v. Butts, 388 U.S.

130, 162–65, (1967).   Reckless disregard for the truth may be tested by whether "defendant in fact entertained serious doubts as to the truth of his publication," or by whether defendant was aware to a high degree "of probable falsity." St. Amant v. Thompson, 390 U.S. 727, 731 (1968).

Ms. Naughton is not a public figure, and she is not a public official.   As the executive director of the WHA, Ms. Naughton for all time before her employment, and during her employment was a private person who resided in the town of Windsor.   She was a mere wife and mother and went about her business without injecting herself in public controversies and affairs. **Affidavit of Urleen Naughton, item # 13-19**.  Ms. Naughton was not an employee of the state, and it did not pay her salary or her employment benefits.  The essence of the defamatory remarks made by the defendants trampled not only upon Ms. Naughton's qualifications and integrity with respect to the position she held, but also denigrated her honesty and integrity in the eyes of her community, to the point, her children resorted to defending her against newspaper articles their friends sent them, regarding her alleged misconduct at the WHA. **Affidavit of Urleen Naughton, item # 27.**

The defendants have never proffered any evidence that Ms. Naughton was ever a public figure, nor that she attained public figure status outside of their self-serving conclusionary assertions that she is one, so they may obtain enhanced protection from their defamatory publications, and themselves from liability.  Ms. Naughton was drawn into the instant controversy against her will by both the non-media defendants, as well as the media-defendants, but she has never once commented on, or responded to the defendants' defamatory statements about her, slanderous though they were.

Furthermore, all counts sounding in defamation of Character and false light/invasion of privacy were pleaded on the basis that all the defendants "acted with reckless disregard for the

truth, and falsities of the statements contained in the petition, and publication of the document

was ordered published ("circulated")" by agreement of all the defendants, including Defendant

Garibay, Trinks and Bress to third parties, including HUD, CHFA, by social media, and to the

local newspapers, Journal Inquirer, and the Windsor Weekly Journal and their reporters at issue.

All the defendants, including the media defendants were informed of the falsities of the

allegations by Attorney Howard's findings, by HUD's statement to Defendant Garibay and

Gutcheon, Engleman and Jamaal at the WHA, Trinks and Bress at the Town Council, and

Grossman, McAllister, and Smith at the March 21, 201 meeting.  Besides, at all times relevant,

all the non-media defendants acted in concert with, and in conformance with the plans they

hatched from their many meetings, which were later communicated to, and published to the

Journal Inquirer, the Windsor Weekly Journal and their respect reporters at issue.


### 3.  **Ms. Naughton Corrected Her Claims Against the Defendants in Her Second Amended Complaint as to Defamation and False Light.**


A court should dismiss a complaint for failure to state a claim under **\*335** Rule 12(b)(6),

Fed.R.Civ.P., only if it appears beyond doubt that the plaintiff can prove no set of facts supporting

its claim that entitles it to relief.  Dove v. Fordham Univ. 56 F.Supp.2d 330, 335 (S.D.N.Y. 1999)

*Citing* H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, (1989); Dahlberg v. Becker, 748 F.2d

85, 88 (2d Cir.1984). A court must construe the complaint's allegations in the light most favorable

to the plaintiff and accept those allegations as true. Id. *See*  Scheuer v. Rhodes, 416 U.S. 232, 236,

(1974);  Dacey v. New York County Lawyers' Assoc., 423 F.2d 188, 191 (2d Cir.1969).

In reviewing the complaint in response to a motion to dismiss, the court applies a

"plausibility standard," which is guided by two working principles. *See* Iqbal, 556 U.S. at 678,

(2009). First, the requirement that the court accept as true the allegations in the complaint " 'is inapplicable to legal conclusions,' and 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' " Harris v. Mills, 572 F.3d at 72 (2d Cir. 2009). On September 27, 2021, Ms. Naughton submitted her Second Amended Complaint, which corrected the alleged deficiencies alleged by the Defendants Journal Inquirer, the Windsor Weekly Journal, Joe Chaisson and Anthony Zepperi, sounding in defamation and false light.

## E.  **PRAYER FOR RELIEF**

For the foregoing reasons, the defendants' Motions to Dismiss must be denied.


**FOR THE PLAINTIFF,**
**URLEEN NAUGHTON,**


BY_____/S/_____          Dated:  October 30, 2021
Richard C. Gordon, Esq.,
Fed Bar No.: ct27288
40 Court Street
Windsor, CT 06095
Tele: (860) 534-0547
Email:  rcgordonlaw@gmail.com

## CERTIFICATION OF SERVICE

The undersigned counsel certifies that a copy of the foregoing Memorandum of Law in

Opposition to Defendants' Motions to Dismiss will be served upon the Defendants on or

immediately after October 30, 2021, via the Court's electronic filing system in accordance with the

Local Rules to all counsel of record.

**FOR THE PLAINTIFF,**
**URLEEN NAUGHTON,**

BY_____/S/_____          Dated:  October 30, 2021
Richard C. Gordon, Esq.,
Fed Bar No.: ct27288
40 Court Street
Windsor, CT 06095
Tele: (860) 534-0547
Email:  rcgordonlaw@gmail.com