UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| URLEEN NAUGHTON<br>Plaintiff | ) CASE NO.: 3:21-cv-402 (KAD)<br>)<br>) |
| v. | ) <br>) September 7, 2021 |
| ADAM GUTCHEON, et al.,<br>Defendants. | )<br>) |

## AFFIDAVIT OF Shelly McDougall

COMES NOW, I Shelly McDougall, having duly sworn, and say:

1. I am older than eighteen (18) years old, and I am an African American woman.

2. I have personal knowledge about the subject matter of this affidavit, and I am aware of the obligations of an oath.

3. For all relevant times hereto, I have been a resident of the Town of Windsor.

4. I worked for the Windsor Housing Authority for fifteen (15) years, as its Section-8 manager. In that role I was the person who exclusively handled all Section-8 related matters, up to my resignation from the organization on June 4, 2021.

5. Based on my experience prior to, and my tenure at the Windsor Housing Authority (hereinafter WHA), I was made the "second in charge" at the organization, under Ms. Naughton."

6. In or around January, we obtained a copy of the document referred to as the petition.

7. Soon after receiving it, one of my office mates began perusing the document. It did not take long for us to see that the petition was forged as to some names, and that some of the signatures were actual forgeries.

8. In other instances, when we called the tenants, they stated that they did not intend to sign a petition to remove the executive director, and that they did not know what they were signing.

1

9. We also learned that Mr. Jamaal was the person who obtained the signatures from the tenants from Westbrook Village, while Mr. Brian Smith obtained the signatures from the tenants from Fitch Court Apartments.

10. In or around June 4, 2021, I resigned due to unreasonable working conditions and false accusations being made on the minority staffs at WHA.

11. When Mr. Gutcheon and others terminated Ms. Naughton's employment on May 10, 2021, she obtained a payout with respect to her accrued sick time and vacation time. From the Payroll company which processed the WHA's payroll and related payouts.

12. Mr. Gutcheon reported to the OIG "that it was I who had cut the check to Ms. Naughton." This statement was not true. The OIG actually came to my home to interview me about this issue!

13. I believe after Ms. Naughton received payment of her accrued sick time, vacation time. The WHA began running a deficit with respect to its bank balances. In my view, this situation occurred because Gutcheon and his board, did not take steps to see that there were funds available if they fired Ms. Naughton and had to pay her for her accrued benefits.

14. While Ms. Naughton was out on sick leave, and specifically on May 6, 2021, Mr. Gutcheon offered me the position of interim executive director of the WHA, and he presented me with a contract.

15. After taking prescribed sick leave, I resigned on June 4, 2021. Prior to my resignation Mr. Gutcheon terminated my access to the Section 8 (HCV) bank accounts. The same day Ms. Naughton was terminated on May 10, 2021.

16. To date, I have not been paid for the $6,000.00 the WHA owes me for accrued vacation and sick days, which the board claimed I was required to provide them a two (2) week notice. Ms. Schumsky did receive her payout for vacation time and sick time. There were no questions asked by Mr. Gutcheon regarding her payout by the payroll company who paid Ms. Naughton on the very same date as Schumsky.

17. I know Ms. Schumsky was a collaborator with Mr. Gutcheon and others. Ms. Schumsky did not know accounting or accounting practices. There were numerous written complaints by the accountant and errors in her day-to-day work performance. Ms. Schumsky walked off the job. I terminated her on May 7, 2021.

18. In or around April 2021, Mr. Gutcheon and Ms. Englemann came to the WHA one day, and began questioning the staff. At one point, I was asked by Ms. Englemann, "why did Ms. Naughton make me the number two at the WHA?"

2

19. At that time, I did not inform Ms. Englemann and Mr. Gutcheon, the reason why Ms. Schumsky could not be the number two at the WHA. It was common knowledge that Ms. Schumsky was providing information to Mr. Gutcheon.

20. At the same occasion Ms. Englemann's visit to the WHA, Ms. Englemann tried to hand a Section 8 application belonging to "a Mr. Gerald Trinks," the same last name as the mayor of the Town of Windsor.

