## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| URLEEN NAUGHTON, | ) | 3:21-CV-00402 (KAD) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GUTCHEON, et al., | ) | |
| *Defendants*. | ) | |
| | ) | AUGUST 24, 2022 |

### MEMORANDUM OF DECISION RE: DEFENDANTS' MOTIONS TO DISMISS
### (ECF NOS. 56, 57, 58, 59)

Kari A. Dooley, United States District Judge

Plaintiff, Urleen Naughton, the former Executive Director of the Windsor Housing Authority, asserts by way of an Amended Complaint thirty-eight (38) causes of action against fifteen (15) Defendants to include sixteen (16) claims under federal law, specifically pursuant to 42 U.S.C. §§ 1981, 1983, 1985(3), and 1986 for violation of her equal protection rights and her substantive due process rights. She brings an additional twenty-two (22) state law claims as well.[1] Defendants include the Windsor Housing Authority ("WHA"); WHA's Commissioners, Adam Gutcheon and Carol Englemann; WHA's resident-Commissioner, Tariq Jamaal; WHA's former finance manager, Jennifer Schumsky; WHA residents, Andrew MCallister, Sally Grossman, and Brian Smith; Windsor Town Counsel's Personnel Committee Chair, Lisa Bress; Windsor's Mayor, Donald Trinks; Connecticut State Representative, Jane Garibay; the Windsor Journal Weekly and its reporter, Anthony Zepperi; and the Journal Inquirer and its reporter, Joe Chaison. The gravamen

---

[1] Plaintiff's state law claims include breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference with contractual relations, defamation, false light, and intentional and negligent infliction of emotional distress.

of Plaintiff's corpulent[2] Amended Complaint, at least insofar as the federal claims are concerned, is that Defendants, acting in concert, conspired to remove her from her position as the Executive Director of the WHA on account of her race and national origin in violation of her equal protection and due process rights. All Defendants moved to dismiss the Amended Complaint in its entirety for numerous reasons.[3] Plaintiff opposes Defendants' motions to dismiss. For the reasons set forth below, Defendants' motions to dismiss are GRANTED. The federal law claims, Counts One through Fourteen, Thirty-Five and Thirty-Six are dismissed with prejudice. The Court declines to exercise supplemental jurisdiction over the remaining state law claims, Counts Fifteen through Thirty-Four and Thirty-Six through Thirty-Eight, which are dismissed without prejudice.

**Standard of review**

On a motion to dismiss under Rule 12(b)(6), the Court "must accept as true the factual allegations in the complaint and draw all inferences in the plaintiff's favor." *Kinsey v. New York Times Co*., 991 F.3d 171, 174 (2d Cir. 2021) (quotation marks, alterations, and citation omitted). To survive a motion to dismiss filed pursuant to Rule 12(b)(6), the "complaint must 'state a claim to relief that is plausible on its face,'" setting forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Kolbasyuk v. Capital Mgmt. Servs., LP*, 918 F.3d 236, 239 (2d Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The assessment of whether a complaint's factual allegations plausibly give rise to an entitlement to relief 'does not

---

[2] The Amended Complaint is over 100 pages and includes 634 separately numbered paragraphs. The extent to which the allegations are unnecessarily repetitive from count to count, cannot be overstated and the result is an unwieldy and difficult to navigate complaint.

[3] In June and July of 2021, Windsor Journal Weekly, Zepperi, Journal Inquirer, and Chaison (collectively, "Media Defendants") moved to dismiss the claims against them. (ECF No. 60, 71) On December 3, 2021, Plaintiff moved for leave to amend her allegations as against the Media Defendants. (ECF No. 125) On July 18, 2022, the Court granted the Media Defendants' motions to dismiss with prejudice and denied Plaintiff's motion for leave to amend. (ECF No. 137) Herein, the Court addresses the remaining motions to dismiss filed by the remaining Defendants.

impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal' conduct." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) (quoting *Twombly*, 550 U.S. at 556). At this stage "the court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side." *Id*.

In general, the Court's review on a motion to dismiss pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint. . . ." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007); *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010). However, "it is well established that on a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the court may also rely upon documents . . . incorporated by reference in the complaint." *Halebian v. Berv*, 644 F.3d 122, 131 (2d Cir. 2011); *McCarthy*, 482 F.3d at 191. And "[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

**Allegations**[4]

---

[4] In her opposition to Defendants' motions to dismiss, Plaintiff submitted 238 pages of affidavits, documents and other evidence to support her claims. This is improper and the Court is not permitted to consider these materials in response to the motion to dismiss. *See Williams v. Time Warner Inc.*, 440 Fed. Appx. 7, 9 (2d Cir. 2011) ("It is well-established that in deciding a Rule 12(b)(6) motion, the Court is generally limited to the facts as presented within the four corners of the complaint, to documents attached to the complaint, or to documents incorporated within the complaint by reference."); *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (plaintiff cannot amend complaint through filing an objection to motion to dismiss); *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nig.*, 265 F.R.D. 106, 122-123 (S.D.N.Y 2010) ("Courts in [the Second] Circuit have made clear that a plaintiff may not shore up a deficient complaint through extrinsic documents submitted in opposition to a defendant's motion to dismiss."). The question for the Court is whether the factual allegations plausible state a basis for liability on the part of Defendants. The Court's assessment goes to the adequacy of the pleadings not the merits of the purported claims. *See Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985) ("The court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient.").