21. At that time, Ms. Englemann stated, "this is from the mayor!" She was informed that we could not accept the application (envelope), because all applications had to be mailed in, then placed in a secured box to be drawn later, consistent with WHA and HUD guidelines.

22. On information and belief, Ms. Schumsky accepted the application from Ms. Englemann in violation of HUD and WHA policy.

23. To my knowledge, all members of the WHA staff, including Ms. Schumsky are aware of the procedures involved in accepting rental applications.

24. Ms. Naughton was a very competent and talented executive director. Under her management, the WHA attained the designation of "HUD High Performer."

25. Under Ms. Naughton's tenure, the WHA's financial position improved substantially more than at any point during my fifteen (15) year employment there. Ms. Naughton was the only executive director at the WHA to have accomplished this success, especially in the short time she was employed by the organization.

26. Ms. Naughton leadership, the WHA also produced substantial reduction in the rents tenants paid, and she made many improvements to the policies of the WHA.

27. I do not believe that some of the defendants liked Ms. Naughton very much, because they often made disparaging comments about her clothes and cars.

28. I learned that none of the Caucasian who were executive director of the WHA were treated like Ms. Naughton, in that they were not subjected to a <u>probationary period</u> when they were hired, as Ms. Naughton.

29. One of the Caucasian executive directors who preceded Ms. Naughton did not know very much about housing, yet she was not terminated from the WHA, or treated as Jermika Williams and Ms. Naughton (both are African Americans) were. For example, some of us on staff learned that <u>Ms. Williams was not allowed to speak in WHA meetings</u>, and the same requirement was placed on Ms. Naughton, soon after she was hired. Neither of the two Caucasian executive directors were subjected to the same treatment, while I was employed at the WHA for fifteen (15) years.

30. While I was employed by the WHA, I learned that a tenant (Ms. Brandy Cook) from the Bloomfield Housing Authority was called by Mr. Gutcheon.

31. I am familiar with Ms. Cook because I was the Section-8 manager at the WHA ands she was a Section-8 tenant.

32. More specifically, I learned that in April 2021, Mr. Gutcheon called her from telephone bearing a (202) area code, and declared he was calling from the WHA.

33. Ms. Cook stated that during the call, and without identifying himself, he asked her "if she was familiar with Urleen and Shelly, to which she said, yes?"

34. Ms. Cook further informed that Mr. Gutcheon then asked her "how were they treating you, and if they had ever told her that she was lucky to be living in her house/apartment, to which she told him, no?"

35. Ms. Cook further informed that during her conversation with Mr. Gutcheon in April 2021, she asked him several times to identify himself, but he would not tell her his name, just that "he was calling from the WHA, and that she shouldn't speak to Urleen and Shelly anymore."

36. From my standpoint, Mr. Gutcheon's instructions to Ms. Cook was quite strange, because I was still the only person at the WHA who dealt with the Section-8/Public Housing tenants, and no one at the organization knew more about Section-8/Public Housing than I did. The question was, since Mr. Gutcheon was calling and instructing the Section-8/Public Housing tenants at the WHA and the BHA, not to speak to Ms. Naughton and I, who were they supposed to call, when they had issues?

37. Further affiant saith not.

38. I hereby certify under pains and penalties of perjury under the laws of the State of Connecticut that I have not made a false statement with respect to the information I provided in the preceding paragraphs.

39. I declare that to the best of my knowledge and belief that the information provided herein is true, accurate and complete.

_____       9/28/2021
Shelly McDougall                                      Dated
Affiant

On 9/28/2021 before me Shelly Mcdougall personally appeared before me _____ and proved to me on the basis of satisfactory evidence that she is the person subscribed in the within affidavit and acknowledged to me that she executed same in his authorized capacity, and who being duly sworn on her oath according to law, deposes and says that she has read the foregoing affidavit subscribed by her and that the matter stated herein, and that the information are true to the best of her knowledge, information and belief.

I certify under PENALTY OF PERJURY under the laws of the State of Connecticut, that the foregoing paragraphs are true and correct.

WITNESS my hand and official seal_____(Notary Seal)

_____
Notary/Commissioner of the Superior Court

LONNIE B BARNES
NOTARY PUBLIC
CONNECTICUT
MY COMMISSION EXPIRES 06-30-2022

5