The Court accepts as true the allegations in Plaintiff's Amended Complaint, which are summarized as follows. Plaintiff is a black, African American woman residing in Windsor, Connecticut. Plaintiff was born in the United States Virgin Islands. She has thirty years of experience in housing management. From August of 2018 through her termination on May 10, 2021, Plaintiff was employed as the Executive Director of the Windsor Housing Authority ("WHA"). The purpose of the WHA is to provide safe and affordable housing to low income, elderly, and disables residents of Windsor.[5] As the Executive Director, Plaintiff was the chief operating officer responsible for managing the daily operations of the WHA. Plaintiff is certified by the United States Department of Housing and Urban Development ("HUD") in fair housing, and as a public housing manager, rent calculations and reasonable accommodation specialist, family sufficiency specialist, maintenance supervisor, and hearing officer. She also is certified by HUD to submit data on behalf of the WHA and to access HUD funding, drug elimination reporting, and events tracking. In November of 2020, HUD has recognized Plaintiff as a "high performer" in her capacity as WHA's Executive Director.

The WHA is a tax-exempt, non-profit, quasi-public entity[6] governed by the Windsor Housing Board of Commissioners ("Board of Commissioners"). In accordance with the WHA's bylaws, the Board of Commissioners have the power to hire and terminate the WHA's Executive Director.[7] The Board of Commissioners also establishes policies for the WHA, which are then implemented by the Executive Director. The Board of Commissioners consists of, among others,

---

[5] A large portion of WHA residents are African American or members of other minority groups.
[6] Pursuant to a cooperative agreement governed by federal law between Windsor and the Connecticut Department of Housing, the WHA is not funded by Windsor.
[7] The Board of Commissioners do not maintain any managerial responsibilities with respect to the daily operations of the WHA.

Defendants Commissioners Gutcheon[8] and Englemann,[9] and resident-Commissioner, Jamaal.[10] Prospective members of the Board of Commissioners are interviewed and selected by Defendant Bress,[11] who serves as Chair of the Windsor Town Counsel's Personnel Committee. The Windsor Town Counsel then reviews Defendant Chairwoman Bress' selections and submits them to Windsor's Mayor, Defendant Trinks.[12] Defendant Mayor Trinks finally approves and executes selections on behalf of the Windsor Town Counsel.

Other named Defendants include the former finance manager of the WHA, Jennifer Schumsky.[13] Plaintiff alleges that, in March of 2021, Defendant Schumsky was appointed as Defendant Commissioner Gutcheon's "preferred liaison" to provide him WHA documents when Plaintiff was on medical leave in 2021.[14] Finally, Defendant Representative Garibay[15] is a member of the Connecticut House of Representative and the former Executive Director of the Windsor Chamber of Commerce. Plaintiff alleges that she "made" Gutcheon her successor in the Windsor Chamber of Commerce.

Plaintiff alleges that Windsor has a history of discrimination against African Americans. She alleges that Windsor "public officials" have stated that they "want Windsor to be the way it

---

[8] Defendant Commissioner Gutcheon is a Caucasian male. He was appointed to the WHA Board of Commissioners in November of 2020 as a Democrat. Plaintiff alleges that his appointment was "at the behest" of Defendants Representative Garibay, Mayor Trinks, and Chairwoman Bress. Defendant Commissioner Gutcheon is also the Executive Director of the Windsor Chamber of Commerce.

[9] Defendant Commissioner Englemann was appointed to the WHA Board of Commissioners on March 1, 2021 as a Democrat.

[10] Defendant resident-Commissioner Jamaal prides himself as a "community leader" in Windsor. He was appointed to the Board of Commissioners as a resident "unaffiliated" with any political party on February 1, 2021. Prior to his appointment, he was a registered Democrat. Plaintiff alleges that Defendant resident-Commissioner Jamaal changed his political party affiliation to qualify for an appointment to the Board of Commissioner. Plaintiff alleges that Defendant Chairwoman Bress knew of his scheme.

[11] Defendant Chairwoman Bress is Caucasian.

[12] Defendant Mayor Trinks is Caucasian. He has served as the Mayor of Windsor since 2009.

[13] Defendant Schumsky is Caucasian. She was terminated as finance manager of the WHA in May of 2021.

[14] Plaintiff was on medical leave from March 23, 2021 through her termination on May 10, 2021.

[15] Defendant Representative Garibay is Caucasian and the sister of Defendant Commissioner Englemann. She resides in Windsor.

used to be," meaning before members of minority groups moved to town. At a Board of Commissioners meeting in November of 2020, Defendant Commissioner Gutcheon stated that "Windsor is a very racist town, and they try to sweep it under the rug as if it does not exist."[16] Thereafter, in January of 2021, Defendant Commissioner Gutcheon demanded that all members of the Board of Commissioners resign except himself, three of whom were African American.[17]

Plaintiff alleges that, beginning in late October of 2020, members of the Board of Commissioners, the WHA, and WHA residents began a concerted and conspiratorial effort to oust Plaintiff from her position as Executive Director on account of her race and national origin. These individuals included Defendants Commissioners Gutcheon[18] and Englemann; resident-Commissioner Jamaal; residents MCallister, Grossman, and Smith; Chairwoman Bress; Mayor Trinks; and Representative Garibay. In accordance with this effort, Defendants resident-Commissioner Jamaal and resident MCallister[19] jointly authored and circulated a petition which sought to have Plaintiff removed as Executive Director.[20] The petition raised a number of complaints concerning the condition and management of the particular WHA property in which Defendants resident-Commissioner Jamaal and resident MCallister resided. Plaintiff alleges that Defendants Commissioners Gutcheon and Englemann, residents Grossman and Smith,

---

[16] Defendant Commissioner Gutcheon subsequently moved for the Board of Commissioners to strike the statement from the record on the basis that he was "misquoted or misunderstood."

[17] One of the African American Commissioners resigned in January of 2021. On February 2, 2021, the second of the African American Commissioners was removed by Defendants Chairwoman Bress and Mayor Trinks. Plaintiff alleges that the second African American Commissioners was a Republican and that Defendants Chairwoman Bress and Mayor Trinks removed her "to stack the Board of Commissioner[s] with newly appointed members who were partial to their goal to terminate [Plaintiff]." Plaintiff further alleges that the removal of these African American Commissioners was executed simultaneously with the appointment of Defendants resident-Commissioner Jamaal and Commissioner Englemann. The third of the African American Commissioners resigned on March 22, 2021. Following their leave, the Board of Commissioners consisted of, among others, three Democratic and one unaffiliated members.

[18] Plaintiff alleges that Defendant Commissioner Gutcheon informed Defendant resident Smith of his plan to remove Plaintiff from her position as Executive Director by "changing the WHA's management and staff" and by "add[ing] media pressure."

[19] Defendant resident MCallister is Caucasian.

[20] Plaintiff alleges that Defendants resident-Commissioner Jamaal and resident MCallister coerced other WHA residents to sign the petition under fraudulent circumstances.

Chairwoman Bress, and Mayor Trinks each commented on drafts of the petition at various times. Plaintiff further alleges that the petition contained numerous false and defamatory statements related to her performance as Executive Director of the WHA.[21]

Thereafter, the petition was presented to the WHA, the Windsor Town Council, the Board of Commissioners, the Connecticut Housing Finance Authority ("CHFA"), and HUD. In response, three investigations[22] were initiated in connection with the petition: (1) a federal investigation conducted by HUD, (2) a state investigation conducted by CHFA, and (3) an independent investigation conducted by a law firm hired by the WHA.[23]

The false statements contained in the petition were widely published to the public through local newspapers. Plaintiff's Amended Complaint specifically references three editorials authored

---

[21] Specifically, Plaintiff alleges that "[t]he petition was riddled with falsehoods, including but not limited to: that [Plaintiff] was harsh and abusive towards residents; that [Plaintiff] told residents they should be glad they have a roof over their heads and that if they did not like things they should go buy a house; that [Plaintiff] clandestinely removed two computers from [a] [c]ommunity [r]oom; that [Plaintiff] relentlessly bashed and smeared the previous Executive Director [of the WHA]; that [Plaintiff] fired experienced and competent employees and replaced them with ineffective and incompetent workers of her own choosing; that [Plaintiff] lies recklessly and shamelessly; that [Plaintiff] threatened and defrauded tenants; . . . that [Plaintiff] frequently threatened residents with eviction if they disagreed with her; that she was dishonest; that she towed visitor's vehicles; that she rejected the sound recommendations of WHA contractors; that she underestimated dangerous electrical problems; left tenants without heat for weeks, and even months; maintained a bodyguard . . .; viewed maintenance as tenant's financial responsibilities; extorted ill-gained revenue from tenants through usurious profit oriented collection practices backed by illegal, harassing threats; that she regularly terrorized indigent aged, mentally and physically disabled tenants with eviction; wasted administration expenditures by purchasing a new lawnmower, new truck, new snow blowers, a new covered, enclosed truck trailer, a new cavernous prefabricated shed, and most notably, a ridiculous and unnecessary deluxe golf-cart for management to use when touring the [small] grounds; that she provided below standards moving services done by non-professional, paid under-the-table, laborers that arrived with no equipment whatsoever and use[d] . . . a derelict shopping cart to haphazardly move tenants; that she regularly overlooked existing tenants and generously renovated units to preferred outsiders; that new handicapped units [were] hazardous to disabled tenants [because the] flooring [had] raised strips of vinyl between floor sections . . . and tenant complaints were ignored; that she maintained a failed strategy of dividing and isolating tenants from one another; [that] an isolated tenant is a weakened and vulnerable tenant and that is what this adversarial management wants; [and] that the tenants [stood] together [in] protest . . . [of] the hurtful policies and practices of the abusive, corrupt, and dishonest Executive Director."

[22] In Plaintiff's September 9, 2021 affidavit attached to her opposition to the Media Defendants' motions to dismiss, Plaintiff identifies each of these three investigations initiated in response to the petition. The Court considers Plaintiff's statements, submitted under oath, with respect to these investigations as judicial admissions. *See In re Motors Liquidation Co*., 957 F.3d 357, 360–61 (2d Cir. 2020) ("[I]n order for a statement to constitute a judicial admission it must not only be a formal statement of fact but must also be intentional, clear, and unambiguous."); *see also Hoodho v. Holder*, 558 F.3d 184, 191 (2d Cir. 2009) ("Admissions by parties are not subject to judicial scrutiny to ensure that the admissions are fully supported by the underlying record.").

[23] According to Plaintiff, the independent investigation conducted by a law firm hired by the WHA found no evidence of wrongdoing by the WHA or Plaintiff.

individually by Defendants Commissioner Gutcheon and residents Grossman and Smith. First, in January of 2021, Defendant Commissioner Gutcheon published an editorial in the Windsor Journal Weekly which allegedly repeated many of the falsities contained in the petition.[24] Second, in February of 2021, Defendant resident Grossman,[25] also published an editorial in the Windsor Journal Weekly which repeated many of the falsities contained in the petition.[26] Finally, in March of 2021, Defendant resident Smith, with the assistance of Defendant resident Grossman, likewise published an editorial in the Windsor Journal Weekly which repeated many of the falsities contained in the petition.[27] Plaintiff also alleges that local Windsor newspapers published "various articles"[28] containing the false statements originally authored by Defendants resident-Commissioner Jamaal and resident MCallister and set forth in the petition.

Moreover, Plaintiff generally alleges that other false and defamatory statements were made by Defendants. Defendant Commissioner Gutcheon "made multiple false statements" about Plaintiff to include that Plaintiff was "running a deficit at WHA;" that WHA residents "were being forced by [Plaintiff] to pay to have their belongings removed" when WHA residents moved to accommodate renovations; that Plaintiff was "harassing and intimidating" WHA residents; and that Plaintiff had stolen WHA funds. Defendant Chairwoman Bress "made a false report to the

---

[24] Plaintiff alleges that Commissioner Gutcheon inaccurately stated that: over ninety percent of the residents of the subject WHA property knowingly and voluntarily signed the petition; the WHA failed to investigate the petition; members of the Board of Commissioners were praised for their loyalty; a member of the WHA Board mocked members of the Town Council; Plaintiff stole funds from the WHA; Plaintiff bullied, harassed, and threatened residents; Plaintiff charged residents usurious moving fees; Plaintiff paid laborers under-the-table to move residents.

[25] Defendant resident Grossman is Caucasian.

[26] Plaintiff alleges that resident Grossman inaccurately stated that: Plaintiff hired an independent law firm to investigate the petition without the knowledge or permission of the Board of Commissioners; the WHA improperly contested the appointment of a new tenant commissioner because of his involvement in the petition; Plaintiff imposed retaliatory rent increases in excess of thirty percent on residents who submitted complaints.

[27] Plaintiff alleges that resident Smith inaccurately stated that: immediately upon being hired as Executive Director, Plaintiff terminated the existing landscaping contractor and instead hired "her own people;" Plaintiff threatened not to renew a resident's lease if "he wasn't quiet;" Plaintiff bullied, harassed, and threatened residents. Plaintiff further alleges that Defendant Trinks commended resident Smith on an "extraordinarily well-written letter."

[28] Plaintiff's Amended Complaint does not specifically reference any articles published by local Windsor newspapers other than the aforementioned editorials.

Windsor Health Department that one WHA resident "had no heat and/or air-conditioning in their apartment for weeks, even months." Defendant Representative Garibay "made false statements to HUD that Plaintiff was "running a deficit at WHA." Lastly, Defendant resident Smith "published a statement to a third person" that disparaged Plaintiff, to include that Plaintiff was "fucking evil," "incompetent," "a bitch," "an asshole," "ruined his home," and "stole funds.".

On March 21, 2021, Defendants Commissioners Gutcheon and Englemann; resident-Commissioner Jamaal; residents MCallister, Grossman, and Smith; Mayor Trinks; Representative Garibay; and other WHA residents held a meeting to discuss Plaintiff's removal as the WHA's Executive Director. Two other African American members of the Board of Commissioners were not notified of this meeting. These Defendants planned to replace one of the two other African American Commissioners with someone who would be favorable to terminating Plaintiff. On March 23, 2021, Plaintiff filed a federal lawsuit against Defendants. Defendants as well as Windsor at large were "abuzz with chatter about the suit." On May 10, 2021, after a vote of the Board of Commissioners, Plaintiff was terminated as Executive Director of the WHA for "insubordination, lack of candor and violations of the Personnel Policy. . . ."

Additional factual allegations shall be set forth below as necessary.

**Discussion**

Plaintiff asserts in her Amended Complaint sixteen (16) claims pursuant to §§ 1981, 1983, 1985(3), and 1986 against Defendants for conspiring to violate her equal protection rights and her substantive due process rights.[29] Plaintiff's federal claims against Defendants allege race and national origin discrimination, hostile work environment, harassment, and retaliation. Defendants seek to dismiss all of the claims against them for numerous independent reasons.

---

[29] Count 1 asserts a claim under § 1981. Counts 4–14 and 35–36 assert claims under § 1983. Count 2 asserts a claim under § 1985(3). Count 3 asserts a claim under § 1986.

### a. Federal law claims pursuant to §§ 1981, 1983, 1985(3), 1986.

With respect to Plaintiff's federal law claims, Counts Four through Fourteen, Thirty-Five, and Thirty-Six of the Amended Complaint assert claims against Defendants Gutcheon, Englemann, Schumsky, Garibay, Trinks, Bress, MCallister, Jamaal, Grossman, and Smith pursuant to § 1983 for allegedly violating her equal protection right "to be free from race and national origin discrimination," "hostile work environment, harassment, and retaliation" as secured by the Fourteenth Amendment to the United States Constitution, as well as "her property interest in her employment." Not all Defendants are named in all of the § 1983 Counts. Count One of the Amended Complaint asserts claims against Defendants Gutcheon, Englemann, Jamaal, and WHA pursuant to § 1981 for allegedly discriminating against her on the basis of her race and national origin. Finally, Counts Two and Three of the Amended Complaint assert claims against Defendants Gutcheon, Garibay, Trinks, and Bress pursuant to §§ 1985(3) and 1986 for allegedly participating in a conspiracy to violate her civil rights that was motivated by an animus towards her race and national origin.[30]

Although Defendants argue for a multitude of reasons that Plaintiff's federal law claims should be dismissed, and the motions overlap considerably but not entirely in this regard, each Defendant argues that, fatal to all of Plaintiff's federal law claims, the Amended Complaint is devoid of any factual allegation that would support the inference that their conduct derived from race-based animus or was motivated by Plaintiff's race or national origin in any way shape or form. (ECF No. 56-1 at 4–9; 57-1 at 14–18; 58-1 at 11–13, 15; 59-1 at 5, 11–13) The Court agrees with Defendants.

---

[30] Plaintiff's § 1986 claim is predicated on her § 1985(3) claim. *See Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993) (per curiam) (Section "1986 claim must be predicated upon a valid § 1985 claim.").

"Section 1983[31] gives a cause of action to any person who has been deprived of his constitutional rights, privileges or immunities under color of state law." *Powell v. Workmen's Comp. Bd. of State of N. Y.*, 327 F.2d 131, 135 (2d Cir. 1964). The Fourteenth Amendment to the United States Constitution declares that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). There are multiple theories under which a race based Equal Protection claim may be advanced. *See Brown v. City of Oneonta, New York*, 221 F.3d 329, 336–37 (2d Cir. 2000). And frankly, the theory under which Plaintiff asserts this claim is hopelessly conclusory and utterly unclear. Notwithstanding, regardless the precise nature of the claim, to state a claim under the Equal Protection Clause under any race-based theory, Plaintiff must allege that a government actor intentionally discriminated against her on the basis of her race or national origin. *Id.*; *see Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 141 (2d Cir. 1999) ("The ultimate inquiry, of course, is one of discriminatory purpose on the part of the defendant himself. Thus, to establish a violation of the Equal Protection Clause . . ., a plaintiff must show that . . . the defendant intended the discrimination to occur."). "Discriminatory purpose 'implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.'" *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 50 (2d Cir. 1999) (citing *Personnel Administrator v. Feeney*, 442 U.S. 256, 279 (1979)). "[C]laims of race-based discrimination under

---

[31] Section 1983 provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."

the Equal Protection Clause . . . require that intentional discrimination be alleged in a non-conclusory fashion." *Clyburn v. Shields*, 33 Fed. Appx. 552, 555 (2d Cir. 2002) (citing *General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391 (1982)).

Similarly, "Section 1981[32] bars certain racially motivated and purposefully discriminatory acts." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994) (citing *General Bldg. Contractors Ass'n*, 458 U.S. at 391). To establish a claim under § 1981, a plaintiff must allege facts supporting the following elements: (1) plaintiff is a member of a racial minority; (2) defendants' intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities. *See Brown*, 221 F.3d at 339 (citing *Mian*, 7 F.3d at 1087). "Those enumerated activities include the rights 'to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property.'" *Id*. (citing 42 U.S.C. § 1981(a)). "Section 1981, like the Equal Protection Clause, only prohibits intentional racial discrimination." *Id*. (citing *General Bldg. Contractors*, 458 U.S. at 391). *See Albert v. Carovano*, 851 F.2d 561, 573 (2d Cir. 1988) (holding that to plead a § 1981 claim alleging selective enforcement, plaintiff must allege instances in which "similarly situated" non-minorities were treated differently). Accordingly, plaintiffs must meet the same pleading standard for their § 1981 claims as for their § 1983 claims under the Equal Protection Clause. *Brown*, 221 F.3d at 339; *see Gant*, 195 F.3d at 141 ("The ultimate inquiry, of course, is one of discriminatory purpose on the part of the defendant himself. Thus, to establish a violation of . . . § 1981, a plaintiff must show that . . . the defendant intended the discrimination to occur.").

---

[32] Section 1981(a) provides in relevant part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens. . . ."

"Section 1985[33] permits a suit by any person who has been the object of a conspiracy designed to deprive him of the equal protection of the laws." *Powell*, 327 F.2d at 135. "To state a cause of action under § 1985(3), a plaintiff must allege (1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States." *Traggis v. St. Barbara's Greek Orthodox Church*, 851 F.2d 584, 586–87 (2d Cir. 1988) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102–03 (1971)). "The language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin*, 403 U.S. at 102; *Carpenters*, 463 U.S. at 835. In other words, a plaintiff "must allege that defendants have, with racial or other class-based discriminatory animus, conspired to deprive [her] of a constitutional or other federal right." *Soto v. Schembri*, 960 F. Supp. 751, 760 (S.D.N.Y. 1997). *See Carpenters*, 463 U.S. at 834 (Section 1985(3) requires that "there must be 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'") (citing *Griffin*, 403 U.S. at 102); *LeBlanc-Sternberg v. Fletcher*, 67

---

[33] Section 1985(3) provides "a cause of action to those injured by conspiracies formed 'for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws.'" *Carpenters v. Scott*, 463 U.S. 825, 825 (1983). Section 1985(3) provides: "If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one of more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." *Id.* at 827.

F.3d 412, 426–27 (2d Cir. 1995) ("Section 1985(3) . . . is applicable only if the plaintiff can show that "some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action.") (*citing Griffin*, 403 U.S. at 102); *Spencer v. Casavilla*, 903 F.2d 171, 175 (2d Cir. 1990) ("[T]o state a claim under § 1985(3) a complaint must allege, *inter alia*, that the defendants who allegedly conspired sought, with discriminatory intent, to deprive the plaintiff of a right covered by the Constitution or other laws."); *Brown*, 221 F.3d at 341 (racial animus required for § 1985 claim).[34] And to state a cause of action under § 1986[35], a plaintiff must allege a valid cause of action under § 1985. *Mian*, 7 F.3d at 1087.

As significant here, "complaints relying upon 42 U.S.C. § 1981 *et seq*. are plainly insufficient unless they contain at least some allegations of facts indicating a deprivation of civil rights." *Fine v. City of New York*, 529 F.2d 70, 73 (2d Cir. 1975); *Powell v. Jarvis*, 460 F.2d 551, 553 (2d Cir. 1972). "[The Second Circuit] has repeatedly held that complaints containing only 'conclusory,' 'vague,' or 'general allegations' of a conspiracy to deprive a person of constitutional

---

[34] "[A] class-based, invidious discrimination . . . was the central concern of Congress in enacting §[§] 1985(3)" and 1986. *Carpenters*, 463 U.S. at 835. "The civil-conspiracy prohibition contained in §[§] 1985(3) [and 1986] was enacted as a significant part of the civil rights legislation passed in the aftermath of the Civil War." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1865 (2017). *See Carpenters*, 463 U.S. at 834–37 (detailing the legislative history of § 1985(3)); *Griffin*, 403 U.S. at 99–101 (same); *Great American Fed. Sav. & Loan Assn. v. Novotny*, 442 U.S. 366, 379 (1979) (Powell, J., concurring) (describing § 1985(3) as a "Civil War Era remedial statute"); *Virginia v. Black*, 538 U.S. 343, 353 (2003) ("The activities of the Ku Klux Klan prompted legislative action at the national level. . . . Congress passed what is now known as the Ku Klux Klan Act . . . now codified at 42 U.S.C. §§ 1983, 1985, and 1986. . . . President Grant used these new powers to suppress the Klan . . . [and b]y the end of Reconstruction in 1877, the first Klan no longer existed."). The Supreme Court cautioned: "Although we have examined with some care the legislative history that has been marshalled in support of the position that Congress meant to forbid wholly non-racial, but politically motivated conspiracies, we find difficult the question whether § 1985(3) provided a remedy for every concerted effort by one political group to nullify the influence of or do other injury to a competing group by use of otherwise unlawful means. To accede to that view would go far toward making the federal courts, by virtue of § 1985(3), the monitors of campaign tactics in both state and federal elections, a role that the courts should not be quick to assume." *Carpenters*, 463 U.S. at 836. This observation is particularly applicable insofar as Plaintiff cites to the political affiliations of the Defendants in a manner which appears to attempt to bolster her conspiracy allegations.

[35] Section 1986 states in pertinent part: "Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in [§] 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case . . . ." *Dacey v. Dorsey*, 568 F.2d 275, 277 n.2 (2d Cir. 1978).

rights will be dismissed. . . . Diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ostrer v. Aronwald*, 567 F.2d 551, 553 (2d Cir. 1977) (citations omitted).

The Court has scoured the Amended Complaint for factual allegations which would support the inference that Defendants' conduct derived from race-based animus or was otherwise motivated by Plaintiff's race or national origin and has found none. The extent of allegations in the Amended Complaint which might reasonably support the inference that Defendants' conduct was motivated by Plaintiff's race or national origin are as follows. Plaintiff repeatedly alleges that Defendants intentionally discriminated against her on the basis of her race and national origin. (Complaint at ¶¶ 90, 109, 101, 111, 113, 125, 133, 147, 161, 175, 189, 203, 217, 232, 247, 262, 278–79, 281, 285–87, 292, 483, 507) These wholly conclusory allegations are simply not entitled to the presumption of truth and add nothing to the question of whether these causes of action are plausibly alleged. *Iqbal,* 556 U.S. at 664 (stating that on a motion to dismiss, allegations that are mere conclusions "are not entitled to the assumption of truth"). Plaintiff asserts that she is African American and originally from the U.S. Virgin Islands. (*Id*. at ¶¶ 5, 91) Plaintiff also asserts that Defendants Gutcheon, Englemann, Garibay, Trinks, Schumsky, Bress, Grossman, and MCallister are Caucasian. (*Id*. at ¶¶ 6–10, 15–16, 48) Plaintiff alleges that "Defendants Bress, Gutcheon, Garibay, Trinks, Jamaal, Smith, MCallister, Englemann and Grossman began a concerted effort to oust [her] from her position as Executive Director of the WHA, because of her race and national origin." (*Id*. at ¶¶ 25) Again, this allegation is not factual, but conclusory. Plaintiff alleges that two African American Commissioners were not informed of or invited to a meeting held a meeting to discuss Plaintiff's termination. (*Id*. at ¶¶ 76, 236, 251, 266) Plaintiff further alleges that Defendants "treat[ed] her significantly less favorably than a former Executive Director of the WHA, who was

White and American." (*Id*. at ¶ 95) Plaintiff provides no examples of such disparate treatment nor provides any specifics as to events which occurred during the former Executive Director's tenure so as to give rise to inference of discriminatory intent through disparate treatment. Plaintiff alleges that "Windsor has a history of discrimination against African Americans and other minorities." (*Id*. at ¶ 24) Plaintiff alleges that Defendant Gutcheon asserted at a meeting of the Board of Commissioners that "Windsor was a racist town, and they try to sweep it under the rug as if it doesn't exist." (*Id*. at ¶¶ 43, 97, 114, 123, 134, 148, 162, 176, 190, 204, 218, 233, 248, 263, 282, 484, 508) Plaintiff alleges that unnamed individual policymaking officials of the Town and unnamed Board members of the Board of Commissioners "stated . . . 'we want Windsor to be the way it used to be' before minorities came to town, . . . [and] that 'some people in town are upset by the fact that the Windsor School System is now 65% minority, not like it was in the 1960s and 70s.'" (*Id*. at ¶¶ 25, 97, 114, 123, 134, 148, 162, 176, 190, 204, 218, 233, 248, 263, 282, 484, 508) Moreover, Plaintiff alleges that Defendant Gutcheon called for all Commissioners to resign from the Board of Commissioners except himself, including three African American Commissioners. (*Id*. at ¶¶ 47, 110, 138–39, 152–53, 166, 180, 188, 194, 208, 210, 223, 239, 253, 272, 488–89, 514) Finally, Plaintiff alleges that, in a March of 2021 letter to the editor of the Windsor Journal Weekly, Resident Smith complained that Plaintiff fired the existing landscaper and instead hired "her own people." (*Id*. at ¶¶ 110, 139, 153, 188, 210, 239, 489). There are no allegations which reveal the race or national origin of the replacement landscapers so as to either bolster or exclude any inference of racial animus from this statement.

Plaintiff's allegations of racial animus are nothing more than conclusory, speculative assumptions apparently premised upon hearsay statements by unknown and unknowable actors. The entire Amended Complaint evinces—quite literally—a race-based conspiracy theory that is

unsupported, directly or by inference, with factual allegations. Plaintiff identifies no racially charged rhetoric directed at or about her. Indeed, the most offensive commentary attributed to one of the Defendants, Defendant Smith, that the Plaintiff was "incompetent," a "bitch," fucking evil" an "asshole" and a thief, is conspicuous for its lack of any racial animus.[36]

The length and breadth of the Amended Complaint notwithstanding, Plaintiff has only "made 'vague and conclusionary allegations' of discrimination based only on the difference in race between [herself] and some of the [D]efendants without any showing otherwise of an 'intentional and purposeful deprivation of constitutional rights.'" *Birnbaum v. Trussell*, 347 F.2d 86, 90 (2d Cir. 1965) (citing *Morgan v. Sylvester*, 125 F. Supp. 380, 386-387 (S.D.N.Y.1954), *aff'd per curiam*, 220 F.2d 758 (2d Cir.), *cert. denied*, 350 U.S. 867 (1955)). And Plaintiff's failure to allege any conduct indicating that any actions by Defendants were motivated by a racial or discriminatory animus is dispositive of her federal law claims pursuant to §§ 1981, 1983, 1985(3), and 1986. *See Burgis v. New York City Dep't of Sanitation*, 798 F.3d 63, 68 (2d Cir. 2015) (affirming dismissal of Equal Protection and §§ 1981 claims where plaintiff "fail[ed] to allege in other than conclusory fashion any specific instances of discrimination with respect to any individual plaintiff or others similarly situated"); *Powell*, 327 F.2d at 137 (affirming dismissal of §§ 1983 and 1985 claims where plaintiff, *inter alia*, failed to sufficiently allege invidious discrimination); *Dacey*, 568 F.2d at 277 ("Having failed to state a cause of action under § 1985, plaintiff has failed to state a claim under § 1986."). *See also, Zemsky v. City of New York*, 821 F.2d 148, 150–51 (2d Cir. 1987) (affirming dismissal of claims pursuant to §§ 1981, 1985, and 1986 for failure to sufficiently allege deprivation of rights as a result of racial or class-based animus); *Williams v. Calderoni*, No. 11 CIV. 3020 CM, 2012 WL 691832, at *7 (S.D.N.Y. Mar. 1, 2012), *aff'd sub nom.*, *Williams v.*

---

[36] To be sure, the statements attributed to Defendant Smith are cruel and offensive.

*Schwartz*, 529 F. App'x 89 (2d Cir. 2013) (dismissing § 1981 claim because "[t]he naked assertion by plaintiff that 'race was a motivating factor' without a fact-specific allegation of a causal link between defendant's conduct and the plaintiff's race is too conclusory to survive a motion to dismiss"); *Traylor v. Hammond*, 94 F. Supp. 3d 203, 215 (D. Conn. 2015) (dismissing § 1983 claim because "[t]he naked assertion by [a] plaintiff that 'race was a motivating factor' without a fact-specific allegation of a causal link between defendant's conduct and the plaintiff's race is too conclusory to survive a motion to dismiss."); *Carpenters*, 463 U.S. at 834 (affirming dismissal of § 1985(3) claim where plaintiff failed to allege "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action"). Accordingly, Counts One through Fourteen, Thirty-Five and Thirty-Six are dismissed. [37]

---

[37] In Counts 35 and 36 of the Amended Complaint, Plaintiff identifies the § 1983 claims as substantive due process violations which interfered with her right to her employment and retaliation against her for filing the present lawsuit. (*See* Counts 35–36, ECF No. 36 at 92–100). Notwithstanding the distinct nature of the alleged constitutional violations identified in Counts 35 and 36, a review of the allegations in support of the substantive due process and retaliation claims reveal that they too are premised entirely on race and national origin animus. (*See* Complaint at 93, ¶ 486) ("By the conduct described herein, the [D]efendants intentionally deprived Naughton of the *rights enjoyed by white citizens* in the creation, performance, enforcement and enjoyment of the benefits and privileges of her contractual employment relationship with the WHA, by breaching their duty as to her substantive due process right (sic)."); (Complaint at 98, ¶ 513) ("By the conduct described herein, the [D]efendants intentionally deprived Naughton of the *rights enjoyed by white persons* in the creation, performance enforcement and enjoyment of the benefits and privileges of her contractual employment relationship with the WHA by retaliating against her for filing her suit against them."). And as discussed above, the Amended Complaint fails to provide adequate factual support for Plaintiff's conclusory allegations in this regard. As such, Counts 35 and 36 fail for the same reasons the remaining §1983 Counts fail. Moreover, Plaintiff has abandoned her substantive due process and retaliation claims. In moving to dismiss Plaintiff's substantive due process claim, Defendants first argued that Plaintiff's due process claim is subsumed in her more particularized allegations of violations of her equal protection rights. *See Velez v. Levy*, 401 F.3d 75, 94 (2d Cir. 2005) ("[W]here a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process.") (citing *Conn v. Gabbert*, 526 U.S. 286, 293 (1999)); *Hu v. City of New York*, 927 F.3d 81, 104 (2d Cir. 2019) ("It is now well established that, '[w]here another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process.'") (quoting *Southerland v. City of New York*, 680 F.3d 127, 142-43 (2d Cir. 2012)). Second, Defendants argued that "[t]he Second Circuit has instructed that the substantive due process component of the Due Process Clause does not provide a remedy to a public employee that would not be available to a private employee subject to identical conduct by his employer." *Claudio v. Town of Enfield*, No. 07CV146 (WWE), 2008 WL 2786433, at *6 (D. Conn. July 16, 2008) (citing *McClary v. O'Hare*, 786 F.2d 83, 89 (2d Cir. 1986)). "Thus, a public employee cannot challenge termination pursuant to the substantive due process clause." *Id.* (citing *Chaffer v. Bd. Of Educ.,* 75 Fed. Appx. 12, 13 (2d Cir. 2003)). With respect to Plaintiff's retaliation claim, Defendants further argued that Plaintiff's Amended Complaint failed for various reasons to state a plausible retaliation claim. Plaintiff did not address these arguments in her opposition to Defendants' motions to dismiss and, therefore, has abandoned her substantive due process and retaliation claims. *See, e.g., Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) (dismissing several claims as a

**b.  Leave to Amend**

Plaintiff did not seek leave to further amend her Amended Complaint and the Court does not *sua sponte* afford Plaintiff the opportunity. *Ritchie Cap. Mgmt., L.L.C. v. Gen. Elec. Cap. Corp.*, 821 F.3d 349, 351 (2d Cir. 2016) (per curiam) (holding that it was not abuse of discretion to deny plaintiffs opportunity to amend complaint where plaintiffs "did not ask the district court for leave to amend"). And although the Court is mindful that leave to amend "shall be freely given when justice so requires," Fed. R. Civ. P. 15(a)(2), a Court may deny leave to amend a complaint where "[plaintiff] has had multiple opportunities to amend [her] claims but did not submit the proposed amendment for review by the district court." *Rosendale v. Brusie*, 374 F. App'x 195, 198 (2d Cir. 2010) (citing *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795–96 (2d Cir. 1999) (per curiam) (factors warranting denial of leave to amend include repeatedly failures to cure deficiencies and futility)); *Rosendale v. Iuliano*, 67 Fed. Appx. 10, 14 (2d Cir. 2003) (unpublished) (concluding that the district court had not abused its discretion by denying leave to amend where [plaintiff] had not submitted a proposed amended complaint).

Here, not only did Plaintiff not seek leave to amend, she has not asserted that she is aware of facts that would cure the deficiencies identified herein. *Starks v. Metro. Transportation Auth.*, No. 1:20-CV-09569 (MKV), 2022 WL 814668, at *8 (S.D.N.Y. Mar. 17, 2022). Moreover, Plaintiff has already had an opportunity to further amend her Amended Complaint to address

---

result of the plaintiff's lack of response); *Thurmand v. Univ. of Connecticut*, No. 3:18-CV-1140 (JCH), 2019 WL 369279, at *3 (D. Conn. Jan. 30, 2019) (noting that "[c]ourts in [the Second] Circuit have presumed that plaintiffs have abandoned their claims when they do not oppose a motion to dismiss them," and finding claims abandoned); *Brandon v. City of New York*, 705 F. Supp. 2d 261, 268 (S.D.N.Y. 2010) ("In his brief, [plaintiff] did not raise any arguments opposing [d]efendants' motion regarding these two claims. Accordingly, the [c]ourt deems [plaintiff's] first and third claims abandoned."). To the extent Plaintiff's opposition might be liberally read to oppose dismissal of these claims generally, an objection without analysis adds nothing to the adjudicative process. *See, e.g., In re UBS AG Securities Litigation*, 2012 WL 4471265, at * 11 (S.D.N.Y. 2012) (recognizing that a party "concedes through silence" arguments by its opponent it fails to address); *First Capital Asset Management., Inc. v. Brickellbush, Inc.*, 218 F. Supp. 2d 369, 392-393 (S.D.N.Y. 2002) (considering an argument not addressed in opposition brief to be waived).

Defendants' arguments for dismissal. Plaintiff did not do so. Rather, Plaintiff moved for leave to amend to correct the deficiencies identified in her Amended Complaint solely with respect to the Media Defendants. *See* footnote 3; (ECF No 125) She made no attempt to substantively bolster or provide additional factual allegations in support of her federal law claims pursuant to §§ 1981, 1983, 1985(3), and 1986 against Defendants. "The numerous opportunities that [Plaintiff] has had to clarify or restate [her] claims and [her] failure to do so, in conjunction with [her] failure to submit a proposed amended pleading, provide a sufficient basis for . . . denying leave to amend." *Rosendale*, 67 Fed. Appx. at 14. Accordingly, the Court does not afford Plaintiff leave to amend. *Starks*, 2022 WL 814668, at *8 (citing *Turban v. Bar Giacosa Corp.*, No. 19-CV-1138 (JMF), 2019 WL 3495947, at *5 (S.D.N.Y. Aug. 1, 2019) (declining to *sua sponte* grant leave to amend where party did not request leave to amend and did not give "any indication that [they are] in possession of facts that would cure the problems identified in this opinion").

    **c.** **State law claims for breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference with contractual relations, defamation, invasion of privacy by false light, and intentional and negligent infliction of emotional distress**

The remaining claims for relief in Plaintiff's Amended Complaint are Connecticut state law claims over which this Court declines to exercise supplemental jurisdiction. *Reyes v. Erickson*, 238 F. Supp. 2d 632, 639 (S.D.N.Y. 2003) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966)). The Court does not therefore take up the issues raised as to the sufficiency of the allegations in support of these claims nor the legal bases upon which dismissal was sought. The remaining state law claims are dismissed without prejudice pursuant to 28 U.S.C. § 1367(c). *Id*.

**Conclusion**

For the foregoing reasons, Defendants' motions to dismiss are GRANTED. (ECF Nos. 56, 57, 58, 59) Counts One through Fourteen and Thirty-Five and Thirty-Six are dismissed with prejudice. Counts Fifteen through Thirty-four and Thirty-Seven through Thirty-Eight are dismissed without prejudice. The Clerk of the Court is directed to close the case.

**SO ORDERED** at Bridgeport, Connecticut, this 24th day of August 2022.

_/s/ Kari A. Dooley_

KARI A. DOOLEY

UNITED STATES DISTRICT JUDGE